No. 23-15973

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA, et al.

*Plaintiff-Appellant,*

v.

PST SERVICES LLC,

*Defendant-Appellee,*

*v.*

SOMNIA, INC., et al.

*Defendants.*

Appeal from the United States District Court for the Eastern District of California
Case No. 1:15-cv-00433-ADA-EPG, Honorable. Dale A. Drozd

**APPELLANT'S OPENING BRIEF**

GLENN E. CHAPPELL
ANDREA R. GOLD
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, District of Columbia 20006
(202) 973-0900
*gchappell@tzlegal.com*
*agold@tzlegal.com*

WILMER HARRIS
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
715 Fremont Ave., Suite A
South Pasadena, CA. 91030
(626) 441-4129
*wharris@sshhzlaw.com*

MICHAEL D. SEPLOW
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
9415 Culver Blvd., #115
Culver City, CA 90232
(310) 396-0731
*mseplow@sshhzlaw.com*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

JURISDICTIONAL STATEMENT ....................................................................5

STATUTORY AND REGULATORY AUTHORITIES .................................6

QUESTIONS PRESENTED.................................................................................6

STATEMENT OF THE CASE............................................................................7

    I.     Background on the Anesthesia Care Industry................................7

    II.    Legal and Regulatory Framework...................................................9

        A.    The Medicare Framework.....................................................9

        B.    Modifier Codes for Anesthesia Practice .........................11

    III.   The SAC's Allegations....................................................................19

    IV.   Procedural History and the District Court's Decision..............26

LEGAL STANDARD ..........................................................................................31

SUMMARY OF THE ARGUMENT ...............................................................32

ARGUMENT ........................................................................................................35

    I.     The SAC pleads ample facts establishing each element of an FCA violation, including falsity. .....................................................35

    II.    The SAC's theory of liability is fact-intensive—not purely legal— and the District Court's contrary ruling led to application of an incorrect analysis of the falsity element. .......................................40

    III.   The District Court's denial of reconsideration was erroneous because the controlling issues are factual questions and the time elapsed between the dismissal order and Ms. O'Neill's motion for reconsideration was reasonable under the circumstances. ........................47

CONCLUSION .....................................................................................................53

STATEMENT OF RELATED CASES ...........................................................54

CERTIFICATE OF COMPLIANCE...............................................................55

CERTIFICATE OF SERVICE..........................................................................56

ADDENDUM.......................................................................................................A1

# TABLE OF AUTHORITIES

**CASES**

*Agendia, Inc. v. Becerra*,
    4 F.4th 896 (9th Cir. 2021) ................................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................31

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
    254 F.3d 882 (9th Cir. 2001) .....................................................48, 49

*Clarian Health W., LLC v. Hargan*,
    878 F.3d 346 (D.C. Cir. 2017) ...................................................16, 46

*Cobell v. Jewell*,
    802 F.3d 12 (D.C. Cir. 2015) .............................................................49

*Cobell v. Norton*,
    224 F.R.D. 266 (D.D.C. 2004) ........................................................51

*Gish v. Newsom*,
    No. 20-CV-755, 2020 WL 6054912 (C.D. Cal. Oct. 9, 2020) ...................49

*Jadwin v. Cnty. of Kern*,
    No. 07-CV-0026, 2010 WL 1267264 (E.D. Cal. Mar. 31, 2010) .........49, 50

*Koerschner v. Budge*,
    No. 3:05CV00587ECRVPC, 2009 WL 2382568 (D. Nev. July 30, 2009) ...............49

*Phelps v. Alameida*,
    569 F.3d 1120 (9th Cir. 2009) .........................................................50

*Sateriale v. R.J. Reynolds Tobacco Co.*,
    697 F.3d 777 (9th Cir. 2012) ............................................................31

*Toole v. Baxter Healthcare Corp.*,
    235 F.3d 1307 (11th Cir. 2000) ........................................................49

*United States ex rel. Anita Silingo v. WellPoint, Inc.*,
    904 F.3d 667 (9th Cir. 2018) ............................................................42

*United States ex rel. Campie v. Gilead Scis.*,
    862 F.3d 890 (9th Cir. 2017) ............................................................35

*United States ex rel. Druding v. Druding*,
    952 F.3d 89 (3d Cir. 2020) ...............................................................41

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
    880 F.3d 89 (3d Cir. 2018) ...............................................................41

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
614 F.3d 1163 (10th Cir. 2010)..................................................................32

*United States ex rel. Polukoff v. St. Mark's Hosp.*,
895 F.3d 730 (10th Cir. 2018) ...................................................................41

*United States ex rel. Silingo v. WellPoint, Inc.*,
904 F.3d 667 (9th Cir. 2018) ............................................ 33, 40, 42, 43

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) .............................................................31, 32

*United States v. Intermountain Healthcare, Inc.*,
No. 2:20-CV-00372-TC-CMR, 2022 WL 271760 (D. Utah Jan. 28, 2022) ...8, 11, 12

*United States v. Kerr*,
855 F. App'x 883 (4th Cir. 2021) ...........................................................49

*United States v. Westlands Water Dist.*,
134 F. Supp. 2d 1111 (E.D. Cal. 2001) ................................................52

*Universal Health Services v. United States ex rel. Escobar*,
579 U.S. 176 (2016) ............................................................................ 41, 44

## STATUTES

42 U.S.C. § 1395 ..............................................................................9, 10, 19

Cal. Gov't Code § 12651 ................................................................................35

## OTHER AUTHORITIES

*Anesthesia*, Nat'l Inst. of Gen. Med. Scis., Nat'l Insts. of Health (last updated
Sept. 2023), https://perma.cc/3RF2-T9JP ..................................................8

*Claim Form Instructions*, Noridian Healthcare Solutions (last updated Apr. 23,
2024), https://perma.cc/HTM6-W2RY ....................................................11

CMS, *Internet-Only Manuals (IOMs)*, CMS.gov (last updated Sept. 6, 2023),
https://www.cms.gov/medicare/regulations-guidance/manuals/internet-
only-manuals-ioms ...................................................................................15

CMS, *List of CPT/HCPCS Codes*, cms.gov (last updated Apr. 18, 2024),
https://perma.cc/DZ78-GEAV ...................................................................11

CMS, Publication No. 100-04, *Medicare Claims Processing Manual*, Ch.12, § 14017, 18, 38,
43

CMS, Publication No. 100-04, *Medicare Claims Processing Manual*, Ch.12, § 40 ...............17

CMS, Publication No. 100-04, *Medicare Claims Processing Manual*, Ch.12, § 50
(Rev. 12511, Feb. 15, 2024).......................................................... 13, 17, 18, 39

CMS, *What's a MAC*, CMS.gov (last updated March 13, 2024),
https://perma.cc/4NNZ-DS44.....................................................................10

*Modifiers*, Noridian Healthcare Solutions (last updated Mar. 8, 2024),
https://perma.cc/Y93X-HNP7...................................................................12

*Nurse Anesthetist (CRNA)*, Cleveland Clinic (last updated Mar. 17, 2022),
https://perma.cc/D2NE-GU75.....................................................................8

Ruby L. Hoyem et al., *Advocacy, Research, and Anesthesia Practice Models: Key Studies of Safety and Cost-Effectiveness*, 20(4) Policy, Politics, & Nursing Practice 193 (2019)...........................................................................................................9

RULES

Fed. R. Civ. P. 9(b)...........................................................................................31

REGULATIONS

42 C.F.R. § 414.40 ...........................................................................................14

42 C.F.R. § 414.46 .......................................................................... 12, 13, 14, 44

42 C.F.R. § 414.60 ...........................................................................................45

42 C.F.R. § 415.110 .................................................................................. 13, 44

42 C.F.R. § 482.52 ...........................................................................................14

Medicare and Medicaid Programs; Hospital Conditions of Participation: Anesthesia Services, 66 FR 56,762-56,769 (Nov. 13, 2001) ......................................14

Medicare Program; Fee Schedule for Physicians' Services, 56 FR 59,502 (Nov. 25, 1991).........................................................................................................14

# INTRODUCTION

This is an appeal of the dismissal of False Claims Act[1] causes of action at the pleading stage. Defendant PST Services LLC ("PST") provides services, including medical billing, in the healthcare industry. Relator Nicole O'Neill alleges in her Second Amended Complaint ("SAC") that PST, along with other Defendants (who have settled out of the case), submitted false reimbursement requests for anesthesia services to Medicare that caused Medicare to overpay.

The SAC's theory of liability as to PST is partly one of *factual* falsity. That is, the SAC's fraud-based causes of action against PST do not necessarily depend on establishing that PST violated laws or regulations incorporated into its agreement with the Government as conditions for payment. That type of claim would be a claim of purely *legal* falsity. To be clear, PST did violate the law (including Medicare regulations and other requirements) by submitting false bills, but an important component of the fraud was the claims' misleading description of the anesthesia services PST claimed were provided to patients. Put simply, PST's claims for payment communicated to the Government that patients were provided one, more expensive type of anesthesia care when in truth those patients received a different, less expensive type of care.

A fundamental error in the District Court's dismissal order, and its subsequent order denying Ms. O'Neill's motion to reconsider that order, was its determination that

---

[1] This includes claims under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the California False Claims Act, Cal. Gov't Code § 12650, *et seq.*

the SAC's falsity allegations turn solely on interpretations of Medicare regulations. That ruling was erroneous because, while an understanding of the complex web of statutes, regulations, and agency guidance is important in this case, the regulations are inconclusive as to the propriety or impropriety of certain key conduct alleged here.

Specifically, the SAC alleges that Defendants, including PST, effectuated their fraudulent representations through use of the wrong medical billing modifier, a code included in Medicare claim forms that informs the Government of the nature of the anesthesia-care model under which a patient receives care and the level of involvement an anesthesiologist had in that care. But no statute or regulation prescribes which specific modifier codes are to be used in a given case. Instead, Medicare entrusts the administering agency and its private-industry partners to work out the proper use of modifier codes in the field.

Thus, the Centers for Medicare & Medicaid Services ("CMS"), the agency responsible for administration of the Medicare program, has not promulgated binding regulations governing use of modifier codes. Instead, CMS has published only general instructions in a guidance document that does not have force of law. Read in context, CMS's guidance demonstrates why PST's use of the modifier codes it selected was deceptive, but that document is not a regulation that controls the falsity inquiry in this case as a matter of law.

Accordingly, whether Defendants' use of that code was fraudulent is in significant part a question of fact. The key question is, under all the evidence before it

and in light of industry practice and guidance from the contractor responsible for processing Medicare claims in the at-issue region of the country, what would the Government have understood when reviewing a Medicare reimbursement claim submitted by Defendants, and had it correctly understood which anesthesia services the patient received, would it have paid the price it paid for those services? Considering all the context and all the allegations set forth in the SAC, the answer is no. At very least, the SAC makes it plausible that the answer is no, and nothing more is required to survive a motion to dismiss.

Nevertheless, the District Court treated a Medicare guidance document as a regulation that controlled the question, and because it (mistakenly) agreed with PST's interpretation of the document, it ruled that Ms. O'Neill's claims failed as to falsity as a matter of law. This error permeated the District Court's rulings on the SAC's claims against PST.

Ms. O'Neill maintained that whether the modifier code used by PST was fraudulent is a question of fact not suitable for resolution at the pleading stage, and she was proven right. After the claims against PST were dismissed, the case moved forward into discovery. That discovery led to additional evidence further confirming that the use of inaccurate and improper modifier codes was deceptive, and that this practice led to overpayment.

But on reconsideration, the District Court repeated the same error, refusing to consider this evidence on the ground that the question presented was purely one of law.

The District Court's conclusion thus slammed the door on crucial facts and required Ms. O'Neill to prove too much at the pleading stage.

The District Court also erred when it refused to reconsider its dismissal order on the ground that Ms. O'Neill filed her motion for reconsideration too late. This conclusion reflects both a misunderstanding of the governing law and a mistaken view of the history of this case. First, because the litigation was still ongoing, Ms. O'Neill sought reconsideration under Federal Rule of Civil Procedure 54(b), which permits a district court to modify an interlocutory order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."

Even though a judgment adjudicating all the claims and all the parties' rights and liabilities had not been entered when Ms. O'Neill filed her motion, the District Court applied the far more stringent timeliness standards articulated in Rules 59 and 60, which do not govern interlocutory orders. Instead, those rules govern reconsideration of *final* judgments and orders. When final judgment has been entered, finality concerns compel application of stricter timeliness requirements. But those concerns are not present when the litigation is still ongoing. Indeed, the evidence adduced by Ms. O'Neill in discovery shows why a far more flexible standard is needed.

Second, in any event, Ms. O'Neill's motion was timely. The District Court repeatedly stated that Ms. O'Neill "has not explained why she waited almost four years to challenge the court's ruling on the motion to dismiss," but that overlooks Ms. O'Neill's explanation in her motion for reconsideration that she could not have

reasonably been expected to (and could not) obtain this additional evidence prior to discovery. Discovery in this case did not close until the end of 2021—approximately 3.5 years after the District Court's order on PST's motion to dismiss. Thus, the assertion that Ms. O'Neill waited "nearly four years" is beside the point. Under the facts here, the time elapsed between the District Court's dismissal order and Ms. O'Neill's filing of her motion for reconsideration was reasonable—especially under Rule 54(b)'s flexible standard, which asks only whether granting reconsideration is in the interest of justice.

When the SAC's theory of falsity is properly analyzed as a question of fact in crucial respects, rather than one purely of law, its allegations are more than sufficient to make it plausible that PST deceived the Government into overpaying through use of an improper and incorrect modifier code. And at minimum, Ms. O'Neill should be allowed to file the Third Amended Complaint she submitted along with her motion for reconsideration, which compiles the important supporting evidence obtained in discovery. Accordingly, this Court should reverse the District Court's dismissal of the SAC's claims against PST, or, at minimum, vacate the dismissal with prejudice and instruct the District Court to grant leave to amend.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331. The District Court dismissed the claims against PST in its September 7, 2018 order. *See* ER-129-30. Then, on June 6, 2023, the Court entered an order dismissing the remaining claims against the

remaining Defendants pursuant to a stipulation of dismissal entered after the claims against those remaining Defendants were resolved via settlement. *See* Dist. Ct. ECF No. 235; Dist. Ct. ECF No. 232. The District Court denied Ms. O'Neill's motion for reconsideration of its September 7, 2018 order on March 4, 2024. ER-5.

Now that the District Court has denied the motion for reconsideration, no prior orders by the District Court are subject to any pending motions. Therefore, the District Court's orders dismissing Defendants are final, and this Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY AUTHORITIES

Relevant statutory and regulatory authorities appear in the addendum to this brief.

## QUESTIONS PRESENTED

**I.** Ms. O'Neill alleges that PST deceived the Government into overpaying for anesthesia services by billing under a modifier code that conveyed to the Government that one type of service was provided to patients when another, less expensive type of service was provided. She alleged numerous facts supporting her allegation that the Government would have been deceived by this use of the at-issue modifier code and would not have otherwise paid the rate it did. This evidence included (for example) the bylaws governing anesthesia care at the hospital where PST billed, guidance from CMS, guidance from the private entity the Government entrusts with claims processing in the region where the hospital was located, and admissions by PST's and the other

Defendants' own employees. Did the District Court err when it found that Ms. O'Neill failed to plausibly allege that use of the at-issue modifier code was fraudulent?

**II.** The SAC's theory of liability is that PST misrepresented the type of anesthesia services to patients provided, representing that one, more expensive service was provided when another, less expensive service was actually provided. Did the District Court err when it ruled that the case turned solely on interpretation of the language of a regulation?

**III.** Based on new evidence adduced in discovery, Ms. O'Neill sought reconsideration of a non-final order pursuant to Federal Rule of Civil Procedure 54(b), and she filed her motion after discovery closed and explained she could not have reasonably obtained the new evidence prior to discovery. Rule 54(b) allows modification of a non-final order "any time before the entry" of final judgment. Did the District Court err when it denied the motion for reconsideration based on timeliness standards found in different rules other than Rule 54(b) (Rules 59(e) and 60(B)) and because Ms. O'Neill did not file her motion for reconsideration until after discovery closed?

## STATEMENT OF THE CASE

### I. Background on the Anesthesia Care Industry

Anesthesia is "medical intervention that prevents patients from feeling pain during procedures like surgery, certain screening and diagnostic tests, tissue sample removal (e.g., skin biopsies), and dental work." *Anesthesia*, Nat'l Inst. of Gen. Med. Scis.,

Nat'l Insts. of Health (last updated Sept. 2023), https://perma.cc/3RF2-T9JP. There are different types of anesthesia: examples include general anesthesia, which affects the whole body and renders the patient unconscious, and monitored sedation, which sedates the patient but does not place them in a state of unconsciousness. *See id.* General anesthesia, which is often the type of service given to hospital patients who are undergoing surgery, "consists of three phases: induction (causing unconsciousness), maintenance (maintaining unconsciousness), and emergence (reversing unconsciousness)." *United States v. Intermountain Healthcare, Inc.*, No. 2:20-CV-00372-TC-CMR, 2022 WL 271760, at *1 (D. Utah Jan. 28, 2022). "General anesthesia can be dangerous—and at times unpredictable—so it is critical for the anesthesiologist to constantly monitor the patient during surgery." *Id.*

In the anesthesia care industry, there are generally two groups of care providers who deliver anesthesia services: anesthesiologists (also known as "Medical Doctors of Anesthesia," or "MDAs"), who are licensed physicians; and Certified Registered Nurse Anesthetists ("CRNAs"), registered nurses with special training, certifications, and expertise in anesthesia care. *Nurse Anesthetist (CRNA)*, Cleveland Clinic (last updated Mar. 17, 2022), https://perma.cc/D2NE-GU75.

The division of responsibility between anesthesiologists in any given healthcare facility depends on the practice model employed by the facility. In the United States, there are "three predominant models of anesthesia care": (1) the anesthesiologist-only model, in which a physician practices alone and personally performs each anesthesia

procedure; (2) a physician-oversight model, where one anesthesiologist oversees multiple, concurrent procedures with CRNAs performing the procedures[2]; and (3) the CRNA-independent model, where a CRNA practices autonomously without any supervision by an anesthesiologist. *See, e.g.*, Ruby L. Hoyem et al., *Advocacy, Research, and Anesthesia Practice Models: Key Studies of Safety and Cost-Effectiveness*, 20(4) Policy, Politics, & Nursing Practice 193, 195 (2019).

As we will show, the care model employed by a facility seeking payment from the Government under Medicare is crucial, because that model drives both how the provider must bill for the anesthesia services provided and the rate at which the Government reimburses those services.

## II.    Legal and Regulatory Framework

### A.    The Medicare Framework

This action centers on billing under the federal Medicare program. Title XVIII of the Social Security Act of 1935 establishes Medicare, a federally subsidized health insurance program for elderly and disabled individuals. 42 U.S.C. § 1395 (the "Medicare Act").

Coverage and payment for services rendered to Medicare beneficiaries is administered by the Secretary of the Department of Health and Human Services

---

[2] Many sources, including the cited article, refer to this model as the "Anesthesia Care Team" model, but to avoid jargon, we will refer to this model as the "physician-oversight" model instead.

("HHS") through CMS, which was formerly known as the Health Care Financing Administration ("HCFA"). CMS is responsible for developing the details of the Medicare program, through regulations and interpretive guidelines, and for overseeing the actions of the regional intermediaries. *See* 42 U.S.C. § 1395u.

Medicare has four parts: Parts A, B, C, and D—the relevant parts here are Parts A and B. Part A covers inpatient and institutional health costs, such as hospital expenses (e.g., room, board, nursing, residents' salaries, and other inpatient services). 42 U.S.C. §§ 1395c–1395i–2. Part B covers medical services provided directly to individuals on a fee-for-service basis such as physician services, medical supplies, and diagnostic/laboratory tests. 42 U.S.C. §§ 1395j–1395w.

Under Parts A and B, CMS contracts with private companies nationwide, known as Medicare Administrative Contractors ("MACs"), to process claims by healthcare providers and "serve as the primary operational contact between the Medicare FFS program and the health care providers enrolled in the program." CMS, *What's a MAC*, CMS.gov (last updated March 13, 2024), https://perma.cc/4NNZ-DS44. Thus, physicians participating under Medicare Parts A and B submit bills to MACs, which process claims on behalf of the Government. *Id.* The current MAC for California is Noridian HealthCare Solutions ("Noridian"). ER-80 ¶ 49. Noridian also served as the MAC for services provided from August 2013 to January 2014. *Id.*

### B. Modifier Codes for Anesthesia Practice

When a provider bills the Government for anesthesia services, they submit a claim form to the MAC for their area that, in relevant part, includes four key components: (1) the identity of the individuals involved in the procedure, (2) the anesthesia service provided, (3) the duration of the procedure, and (4) the nature of the care provider's (or providers') involvement in the procedure. *See, e.g.*, *Claim Form Instructions*, Noridian Healthcare Solutions (last updated Apr. 23, 2024), https://perma.cc/HTM6-W2RY. Each of these components impacts the amount Medicare will reimburse for the given services. "By submitting a claim to Medicare for payment, healthcare providers certify that they have complied with healthcare laws, Medicare regulations, and coverage rules." *Intermountain Healthcare, Inc.*, No. 2022 WL 271760, at *2.

The attending provider's (or providers') identity is supplied in the form of an identification number. *See Claim Form Instructions*, *supra*. The service provided is identified by a billing code ("CPT code"), which ranges from 00100 to 01999. *See id.*; CMS, *List of CPT/HCPCS Codes*, cms.gov (last updated Apr. 18, 2024), https://perma.cc/DZ78-GEAV. Each CPT code is associated with a "base unit," which is a measure of time: CMS "assigns a 'base unit' of 0 to 30 units to each CPT code based on the procedure's difficulty and risk." *Intermountain Healthcare, Inc.*, 2022 WL 271760, at *2. Base units reflect "all activities other than anesthesia time," including "usual preoperative and postoperative visits, the administration of fluids and blood

incident to anesthesia care, and monitoring services." 42 C.F.R. § 414.46(a)(1). Next, the "anesthesia time" is provided; this is "the time during which an anesthesia practitioner is present with the patient." § 414.46(a)(3). The total time is converted into fifteen-minute time "units" for purposes of reimbursement calculation, and the allowed base units are added to the anesthesia time. *Intermountain Healthcare, Inc.*, 2022 WL 271760, at *2. Lastly, a modifier code is used to inform the Government of the nature and level of the provider's (or providers') involvement in the procedure. *Modifiers*, Noridian Healthcare Solutions (last updated Mar. 8, 2024), https://perma.cc/Y93X-HNP7.

The aforementioned modifier codes are not specifically dictated by Medicare regulations, but they are consistent with the regulations' establishment of billing categories that correspond to the types and levels of anesthesia care-provider involvement and their provision of standards that must be followed in order to bill under each category. Those categories reflect an acknowledgement of two of the three predominant care models in use today: anesthesiologist-only model and the physician-oversight model.

One category is "personally perform[ed]" services (hereinafter, "Personally Performed"); to bill under this category, the physician must "perform[] the entire anesthesia service alone." 42 C.F.R. § 414.46(c)(1)(i). Thus, the Personally Performed category aligns with the physician-only model.

The regulations also contemplate two variations of the physician-oversight model: medical direction and medical supervision (hereinafter, "Medical Direction" and "Medical Supervision"). Anesthesia services are performed under Medical Direction for purposes of Medicare reimbursement when an anesthesiologist is directly involved in providing the anesthesia services, but with the assistance of a CRNA or other qualified personnel, and the physician meets certain conditions or performs certain tasks, such as monitoring the administration of anesthesia at certain intervals and remaining available to diagnose and treat emergencies. *See* 42 C.F.R. § 414.46(d)(i); *id.* § 415.110 (describing activities physician must perform under 42 C.F.R. § 414.46(d)(i) for "medically directed" services); *see also* CMS, Publication No. 100-04, *Medicare Claims Processing Manual*, Ch.12, § 50(C) (Rev. 12511, Feb. 15, 2024) (hereinafter, "Claims Manual") (explaining when Medical Direction occurs). To bill under the Medical Direction category, a physician may medically direct up to four concurrent procedures. 42 C.F.R. § 415.110(a)(2); *see also Claims Manual*, Ch.12, § 50(J) (defining "Concurrent Medically Directed Anesthesia Procedures" and providing examples of concurrent procedures). Providers must also document their involvement, including their presence during the most crucial parts of the anesthesia procedure, and the care provided to the patient in the patient's medical record. *See* 42 CFR § 415.110(b).

Medicare regulations provide that anesthesia services are performed under Medical Supervision when the anesthesiologist is involved with more than four concurrent cases and/or does not meet the seven requirements to qualify for Medical

Direction. 42 C.F.R. § 414.46(f). Thus, the regulations generally categorize a physician-oversight model involving one physician's supervision of a maximum of four concurrent cases as Medical Direction (subject to also meeting the other requirements listed above), and such a model involving more than four concurrent cases (or not meeting those other requirements) as Medical Supervision.

The regulations do not specifically address the fourth common care model: CRNA-independent care. That is not surprising because, although CMS has revised the regulations over the years, the Personally Performed, Medical Direction, and Medical Supervision categories in the regulations date back to at least the early 1990s and have not changed. *See* Medicare Program; Fee Schedule for Physicians' Services, 56 FR 59,502, 59,628 (Nov. 25, 1991) (setting forth the same categories in the then-operative version of 42 CFR § 415.46). Yet CMS did not allow reimbursement for CRNA-independent care until 2001. That year, CMS changed its policy by allowing states to opt out of the requirement that CRNAs be supervised by a physician in order to receive payment under Medicare. *See* 42 C.F.R. § 482.52(c)(1) (current version); Medicare and Medicaid Programs; Hospital Conditions of Participation: Anesthesia Services, 66 FR 56,762-56,769 (Nov. 13, 2001) (codified at 42 C.F.R. § 482.52(c)(1) (2003)).

As mentioned, Medicare regulations do not dictate which modifier codes are to be used to denote each of these categories. The regulations instead leave it to CMS to establish modifier codes in the field, rather than through formal rulemaking. *See* 42 C.F.R. § 414.40(b) (providing that "CMS establishes uniform national ancillary policies

necessary to implement the fee schedule for physician services," including "[p]ayment modifiers"). The modifiers thus appear in informal guidance published by CMS.

Specifically, the modifiers appear in the *Medicare Claims Processing Manual* ("Claims Manual"), a voluminous online-only manual (manuals like these are commonly called "IOMs" for short) published by CMS for Medicare payment contractors.[3] The Claims Manual contains guidance on numerous aspects of the Medicare-reimbursement process. CMS describes IOMs like the Claims Manual as "CMS' program issuances, day-to-day operating instructions, policies, and procedures that are based on statutes, regulations, guidelines, models, and directives." CMS, *Internet-Only Manuals (IOMs)*, CMS.gov (last updated Sept. 6, 2023), https://www.cms.gov/medicare/regulations-guidance/manuals/internet-only-manuals-ioms.

According to the agency, "[t]he CMS program components, providers, contractors, Medicare Advantage organizations and state survey agencies use the IOMs to administer CMS programs." *Id.* CMS did not promulgate the Claims Manual through notice-and-comment rulemaking; thus, it is guidance that does not have the force of law like a regulation. *See Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 349 (D.C. Cir.

---

[3] In the District Court, some of the other Defendants filed a prior version of the Claims Manual issued in 2017. *See* Dist. Ct. ECF No. 49-3. Because the language in the Claims Manual discussed in this brief appears in the same place as, and—except as noted in the next footnote—does not differ between, the current version available on cms.gov and the version filed by the Defendants, this brief simply refers to the "Claims Manual" without differentiating between the two versions.

2017) (holding instructions on another topic in the Claims Manual "embody a general statement of policy, not a legislative rule," and "do not establish binding norms").

Consistent with the three predominant anesthesia care models detailed above, the Claims Manual establishes modifiers to use when an anesthesiologist personally performs the procedure, for when an anesthesiologist oversees the work of CRNAs in concurrent procedures, and for when CRNAs work independently without supervision. Specifically, the modifiers are listed in the Claims Processing Manual as follows:

- **Anesthesiologist Modifier Codes**
  - AA - Anesthesia Services performed personally by the anesthesiologist
  - AD - Medical Supervision by a physician; more than 4 concurrent anesthesia procedures
  - G8 - Monitored anesthesia care (MAC) for deep complex, complicated, or markedly invasive surgical procedures
  - G9 - Monitored anesthesia care for patient who has a history of severe cardio-pulmonary condition
  - QK - Medical direction of two, three or four concurrent anesthesia procedures involving qualified individuals
  - QS - Monitored anesthesia care service
  - QY - Medical direction of one qualified nonphysician anesthetist by an anesthesiologist

- GC - These services have been performed by a resident under the direction of a teaching physician.

- **Non-physician Anesthetist (such as CRNA) Codes**

  - QX – Qualified nonphysician anesthetist service: With medical direction by a physician.

  - QZ – CRNA service: Without medical direction by a physician.

  - QS – Monitored anesthesia care services (to be used for informational purposes only)

Claims Manual, Ch. 12, §§ 40.9(I), 140.3.3.

Thus, unlike the older Medicare regulations, by including a modifier code specifically for CRNA service (QZ), the Claims Manual introduces a distinct category (hereinafter, "CRNA Service") that makes it possible to seek reimbursement when a CRNA works independently.

Billing for Personally Performed, Medical Direction, or CRNA Service often results in higher reimbursement payments by the Government than billing for Medical Supervision. This is because the fee schedule for anesthesia service is based on allowable units multiplied by an anesthesia conversion factor specific to that locality, *see* Claims Processing Manual, Ch. 12, § 50.A, and the number of units an anesthesiologist may claim for a given procedure is further capped when a claim is submitted under Medical Direction. Specifically, a Medical Direction claim would pay the provider 50% of the allowable units per case under the directing anesthesiologist's name, and 50% under the

name of the directed CRNA—thus allowing the providers to include all the allowable units in calculation of the reimbursement. *Id.* § 50.C. Personally Performed and CRNA Service claims also both allow the provider to include all the allowable units in calculation of the claims they submit.[4] *See id.* §§ 50.A, 50.B, 140.3.

By contrast, when a Medical Supervision claim is filed, the anesthesiologist may only seek reimbursement of three total units (plus one additional unit if the anesthesiologist was present for induction, the phase where the patient is placed into an unconscious state) while the CRNA may seek reimbursement of 50% of the allowable units. *See id.* § 50.D. In many cases, this results in a reimbursement significantly less than for a Medical Direction claim.

Put another way, Medicare authorizes providers to include all the allowable units in calculation of their reimbursement claim when services are Personally Performed by an anesthesiologist, all of the allowable units when the services are performed under the Medical Direction category, and all the allowable units under the CRNA Service category—but when care falls under the Medical Supervision category, the physician may be reimbursed for only 3 to 4 total units on any procedure. This makes Medical Supervision the only category that does not allow the anesthesiologist to include all the

---

[4] Ch. 12, Section 140.3 of the current version of the Claims Manual instructs a CRNA to bill for "the applicable locality-adjusted anesthesia conversion factor multiplied by the sum of allowable base and time units," while the previous version instructed them to bill 80% of that charge. *See* Dist. Ct. ECF No. 49-3 at ECF Page No. 174. In either case, the CRNA could account for all the allowable units for a given procedure and include those units in calculation of the reimbursement.

allowable units in calculation of the reimbursement and instead limits the anesthesiologist to include only 3 or 4 units (45 or 60 minutes) of time in that calculation.

As with nearly any type of agency guidance, the Claims Manual cannot provide CMS' position on every possible billing scenario and whether every potential use of a modifier code is appropriate. Accordingly, CMS relies on (and Congress authorizes) MACs to issue Local Coverage Determinations, decisions "specif[ying] whether or under what conditions that contractor will approve reimbursement for some set of items or services." *Agendia, Inc. v. Becerra*, 4 F.4th 896, 897 (9th Cir. 2021); *see also* 42 U.S.C. § 1395ff(f)(2)(B) (defining "local coverage determination" in relevant part as "a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis"). Local Coverage Determinations issued by MACs are controlling in the MAC's region and receive "substantial deference" from qualified independent contractors, administrative law judges, and the Medicare Appeals Council. *Agendia, Inc.*, 4 F.4th at 897-98.

## III.    The SAC's Allegations

The SAC alleges the following, which the Court must accept as true for purposes of evaluating the sufficiency of the SAC's allegations.

Ms. O'Neill is a licensed CRNA who serves as President, Director, and principal shareholder of Sarasate Nursing Anesthesia, P.C. ("Sarasate"), a company that

contracted with Defendants Primary Anesthesia Services ("PAS") and Somnia, Inc. ("Somnia"). ER-134 ¶ 8. PAS and Somnia are interrelated companies that manage anesthesia services for hospitals and other medical facilities in multiple states, with over 300 anesthesiologists and CRNAs on its staff. ER-134 ¶¶ 9-11; ER-136 ¶ 16. One of the facilities they service is Kaweah Delta Medical Center (hereinafter "Kaweah") in Visalia, California, where Ms. O'Neill first learned of the facts giving rise to her action. *Id.* Kaweah receives Medicare funds for the care of a substantial portion of its patients, ER-137 ¶ 17, and it is a Level III Trauma Center that collects Medicare Part A reimbursement, ER-144 ¶ 47.

In March 2012, Ms. O'Neill (through Sarasate) contracted with PAS/Somnia to provide anesthesia services to patients of Kaweah as Chief CRNA. ER-137 ¶ 18. As part of this arrangement, she was required to enter an employment relationship with PAS/Somnia, with PAS/Somnia characterizing the arrangement as an "independent contractor" relationship, although the degree of control and direction PAS/Somnia exercised over Ms. O'Neill was such that the relationship was in fact an employment relationship. *Id.* As will be explained in greater detail below, PST came into the picture later, in March 2014, when it took over billing at Kaweah. ER-157 ¶ 95.

From about December 2011 through about October 2015, during which time they performed anesthesiology services at Kaweah, Defendants (including PST after it took over billing) knowingly used incorrect modifier codes when submitting claims for reimbursement to Medicare. ER-145 ¶ 51. First, they knowingly billed the Government

using the Medical Direction category for anesthesia services (and thus obtaining the more lucrative payment scheme discussed above for Medical Direction) when Medical Direction failed and they therefore should have billed under the Medical Supervision category. *See, e.g.*, ER-146-47 ¶ 59; ER-150-53 ¶ 74. Indeed, the electronic medical record ("EMR") system implemented and used at Kaweah for patient medical charts required, in order for the chart to be closed for billing to the Government, that an anesthesiologist be listed as Medically Directing the anesthesia services, regardless of the actual type of anesthesia services being provided to the patient. ER-145-46 ¶¶ 52-57.

Billing under Medical Direction was deceptive because, in numerous instances, Defendants failed to meet the requirements for Medical Direction (supervising a maximum of four concurrent procedures and meeting the other requirements). *See, e.g.*, ER-150-53 ¶ 74 (providing multiple specific examples). Additionally, Defendants submitted claims for Personally Performed service when they knew the anesthesiologist was not present throughout the case, as required. ER-146-47 ¶ 59; ER-150-53 ¶ 74.

Further, and most relevant to this appeal, Defendants also submitted claims using the QZ modifier, which denoted CRNA Service, in cases where CRNAs were not working independently but were instead being supervised by an anesthesiologist where Medical Direction failed and the anesthesiologist was overseeing more than four concurrent cases. ER-144-45 ¶¶ 49-50; ER-147 ¶ 62. This, too, overbilled the Government because it allowed Defendants to include all the allowable units in

calculation of the reimbursement even though the supervising anesthesiologist would have been allowed to include a maximum of either three or four time units if the correct modifier (Medical Supervision) were used. ER-143 ¶ 43; ER-147 ¶ 62. To cover the deceit, Defendants would just remove the modifier code for the supervising anesthesiologist from the bill, thus communicating to the Government that the only person involved in the patient's care was a CRNA. ER-144-45 ¶ 49. This did not only result in overpayment; it also obscured the anesthesiologist's level of involvement in the procedure. ER-145 ¶ 50; ER-148 ¶ 66.

The SAC explains that these incorrect usages of modifier codes were material to the Government's payment decision because they constituted direct, express representations concerning the type of anesthesia services Defendants provided. ER-144-45 ¶¶ 49-50; ER-148 ¶¶ 66-68. Because different types of services reimburse at different rates, "the rates requested pursuant to the false certifications submitted by Defendants were higher than the rates the government would have paid if Defendants had disclosed accurately the services for which reimbursement was sought." ER-148 ¶ 67. These false representations thus "went to the very essence of the bargain between Defendants and the Medicare system," and Medicare would not have paid inflated rates to Defendants had it known the truth. ER-148 ¶ 68.

The SAC sets forth indicia showing that use of these modifier codes in such circumstances, thereby denoting CRNA Service, was fraudulent. Relevant here, the SAC explained that even though California is an "opt out" state that allows a CRNA-

independent model of anesthesia care, Kaweah is a Level III trauma center eligible to obtain reimbursement under Medicare Part A, and its own bylaws rejected the CRNA-independent model and forbade use of the QZ modifier. ER-144 ¶¶ 47-48. Consistent with those bylaws, Kaweah's contract with PAS/Somnia prohibited an anesthesiologist-to-CRNA ratio higher than 4:1 under any circumstances. ER-144 ¶ 48. Moreover, because "Medicare requires careful documentation of anesthesia service including documenting all providers involved in the service," it would be deceptive to omit the anesthesiologist from the bill and instead use the QZ modifier to list only the CRNA involved in the care. ER-145 ¶ 50.

The SAC also provides specific examples of false claims for anesthesia services, documenting individual cases and specific dates where physicians engaged in Medical Supervision of numerous concurrent procedures (far more than four) but then billed the services as either Personally Performed or Medically Directed, or dropped their names from the bills entirely so the CRNA could bill under the CRNA-service category. *See* ER-150-53 ¶¶ 74, 77.

As to PST, the SAC alleges that when PST took over the billing processes at Kaweah in March 2014, it continued the other Defendants' practice of fraudulently using modifier codes denoting the Personally Performed, Medical Direction, and CRNA Service categories when the correct category was Medical Supervision. ER-157-63 ¶¶ 95-118. This was particularly striking because Somnia attempted to change the way Kaweah's EMR system functioned so that the Medically Directed category was no

longer required to be used even when that category was incorrect. ER-157-58 ¶ 96. Specifically, the system was changed to allow another descriptor to be selected in place of the Medically Directed category, and "pop-up" compliance reminders were added such that during the charting of anesthesia services for all patients, the system asked "Are you sure?" when a user added to the chart an anesthesiologist who was already recorded as being concurrently present in four or more rooms. ER-157-58 ¶ 96; ER-159 ¶ 104. But these changes did not lead to accurate use of modifier codes; the system was still programmed to make it impossible for a CRNA to close out a patient's medical chart unless an anesthesiologist was documented in the system as Medically Directing the services, and users would just click "ignore" to make the pop-up warnings go away. ER-157 ¶ 95; ER-159-60 ¶¶ 105-07.

The SAC also alleges ample facts showing Defendants' knowledge and approval of both these practices and their noncompliance with the various requirements. As just one example, posing as an anesthesiologist at an Alabama hospital, Ms. O'Neill spoke with a representative of PST's predecessor company (McKesson) to learn more about PST's and its predecessor's Medicare billing practices. ER-166 ¶ 133. The McKesson representative explained that, by refusing to bill under the Medical Supervision category, the company could obtain substantially higher reimbursement for procedures, giving the example of a case where it could obtain $200 if it used a modifier for Medical Supervision but $800 if it used a different modifier. ER-166-67 ¶ 134. He also "gave the example of spinal fusions which allowed 20 units dropping to only 3 units for

medical supervision." *Id.* (emphasis omitted). Thus, the company "would not list a modifier for the anesthesiologist, which would properly have been AD/QX for medical supervision." *Id.* (emphasis omitted). Rather they would use the CRNA modifier "QZ" which indicates there was no MDA directing or supervising, and reimburses at 100%." *Id.*

When asked how the company could do this in hospitals having bylaws that prohibited CRNA-independent care, he responded, "Bylaws don't mean anything to billers. Too much money is lost to bill it as medical supervision." *Id.* (emphasis omitted). He then admitted, "[W]e bill everything at 100%," even while stating "[w]e think the OIG is tapped up to start investigating it." *Id.* This led Ms. O'Neill to reasonably believe that the company "has a nationwide practice of defaulting to the QZ modifier (resulting in a higher reimbursement rate to both McKesson and its clients) when the conditions for medical direction were not met." ER-167-68 ¶ 135 (emphasis omitted).

The SAC also documents the retaliation Ms. O'Neill faced for raising these concerns herself. *See* ER-163-66 ¶¶ 119-32. For example, she repeatedly pressed her concerns with numerous employees of Defendants that Kaweah was inadequately staffed to either maintain the 4:1 physician-to-CRNA ratio mandated by the bylaws (and for which Defendants consistently billed Medicare) or provide safe and adequate care to patients. *See* ER-164-65 ¶¶ 122-26. Defendants did not just ignore Ms. O'Neill's concerns—PAS/Somnia terminated her in retaliation for raising them in June 2014.

ER-165 ¶ 127. Tellingly, PAS/Somnia listed her termination as "without cause" and never provided a justification for letting her go. *Id.*

## IV. Procedural History and the District Court's Decision

Ms. O'Neill filed her action under seal on March 19, 2015, alleging violations of the federal False Claims Act ("FCA"), the California False Claims Act ("CFCA"), retaliation, violation of California's Health and Labor Code, whistleblower retaliation, wrongful termination, and intentional and negligent infliction of emotional distress. Dist. Ct. ECF No. 1. The federal and California governments notified the District Court of their decision not to intervene in November 2016. Dist. Ct. ECF Nos. 16, 17. Thereafter, the original complaint was unsealed, and Ms. O'Neill filed a first amended complaint. Dist. Ct. ECF No. 41. Defendants then moved to dismiss, and the parties briefed the issues. Dist. Ct. ECF Nos. 45, 46, 47, 55, 56, 57.

The District Court denied PST's motion to dismiss outright. Dist. Ct. ECF No. 70 at 23. It also denied the other Defendants' motion as to most of the claims against them. *Id.* at 23-24. The District Court granted the other Defendants' motion to dismiss certain claims in the then-operative complaint "only to the extent those causes of action are based upon Defendants' alleged use of the QZ code." *Id.* at 23. This ruling was based on the other Defendants' argument contesting the materiality of the QZ modifier claims, wherein those Defendants argued that Relator had not shown that use of the QZ modifier was material to the Government's reimbursement decisions. *Id.* at 15. PST

had not made this argument. The District Court granted leave to amend and accordingly gave Ms. O'Neill 28 days to file an amended complaint. *Id.* at 23-24.

Ms. O'Neill then filed the SAC on February 28, 2018. ER-131. In relevant part, the SAC addressed the District Court's prior ruling by including additional allegations concerning the materiality of Defendants' use of the QZ modifier. ER-147-49 ¶¶ 64-70. PST and some of the other Defendants again moved to dismiss. Dist. Ct. ECF Nos. 77, 78. For its part, PST moved to dismiss any FCA claims against it involving submission of claims prior to March 3, 2014 and any claims to the extent they concerned Defendants' alleged misuse of the QZ modifier. Dist. Ct. ECF No. 77-1. PST argued that the QZ modifier-based claims should be dismissed because use of the QZ modifier in place of the Medical Supervision modifier was not fraudulent. *Id.* at 5-10. In PST's view, QZ does not communicate to Medicare that the CRNA acted "alone and without any supervision," primarily because the Claims Manual describes "QZ" as "CRNA service: Without medical direction by a physician." *Id.* at 8.

In response, Ms. O'Neill argued that this argument fails for several reasons, explaining that PST's position did not make sense in context, and because the QZ modifier only reflects a CRNA's work and does not reflect any physician involvement, much less physician supervision. Dist. Ct. ECF No. 81 at 12-17. Ms. O'Neill further argued that given various interpretations of the Claims Manual and its terms, she should at minimum "be permitted to test and present evidence on the meaning of a particular billing code alleged to have been used fraudulently." *Id.* at 17-18.

On September 7, 2018, the District Court granted PST's motion, dismissing the FCA and CFCA claims based upon use of the QZ modifier and all causes of action against PST with respect to any claims submitted prior to March 3, 2014. ER-129-30. In reaching its ruling, the District Court adopted PST's interpretation of the Claims Manual. ER-125-26. The District Court opined that the Claims Manual states only that the QZ code is to be used where CRNAs provide anesthesia services "'without medical direction by a physician'"; thus, it "does not suggest that CRNAs must operate independently in order to use the QZ code—it merely states that the QZ code may not be used if all of the requirements for medical direction have been satisfied." *Id.* (quoting Claims Manual). The District Court further observed that "use of the QZ code does not appear to be prohibited by any rule or regulation." ER-126. Lastly, the District Court rejected Ms. O'Neill's contention that the meaning of the QZ modifier is a factual dispute that cannot be resolved at the pleadings stage, ruling that "requirements of the Manual are legal rather than factual questions, and do not depend on information produced during discovery." ER-125 n.4.

The September 7, 2018 order resulted in the dismissal of all claims pled against PST. *See* Dist. Ct. ECF No. 101 at 4. In an effort to avoid waiting until litigation concluded to appeal the District Court's ruling regarding the claims against PST, Ms. O'Neill then filed a motion under Federal Rule of Civil Procedure 54(b) for entry of final judgment on the District Court's September 7, 2018 order with respect to its dismissal of the claims against PST. *See generally id.* The District Court denied the motion,

Dist. Ct. ECF No. 117; thus, the case proceeded against the other Defendants, with discovery commencing thereafter. Discovery closed on December 1, 2021. Dist. Ct. ECF No. 192.

In May 2022, Ms. O'Neill moved under Rule 54(b) for reconsideration of the dismissal as to PST, on the basis that subsequent discovery revealed further factual evidence supporting the conclusion that PST's use of the QZ modifier was deceptive. ER-18. In the motion, Ms. O'Neill explained that discovery revealed multiple facts supporting her allegation that Defendants' (including PST's) use of the QZ modifier was fraudulent—facts Ms. O'Neill could not have reasonably obtained prior to discovery. *See, e.g.*, ER-23-24 (summarizing newly discovery evidence).

For example, Ms. O'Neill's expert witness obtained explicit guidance from Noridian (the MAC for California) that when Medical Direction is attempted but does not meet Medicare's requirements for billing under the Medical Direction category, Medical Supervision should be reported, not CRNA Service. ER-30-31. Additionally, PST's own compliance director acknowledged in a published article that failed Medical Direction should not be billed with the QZ modifier, and it should instead be categorized as Medical Supervision using the AD modifier code. ER-31. And Ms. O'Neill's expert confirmed based on her extensive expertise that use of the QZ modifier where Medical Supervision occurred was improper. *See* ER-33-34.

Ms. O'Neill attached a proposed Third Amended Complaint to her motion that gathered all this newly discovered evidence and requested that the District Court allow her to file it. ER-38, 68.

Nearly two years later, on March 4, 2024, the District Court denied the motion for reconsideration. ER-5. While acknowledging that Rule 54(b) allows orders to be "revised at any time before the entry of a judgment" and that district courts have inherent power to modify interlocutory orders, the District Court stated that courts "generally interpret the standards for Rule 54 to be coextensive" with the standards for altering or amending judgments or granting reconsideration of final orders, which are enumerated in Rules 59(e) and 60(b). ER-3-4. It thus quoted the timeliness standards in Rules 59 and 60, which the District Court said require "motions for reconsideration [to] be made within a reasonable time, and generally within one year." ER-4. The District Court then stated that Ms. O'Neill "has not explained why she waited almost four years to challenge the court's ruling on the motion to dismiss, a legal determination based on interpreting different provisions." *Id.* It further stated, "discovery was not necessary to the legal interpretation that the court made in issuing the ruling, which it based on the legal issue of the meaning of governing regulations and provisions relating to the QZ and other codes." *Id.*

During the pendency of the motion for reconsideration, litigation against all the other Defendants concluded. In June 2023, pursuant to the parties' joint request, the District Court entered a stipulated dismissal of Relator's claims against the other

Defendants, agreed pursuant to a settlement agreement, which extinguished Ms. O'Neill's individual claims for relief against those Defendants. Dist. Ct. ECF No. 235. That left only the motion for reconsideration as to PST's claims pending. Thus, the District Court's denial of the motion for reconsideration marked the end of proceedings in the District Court.

## LEGAL STANDARD

This Court "review[s] de novo a district court's order granting a Rule 12(b)(6) motion to dismiss," "[c]onstruing the complaint in the light most favorable to the plaintiffs, and drawing all reasonable inferences from the complaint in the plaintiffs' favor." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 784, 787 (9th Cir. 2012) (citation omitted). To satisfy Federal Rule of Civil Procedure 8, a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). However, the defendants' state of mind may be "alleged generally." *Id.* Under this Court's cases, "Rule 9(b) serves two principal purposes": (1) providing defendants with "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong"; and (2) protecting defendants from "false or unsubstantiated charges" "[b]y requiring some factual basis for the claims" of fraud. *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016)

(quotation marks omitted). If a "complaint adequately pleads the circumstances of fraud to satisfy the dual purposes of Rule 9(b)," it is sufficient—regardless of the "particular means" the complaint employs *Id.* at 1183 n.11. Thus, Rule 9(b) "does not require absolute particularity or a recital of the evidence," and "a complaint need not allege a precise time frame, describe in detail a single specific transaction or identify the precise method used to carry out the fraud." *Id.* at 1180 (quotation marks omitted).

Finally, under these pleading rules, it is not necessary for a plaintiff "to provide a factual basis for every allegation," nor for each allegation "taken in isolation," to provide "all the necessary information." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1173 (10th Cir. 2010). Rather, "plaintiffs need only show that, taken as a whole, a complaint entitles them to relief." *Id.*

## SUMMARY OF THE ARGUMENT

**I.** The SAC established viable claims that PST violated the FCA. The District Court's dismissal was based solely on the falsity element, but the SAC pled ample facts making it plausible that PST's use of the QZ modifier code was fraudulent in cases where Medical Supervision occurred. The QZ modifier misstated the value of the services rendered, which resulted in overpayments to PST.

The SAC pled multiple indicia supporting Ms. O'Neill's position on use of the QZ modifier, and the additional facts she adduced in discovery and supplied in her motion for reconsideration further confirmed her position. Among other things, Kaweah's own bylaws, MAC guidance, the Claims Manual, the structure of the

Medicare regulations (including its requirement that all providers involved in a patient's anesthesia care be documented), and admissions by Defendants' (including PST's) own employees all demonstrate why the Government would have been deceived into overpaying by PST's use of the QZ modifier under the facts presented here.

**II.** Whether PST's use of the QZ modifier was deceptive is a question of fact in key respects, not a purely legal question. The SAC's theory of liability is that PST falsely described the services it provided to patients. *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 675 (9th Cir. 2018) (internal quotation marks omitted). The Medicare regulations do not specifically prescribe when a particular modifier must be used, and the Claims Manual is not a regulation that has force of law. Thus, while the Claims Manual supports Ms. O'Neill's position, it would not be dispositive even if it supported PST's position. Rather, falsity here turns on what the Government would have understood under the facts when PST billed using the QZ modifier.

Accordingly, the District Court's conclusion that falsity in this case turned purely on "interpretation" of the "language of [a] regulation" was incorrect. It was thus not a proper basis for dismissal of the SAC on the pleadings, and Ms. O'Neill should be afforded the opportunity to present this authority and evidence, in the context of other evidence adduced in discovery, to a finder of fact on either summary judgment or at trial.

**III.** The two bases the District Court relied on in denying Ms. O'Neill's motion for reconsideration were not proper reasons for rejecting her request to reinstate her

claims against PST. The District Court ruled that the question presented was a purely legal question that could not be influenced by fact evidence, but the SAC's theory of falsity does not necessarily rely on showing that PST violated an express statute or regulatory requirement.

The District Court also ruled that ruled that Ms. O'Neill's delay in bringing her motion for reconsideration was improper, but the standard the District Court used when making this finding was not applicable to Ms. O'Neill's motion, which sought alteration of a non-final judgment pursuant to Federal Rule of Civil Procedure 54(b), not disturbance of a final order or judgment pursuant to Rules 59(e) or 60(b). The finality concerns animating stricter timeliness requirements under Rules 59 and 60 are not present when litigation is still ongoing, and the evidence Ms. O'Neill obtained in discovery shows why a more flexible standard is needed when assessing the timeliness of Rule 54(b) motions. Indeed, Rule 54(b) expressly authorizes modification of a non-final order "any time before the entry" of final judgment.

Thus, the correct standard to apply is simply to ask whether the interests of justice require modification of the order. Moreover, the District Court ignored that Ms. O'Neill could not have presented the new evidence until she had the opportunity to engage in discovery and obtain her expert's opinion.

## ARGUMENT

I.   **The SAC pleads ample facts establishing each element of an FCA violation, including falsity.**

"[T]he essential elements of False Claims Act liability are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 902 (9th Cir. 2017). The CFCA contains the same elements. *See* Cal. Gov't Code § 12651(a)(1). Here, the SAC pled each of those elements in detail. ER-145-47 ¶¶ 51-63 (falsity); ER-147-49 ¶¶ 64-70 (materiality); ER-159-63 ¶¶ 103-118 (knowledge).

Because the District Court's ruling was based only on the falsity element, we will focus on that element here. As to falsity, the SAC set out facts making it plausible that use of the QZ modifier deceived the Government into paying funds to PST it otherwise would not have paid. And even if that were not enough, subsequent factual development (which, as is explained in Sections II and III below, the District Court should have allowed) further confirmed the validity of the SAC's theory of falsity.

First, the SAC alleges that when PST billed with the QZ modifier, it represented that the services were performed by a CRNA working alone, without any supervision. ER-148 ¶ 66. The use of the QZ modifier was directly tied to a higher reimbursement rate than is available for procedures billed with codes for Medical Supervision

(AD/QX). This representation thus misstated the value of the services rendered, which resulted in overpayments to PST. ER-148 ¶¶ 67-68.

The SAC illustrates with instructive fact allegations why PST's use of the QZ modifier was fraudulent. First, the District bylaws prohibited CRNA-independent practice and mandated a 4:1 ration of supervised CRNAs to anesthesiologists—and they thus also prohibited use of the modifier denoting CRNA Service (QZ). ER-144-45 ¶¶ 48-49. These bylaws are not legal requirements, but they confirm a CRNA-independent model of care was forbidden at Kaweah and thus there was no situation in which Defendants should have billed under the QZ modifier. Second, because "Medicare requires careful documentation of anesthesia service including documenting all providers involved in the service," it would be deceptive to omit the anesthesiologist from the bill and instead list only the CRNA with a QZ modifier. ER-145 ¶ 50.

In her motion for reconsideration, Ms. O'Neill provided further supporting evidence adduced in discovery to buttress her allegation that PST's use of the QZ modifier was fraudulent. Drs. Gee, Mendenhall, and Dorin all testified that CRNAs could not practice independently at Kaweah Hospital. ER-79-80 ¶ 46 (quoting testimony of Drs. Gee and Mendenhall); ER-65 (lines 41:16-24) (Dr. Dorin testifying that "somebody made the decision that [CRNAs] were not going to be independent"); ER-46-47, 50-52 (lines 22:16-23:3, 28:24-30:2) (Dr. Gee testifying that, during the relevant period, Somnia used a "mixed model" where an "MD can do their own cases" and "extra MDs would be supervising CRNAs doing the cases," but that in 2019 or

2020 "they gave their CRNAs totally independent practice" and physicians "no longer supervis[ed]"); ER-60-61 (lines 17:15-18:9) (Dr. Mendenhall testifying that, prior to the change in bylaws, physicians were "assigned three or four – maximum of four – rooms to oversee and supervise the assigned CRNAs to those rooms").

Further, Noridian—the MAC for California currently and in 2013-14—specifically instructs that Medical Supervision "occurs when the anesthesiologist is involved in more than four concurrent cases and when not all seven services under medical direction are performed." ER-80 ¶ 49. And a Noridian representative confirmed that "when medical direction is attempted but does not meet" the regulatory requirements for billing under Medical Direction, "medical supervision should be reported." ER-80 ¶ 50. In other words, CRNA Service should *not* be reported.

Thus, in the situations described in the SAC in which physicians purported to "direct" more than four cases or in which any of the Medical Direction requirements were not met, PST should have billed Noridian using the less lucrative Medical Supervision modifier. Ms. O'Neill's expert witness in medical coding and chart auditing, who specializes in anesthesia and pain management, confirmed these facts. ER-42 ¶¶ 9-10. Articles published by the American Society of Anesthesiologists and companies within the industry say the same. ER-81 ¶ 52.

Still further, instructions obtained in discovery confirm the requirement that all providers involved in treatment of a patient document their level of involvement in that treatment, which in turn underscores why use of the QZ modifier is deceptive when

failed Medical Direction occurs. Noridian states, "When multiple anesthesiologists provide services, . . . [t]he time for all anesthesia procedures must be combined and be sure the documentation contains all physicians involved." ER-80-81 ¶ 51 (quoting Noridian Guidance as to "Multiple Anesthesiologists"). Again, if, as PST claims, a biller could simply choose to bill Medically Supervised services as CRNA Service, the documentation would not reflect the physician's involvement at all. *See* ER-148 ¶ 68; ER-149 ¶ 72. Instead, the bill would identify *only* the CRNA involved in the care, falsely conveying that the CRNA was working independently and without supervision. *See* ER-28, 29. By contrast, billing as Medical Supervision informs the Government of exactly who is involved in the case and the nature of the services rendered.

The Claims Manual—which is so crucial to PST's position and was central to the District Court's ruling—further supports the SAC's allegations. It directly addresses cases of Medical Supervision such as those described in the SAC. Chapter 12, titled "Physicians/Nonphysician Practitioners," includes a section titled "Payment for Anesthesiology Services" (Sec. 50).[5] These services are divided into three categories: Personally Performed, Medically Directed, and Medically Supervised. Claims Manual, Ch. 12, §50. As defined in the Claims Manual, the Medically Supervised rate is applicable to at least some of the cases of failed Medical Direction described in the SAC: it is

---

[5] This chapter also contains a section titled "Qualified Nonphysician Anesthetist Services" that provides general billing instructions for CRNAs but does not specifically address situations that fall within the definition of Medical Supervision. *See generally* Claims Manual Ch. 12, § 140.

appropriate "when the anesthesiologist is involved in *furnishing more than four procedures concurrently*" or is performing other services at the same time. *Id.* § 50.D (emphasis added).

PST's interpretation of these guidelines (which the District Court accepted) would render this distinction meaningless. PST essentially contends that, in cases in which a CRNA is Medically Supervised, a biller may simply elect to bill at the more lucrative CRNA Service rate if they so choose. This interpretation would render the Medically Supervised rates in the Claims Manual meaningless by giving the provider the choice to accept a lower payment or a higher one depending on which modifier they use (obviously, they would choose the higher paying one). That misaligns with the Claims Manual's structure, which sets forth three separate models.

PST's own knowledge that it was not supposed to use the QZ modifier further supports Ms. O'Neill's allegation that use of that modifier was fraudulent when Medical Supervision occurred. In January 2014, PST's Compliance Director, Courtney Reasoner, wrote to Somnia that that the QZ modifier could be used only if "it was documented that the CRNA was not medically directed *or supervised*." ER-103 ¶ 148 (emphasis added). Ms. Reasoner even published an article to this effect: "Where a physician medically directs anesthesia services and fails to meet all requirements or exceeds the limit of four concurrent rooms, payment may be made under the Medical Supervision benefit." ER-103 ¶ 149.

Despite all this, PST had a practice of using the QZ modifier, which denoted a

CRNA-independent care model, even though it implemented a physician-oversight model that in practice often resulted in Medical Supervision instead of Medical Direction. PST thus falsely described the value of the services for which they sought reimbursement. These facts make the SAC's claims of falsity more than plausible.

## II.    The SAC's theory of liability is fact-intensive—not purely legal— and the District Court's contrary ruling led to application of an incorrect analysis of the falsity element.

The District Court rejected the SAC's allegations concerning use of the QZ modifier to bill for Medically Supervised CRNA care, and refused to consider the new evidence Ms. O'Neill sought to include in her proposed Third Amended Complaint, on the ground that the SAC's theory of falsity is one concerning "interpretation" of the "language of [a] regulation." ER-124. The District Court even stated: "Whether relator has sufficiently alleged falsity in this case depends upon the language of the regulation, since if none of the alleged conduct is contrary to what the regulations permit, there can be no violation." *Id.* That view of the SAC's allegations is incorrect, and it led the District Court to overlook numerous critical facts pled in the SAC that established the falsity element of Ms. O'Neill's claims.

Under the FCA, a claim for payment can be factually false or legally false. "A factually false claim is one in which the claim for payment is itself literally false or fraudulent, such as when the claim involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 675 (9th Cir. 2018)

(internal quotation marks omitted); *see also United States ex rel. Druding v. Druding*, 952 F.3d 89, 96 (3d Cir. 2020) (a claim is factually false "when the facts contained within the claim are untrue").

By contrast, a claim is legally false where the claimant makes a "knowingly false certification of compliance with a regulation or contractual provision" that is "a condition of payment." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 741 (10th Cir. 2018) (internal quotation marks omitted); *see also United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94 (3d Cir. 2018) (a claim "is legally false when the claimant lies about its compliance with a statutory, regulatory, or contractual requirement"). A prominent example of such a legally false certification (of the implied type) can be found in *Universal Health Services v. United States ex rel. Escobar*, where the relators alleged that a healthcare provider "submitted reimbursement claims that made representations about the specific services provided by specific types of professionals, but that failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for these services." 579 U.S. 176, 184-85 (2016).

Here, regarding PST's use of the QZ modifier, the SAC pleads that PST submitted claims for Medicare reimbursement that were *factually* false in crucial respects. Specifically, using the QZ modifier conveyed to the Government that the patient received care under a CRNA-independent care model, without a physician directing the care. In truth, the care model that was always employed at Kaweah was a physician-

oversight model, with an anesthesiologist overseeing a series of concurrent anesthesia procedures (often more than four, meaning Medical Direction failed and Medical Supervision occurred instead) and directing each CRNA carrying out the anesthesiologist's directives. *See* ER-144-45 ¶ 49; ER-147 ¶ 62; ER-148 ¶ 66. Use of the QZ modifier when care was delivered in a Medical Supervision form of physician-oversight care, but when the regulatory requirements for billing as Medical Direction were not met, concealed that a physician was involved in the care, thus facilitating overpayment on the claims. *See* ER-144-45 ¶ 49; ER-145 ¶ 50; ER-147 ¶ 62; ER-148 ¶ 66. This falsely portrayed the type of care being provided to patients. Thus, PST provided a false "description of . . . services provided" in its claims for payment. *Silingo*, 904 F.3d at 675 (internal quotation marks omitted). This is factual falsity.

As such, these allegations depend on fact evidence, not purely on direct interpretation of binding Medicare regulations on the topic. One does not need to look further than this case to find a good example of the difference between factual and legal falsity. In addition to its allegations concerning PST's deceptive use of the QZ modifier, the SAC also alleges that Defendants billed under the Medical Direction category when the regulatory requirements for Medical Direction were not met. *See, e.g.*, ER-145-46 ¶ 53; ER-146 ¶ 58; ER-150-53 ¶ 74. That is, at least in part, legal falsity because Defendants represented that they complied with an express condition of payment. *See United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 675-76 (9th Cir. 2018) ("Express false certification involves an entity's representation of compliance with the

law as part of the process for submitting a claim when it is actually not compliant."). Falsity of this type is different than PST's use of a modifier code (QZ) that was not specifically addressed by controlling regulations but was fraudulent because it communicated to Medicare that a different model of anesthesia care was provided other than the one actually supplied. *See WellPoint, Inc.*, 904 F.3d at 675.

This is not to say that the SAC asserts only theories of factual falsity. The SAC also alleges PST's claims were legally false because they certified compliance with conditions of payment. For example, as the SAC explained, and as Noridian's instructions confirm, because "Medicare requires careful documentation of anesthesia service including documenting all providers involved in the service," it would be deceptive to omit the anesthesiologist from the bill and instead list only the CRNA involved in the care along with the QZ modifier. ER-145 ¶ 50. The "General Billing Instructions" section of the Claims Manual corroborates this:

> If an employer-physician furnishes concurrent medical direction for a procedure involving CRNAs and the medical direction service is unassigned, the physician should bill on an assigned basis on a separate claim for the qualified nonphysician anesthetist service. If the physician is participating or takes assignment, both services should be billed on one claim but as separate line items.

Claims Manual Ch. 12, § 140.3.4 (emphasis added).

By submitting claim forms that only documented a CRNA's work, PST implied that it complied with these documentation requirements. Such claims did "not merely request payment, but also ma[de] specific representations about the goods or services

provided" (that no physician was involved in the care), and the failure to disclose any physician's involvement "ma[de] those representations misleading half-truths." *Escobar*, 579 U.S. at 190.

Nevertheless, the deceptiveness of Defendants' (including PST's) use of the QZ modifier is in significant part an issue of fact that depends on showing the full context of Defendants' interactions with Medicare. Yet the District Court opined that the SAC failed to establish falsity because "use of the QZ code does not appear to be prohibited by any rule or regulation." ER-126. That is not dispositive—what matters is whether PST misled the Government to induce overpayments. For all the reasons explained above, it did.

The Medicare regulations in the CFR do not specify when it is appropriate to use the QZ modifier. As the SAC explains, the Medicare regulations identify Medical Direction and Medical Supervision as two forms of care in which a physician is overseeing healthcare delivery by CRNAs but maintains ultimate direction and control. *Compare* 42 CFR § 415.110 (setting out the conditions for payment of Medically Directed anesthesia services claims) *with* 42 C.F.R. § 414.46(f) ("Physician medically supervises anesthesia services. If the physician medically supervises more than four concurrent anesthesia services, CMS bases the fee schedule amount on an anesthesia-specific CF and three base units. This represents payment for the physician's involvement in the pre-surgical anesthesia services."). The key point is that 42 CFR § 415.110, 42 C.F.R. § 414.46(f), and the other Medicare regulations contemplate a

patient's care is being overseen (that is, either Medically Directed or Medically Supervised) by a physician. They do not speak to CRNA-independent care.

Regarding CRNA services, the regulations differentiate only between Medically Directed and non-Medically Directed CRNA services. *See, e.g.*, 42 C.F.R. § 414.60(a)(2) ("The CF for an anesthesia service furnished by a CRNA not directed by a physician may not exceed the CF for a service personally performed by a physician."). Contrary to PST's view, this regulation does not affirmatively authorize healthcare providers to choose whether to bill Medically Supervised anesthesia services as Medical Supervision or CRNA Service. Rather, it just reflects the Government's understanding at the time that CRNAs could work either in a physician-oversight model of care that met the requirements for Medical Direction or a physician-oversight model that did not (and thus would fall within the Medical Supervision category). The most likely explanation for the regulations' failure to mention CRNA-independent anesthesia services is that the CRNA-independent model developed later. *See supra* p. 14 (explaining that CMS did not authorize states to opt out of the federal physician-supervision rule until 2001, years after CMS promulgated the language in 42 C.F.R. § 414.60). Regardless of the reason, the regulations left it to CMS and the MACs to flesh out the requirements for billing CRNA-independent work.

The upshot of all this is that Ms. O'Neill's claims do not necessarily depend on showing a violation of these regulations to establish the falsity of the reimbursement claims PST submitted using the QZ modifier. Her claims concern what the

Government reasonably would have understood PST to be representing regarding the characteristics of the anesthesia services it provided in its reimbursement requests. That is a question of fact, not interpretation of a regulation. Nor is the Claims Manual controlling, as the District Court suggested. The Claims Manual is a guidance document. It was not promulgated as a regulation through notice-and-comment rulemaking, and it does not have force of law. *See Hargan*, 878 F.3d at 355. To be clear, as shown above, the Claims Manual supports Relator's reading. *See supra* pp. 38-39. But even if it supported PST's reading, that would not be dispositive of whether PST submitted a fraudulent claim to the Government.

Accordingly, whether PST used the QZ code properly and truthfully—and whether their use of the QZ modifier deceived the Government into overpaying—depends on factual evidence. And if Ms. O'Neill had been given the opportunity to set forth that evidence, she would have shown that PST used the QZ code fraudulently.

Indeed, PST essentially argued before the District Court that the Claims Manual and Noridian Guidance were ambiguous. For example, PST argued that the Claims Manual does not explicitly denominate the "QZ" code as "CRNA independent" services. *See, e.g.*, Dist. Ct. ECF 77-1 at 6. Similarly, PST argued that, since Noridian did not explicitly state that the QZ code could *not* be used for Medical Supervision, such usage was permissible. *See* Dist. Ct. ECF No. 209 at 7-8. But not only did the SAC make out a clear and plausible case that, as used in the field, PST's use of the QZ modifier fraudulently misrepresented the nature of services rendered to the Government, the

evidence adduced in discovery confirmed these allegations. To the extent any ambiguities or disputes remain, they raise factual questions, not legal ones.

Thus, Ms. O'Neill should be afforded the opportunity to present this evidence, along with other evidence adduced in discovery, to a finder of fact on either summary judgment or at trial. At the motion to dismiss stage, any ambiguities or disputes should have been resolved in her favor.

## III. The District Court's denial of reconsideration was erroneous because the controlling issues are factual questions and the time elapsed between the dismissal order and Ms. O'Neill's motion for reconsideration was reasonable under the circumstances.

The District Court declined to consider the new evidence in Ms. O'Neill's motion for reconsideration based on two reasons. First, it ruled that the falsity inquiry was a purely legal question that could not be influenced by fact evidence. *See* ER-4 (describing the motion to dismiss ruling as "a legal determination based on interpreting different provisions"). Second, it ruled that Ms. O'Neill's delay in bringing her motion for reconsideration was unreasonable. *Id.* Neither of those reasons was a proper basis for denying reconsideration.

First, as explained above, key aspects of the SAC's theory of liability involve factual falsity. As such, establish falsity did *not* solely depend, as the District Court concluded, on interpretation of a regulation. Ms. O'Neill maintained from the start that the communicative meaning of the QZ modifier is a question of fact not suitable for adjudication at the pleading stage. *See* Dist. Ct. ECF No. 80 at 12 ("[T]o the extent there

is a dispute as to what services the QZ modifier encompasses, it is a factual dispute that cannot be resolved at the pleadings stage."); *id.* at 16("[A]t most, the language of the [Claims] Manual suggests that there is a factual dispute about the meaning of the QZ modifier that cannot be decided on a motion to dismiss.").

The evidence Ms. O'Neill obtained in discovery further underscored this and illustrated how further factual development would have allowed her to show that the Government would have been deceived into overpaying through PST's use of the QZ modifier. As the proposed Third Amended Complaint illustrates, discovery would have led (and did lead) to additional evidence on that point. *See supra* pp. 29-30.

Second, the District Court's focus on the time elapsed between its order on the motion to dismiss and Ms. O'Neill's filing of her motion for reconsideration misunderstood Rule 54(b)'s flexible standard and did not properly account for the time it took for Ms. O'Neill to gather and organize evidence in and after discovery.

Rule 54(b) permits a district court to revise a non-final order "any time before the entry" of final judgment. The rule's plain language thus codifies a flexible standard for non-final orders that stands in stark contrast to Rule 60(b)'s requirement that a motion for reconsideration of a *final* order or judgment be filed within one year. *See, e.g.*, *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ("[W]hen a district court issues 'an interlocutory order, the district court has plenary power over it and this power to reconsider, revise, alter or amend the interlocutory order is not subject to the limitations of Rule 59[.]'") (citing and quoting *Toole v. Baxter*

*Healthcare Corp.*, 235 F.3d 1307, 1315 (11th Cir. 2000)); *Koerschner v. Budge*, No. 3:05CV00587ECRVPC, 2009 WL 2382568, at *4 (D. Nev. July 30, 2009) ("The law is well-established that a district court has plenary authority over an interlocutory order, and the court has the inherent power to reconsider, revise or amend the order, without regard to the limitations of Rules 59 and 60.") (citing *Santa Monica Baykeeper*, 254 F.3d at 885); *United States v. Kerr*, 855 F. App'x 883, 886 & n.4 (4th Cir. 2021) (explaining that under Rule 54(b), the district court was "free to revisit its judgment and correct its error" on the Government's motion to amend interlocutory order, and explaining, in contrast, that the motion would have been untimely under Rule 60(b)).[6]

The District Court stated, "Courts generally interpret the standards for Rule 54 to be coextensive with Rules 59 and 60." ER-4 (citing *Gish v. Newsom*, No. 20-CV-755, 2020 WL 6054912, at *2 (C.D. Cal. Oct. 9, 2020); *Jadwin v. Cnty. of Kern*, No. 07-CV-0026, 2010 WL 1267264, at *9 (E.D. Cal. Mar. 31, 2010)). That is true when it comes to the *substantive* standard for modifying a non-final order, but it is not true regarding the timeliness standard for filing a motion under Rule 54(b).

The cases cited by the District Court do not say otherwise. In *Gish*, the district court stated that courts in the Central District of California interpret the requirements of Central District Local Rule 7–18 as coextensive with Rules 59(e) and 60(b). 2020 WL

---

[6] *See also Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015) (review of an interlocutory ruling is governed by Rule 54(b) and not the higher showing required to alter or amend a judgment under Rule 59(e)).

6054912. *Gish* did not involve a Rule 54(b) motion. And in *Jadwin*, the district court observed that "courts look to the standards under Rule 59(e) and Rule 60(b) for guidance" on "the standards which a court should apply when assessing a motion to modify an interlocutory order." 2010 WL 1267264, at *9. Thus, the court recited the factors warranting alteration of a judgment under Rules 59(e) and 60(b), but it separately noted that because "a final judgment adjudicating all of Plaintiff's claims ha[d] not been entered," the motion was "timely" under Rule 54(b), even though it would not have been timely under Rule 59(e)'s 28-day deadline. *Id.*

In short, the correct standard under Rule 54(b) is not the rigid timeliness standard the District Court implied from the Rule 59(e) and 60(b) context. Those rules address situations where a final judgment or order has been entered. When that is the case, the public's interest in "the timeliness and finality of judgments" supports application of a stricter timeliness standard. *Phelps v. Alameida*, 569 F.3d 1120, 1135 (9th Cir. 2009) (cleaned up). But where litigation is ongoing and the case is still very much "live," there are no such finality concerns. To the contrary, the changing and developing nature of a case while it is still being litigated militants in favor of the flexible standard articulated in Rule 54(b)'s plain text.

This case is a good illustration of why. For example, Ms. O'Neill explained in her reconsideration papers that her expert sampled 110 patient encounters at Kaweah, finding through that analysis that Somnia/PAS billed separately for Independent CRNA Service, Medical Direction, Personally Performed, and Medical Supervision

services using the appropriate modifiers in certain instances. ER-35. This demonstrated that the CRNA Service and Medical Supervision modifiers are not interchangeable—if that were true, there would be no reason for Defendants to bill under Medical Supervision when it could have billed under the more lucrative QZ modifier. *Id.*

This also demonstrates how Defendants' (including PST's) billing practices were deceptive in context. Because Defendants used the Medical Supervision modifier at times, the claims processor would have reasonably believed that they were billing under Medical Supervision when they were providing care under that model, and CRNA Service when CRNAs were working independently. Ms. O'Neill did not have the data to perform this analysis prior to discovery. It would be unjust to impose a strict timeliness requirement while the case is still progressing and that prevents consideration of crucial evidence that could not have been discovered earlier.

Accordingly, the correct standard to apply is simple: "[I]t is clear that courts have more flexibility in applying Rule 54(b) than in determining whether reconsideration is appropriate under Rules 59(e) and 60(b)," and "Rule 54(b) reconsideration may be granted as justice requires." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) (internal citation and quotation marks omitted).

In any event, Ms. O'Neill's motion for reconsideration was timely. With Rule 60(b)'s more stringent one-year deadline in mind, the District Court stated that Ms. O'Neill "has not explained why she waited almost four years" to seek reconsideration. ER-4. In addition to imposing a deadline that does not apply to Rule 54(b) motions,

that analysis was just incorrect. Ms. O'Neill explained that discovery did not close until December 2021. ER-36. As she set forth in the motion for reconsideration, "she was not able to obtain all the above new evidence until fact and expert discovery between Relator and the Somnia Defendants closed in late 2021," she did not "have the benefit of complete expert analysis yet," and she was unable "to complete obtaining documents from Defendants and taking depositions of all of Defendants' witnesses until discovery completed." *Id.*

Thus, the District Court's focus on the purported four-year time period between the dismissal order and the motion for reconsideration was misplaced. Even under Rule 60(b)(2)'s more stringent standard for modifying a *final* order, newly discovered evidence supports reconsideration if it "could not have been discovered through due diligence." *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1131 n.45 (E.D. Cal. 2001). That is the case here. Under Rule 54(b)'s far more flexible standard, which permits modification of an interlocutory order "any time" before final judgment, the interval between the dismissal order and the motion does not support denying the motion based purely on a rigid "timeliness" requirement that contradicts Rule 54(b)'s plain language. Indeed, the new evidence discovered during litigation of this case against the other Defendants is a perfect illustration of why Rule 54(b) should and does broadly permit modification of a non-final order any time before the litigation concludes.

# CONCLUSION

For all these reasons, the Court should reverse the District Court's order dismissing all claims against PST, or, at minimum, vacate the dismissal with prejudice and instruct the District Court to grant leave to amend.

Dated: May 22, 2024                    Respectfully submitted,

                                      */s/ Glenn E. Chappell*
                                      GLENN E. CHAPPELL
                                      ANDREA R. GOLD
                                      **TYCKO & ZAVAREEI LLP**
                                      2000 Pennsylvania Avenue NW, Suite 1010
                                      Washington, District of Columbia 20006
                                      (202) 973-0900
                                      gchappell@tzlegal.com
                                      agold@tzlegal.com

                                      WILMER HARRIS
                                      **SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
                                      715 Fremont Ave., Suite A
                                      South Pasadena, CA. 91030
                                      (626) 441-4129
                                      *wharris@sshhzlaw.com*

                                      MICHAEL D. SEPLOW
                                      **SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
                                      9415 Culver Blvd., #115
                                      Culver City, CA 90232
                                      (310) 396-0731
                                      *mseplow@sshhzlaw.com*

                                      *Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned counsel for Relator-Appellant

is not aware of any other related cases pending before this court.

Dated: May 22, 2024                       */s/ Glenn E. Chappell*
                                                Glenn E. Chappell

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and 9th Circuit Rule 32-1(a), because it contains 13,150 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typefacing using Microsoft Office Word in Garamond 14-point font.

Dated: May 22, 2024          /s/ *Glenn E. Chappell*
                                          Glenn E. Chappell

## CERTIFICATE OF SERVICE

I certify that on May 22, 2024, I caused to be served a true and correct copy of the foregoing document on all counsel of record via electronically filing it via the CM/ECF System. All counsel of record are registered CM/ECF users, and will be served via the platform.

/s/ *Glenn E. Chappell*
Glenn E. Chappell

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

**False Claims Act**

31 U.S.C. § 3729 ...................................................................................... A3

**California False Claims Act**

Cal. Gov't Code § 12651 ......................................................................... A6

**Regulations**

42 C.F.R. § 414.46 ................................................................................... A9

42 C.F.R. § 415.110 ................................................................................. A13

42 C.F.R. § 482.52 ................................................................................... A14

42 C.F.R. § 414.40 ................................................................................... A16

42 C.F.R. § 414.60 ................................................................................... A17

**Rules**

Federal Rule of Civil Procedure 54 ......................................................... A18

Federal Rule of Civil Procedure 59 ......................................................... A20

Federal Rule of Civil Procedure 60 ......................................................... A21

**Medicare Claims Processing Manual**

Ch. 12, § 40.9 .......................................................................................... A23

Ch. 12, § 50 ............................................................................................. A24

Ch. 12, § 140.................................................................................A30

Ch. 12, § 140.3.3 ..........................................................................A32

Ch. 12, § 140.3.4 ..........................................................................A32

**31 U.S. Code § 3729 - False claims**

(a)     LIABILITY FOR CERTAIN ACTS.—

(1)     IN GENERAL.—Subject to paragraph (2), any person who—

    (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    (C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

    (D)     has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

    (E)     is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

    (F)     knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

    (G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(2)   REDUCED DAMAGES.—If the court finds that—

(A)   the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B)   such person fully cooperated with any Government investigation of such violation; and

(C)   at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

(3)   COSTS OF CIVIL ACTIONS.—

A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b)   DEFINITIONS.—For purposes of this section—

(1)   the terms "knowing" and "knowingly"—

(A)   mean that a person, with respect to information—

(i)   has actual knowledge of the information;

(ii)   acts in deliberate ignorance of the truth or falsity of the information; or

(iii)   acts in reckless disregard of the truth or falsity of the information; and

(B)   require no proof of specific intent to defraud;

(2)   the term "claim"—

(A)  means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

    (i)  is presented to an officer, employee, or agent of the United States; or

    (ii)  is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

        (I)  provides or has provided any portion of the money or property requested or demanded; or

        (II)  will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B)  does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3)  the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4)  the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

(c)  EXEMPTION FROM DISCLOSURE.—

Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

(d)  EXCLUSION.—

This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.

## California Code, Government Code - GOV § 12651

(a)    Any person who commits any of the following enumerated acts in this subdivision shall have violated this article and shall be liable to the state or to the political subdivision for three times the amount of damages that the state or political subdivision sustains because of the act of that person. A person who commits any of the following enumerated acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the state or political subdivision for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101-410Section 5, 104 Stat. 891, note following 28 U.S.C. Section 2461.

      (1)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

      (2)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

      (3)    Conspires to commit a violation of this subdivision.

      (4)    Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less than all of that property.

      (5)    Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

      (6)    Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

      (7)    Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or

knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8)     Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

(b)     Notwithstanding subdivision (a), the court may assess not less than two times and not more than three times the amount of damages which the state or the political subdivision sustains because of the act of the person described in that subdivision, and no civil penalty, if the court finds all of the following:

(1)     The person committing the violation furnished officials of the state or of the political subdivision responsible for investigating false claims violations with all information known to that person about the violation within 30 days after the date on which the person first obtained the information.

(2)     The person fully cooperated with any investigation by the state or a political subdivision of the violation.

(3)     At the time the person furnished the state or the political subdivision with information about the violation, no criminal prosecution, civil action, or administrative action had commenced with respect to the violation, and the person did not have actual knowledge of the existence of an investigation into the violation.

(c)     Liability under this section shall be joint and several for any act committed by two or more persons.

(d)     This section does not apply to any controversy involving an amount of less than five hundred dollars ($500) in value. For purposes of this subdivision, "controversy" means any one or more false claims submitted by the same person in violation of this article.

(e)     This section does not apply to claims, records, or statements made pursuant to Division 3.6 (commencing with Section 810) of Title 1 or to workers' compensation claims filed pursuant to Division 4 (commencing with Section 3200) of the Labor Code.

(f)     This section does not apply to claims, records, or statements made under the Revenue and Taxation Code.

(g)     This section does not apply to claims, records, or statements for the assets of a person that have been transferred to the Commissioner of Insurance, pursuant to Section 1011 of the Insurance Code.

**42 C.F.R. § 414.46 Additional rules for payment of anesthesia services.**

(a)    *Definitions.* For purposes of this section, the following definitions apply:

    (1)    *Base unit* means the value for each anesthesia code that reflects all activities other than anesthesia time. These activities include usual preoperative and postoperative visits, the administration of fluids and blood incident to anesthesia care, and monitoring services.

    (2)    *Anesthesia practitioner,* for the purpose of anesthesia time, means a physician who performs the anesthesia service alone, a CRNA who is not medically directed who performs the anesthesia service alone, or a medically directed CRNA.

    (3)    *Anesthesia time* means the time during which an anesthesia practitioner is present with the patient. It starts when the anesthesia practitioner begins to prepare the patient for anesthesia services and ends when the anesthesia practitioner is no longer furnishing anesthesia services to the beneficiary, that is, when the beneficiary may be placed safely under postoperative care. Anesthesia time is a continuous time period from the start of anesthesia to the end of an anesthesia service. In counting anesthesia time, the anesthesia practitioner can add blocks of anesthesia time around an interruption in anesthesia time as long as the anesthesia practitioner is furnishing continuous anesthesia care within the time periods around the interruption.

(b)    *Determinations of payment amount—Basic rule.* For anesthesia services performed, medically directed, or medically supervised by a physician, CMS pays the lesser of the actual charge or the anesthesia fee schedule amount.

    (1)    The carrier bases the fee schedule amount for an anesthesia service on the product of the sum of allowable base and time units and an anesthesia-specific CF. The carrier calculates the time units from the anesthesia time reported by the anesthesia practitioner for the anesthesia procedure. The physician who fulfills the conditions for medical direction in § 415.110 (Conditions for payment: Anesthesiology services) reports the same anesthesia time as the medically-directed CRNA.

    (2)    CMS furnishes the carrier with the base units for each anesthesia procedure code. The base units are derived from the 1988 American Society of Anesthesiologists' Relative Value Guide except that the

number of base units recognized for anesthesia services furnished during cataract or iridectomy surgery is four units.

(3) Modifier units are not allowed. Modifier units include additional units charged by a physician or a CRNA for patient health status, risk, age, or unusual circumstances.

(c) *Physician personally performs the anesthesia procedure.*

(1) CMS considers an anesthesia service to be personally performed under any of the following circumstances:

(i) The physician performs the entire anesthesia service alone.

(ii) The physician establishes an attending physician relationship in one or two concurrent cases involving an intern or resident and the service was furnished before January 1, 1994.

(iii) The physician establishes an attending physician relationship in one case involving an intern or resident and the service was furnished on or after January 1, 1994 but prior to January 1, 1996. For services on or after January 1, 1996, the physician must be the teaching physician as defined in §§ 415.170 through 415.184 of this chapter.

(iv) The physician and the CRNA or AA are involved in a single case and the services of each are found to be medically necessary.

(v) The physician is continuously involved in a single case involving a student nurse anesthetist.

(vi) The physician is continuously involved in a single case involving a CRNA or AA and the service was furnished prior to January 1, 1998.

(2) CMS determines the fee schedule amount for an anesthesia service personally performed by a physician on the basis of an anesthesia-specific fee schedule CF and unreduced base units and anesthesia time units. One anesthesia time unit is equivalent to 15 minutes of anesthesia time, and fractions of a 15-minute period are recognized as fractions of an anesthesia time unit.

(d) *Anesthesia services medically directed by a physician.*

(1) CMS considers an anesthesia service to be medically directed by a physician if:

(i) The physician performs the activities described in § 415.110 of this chapter.

(ii) The physician directs qualified individuals involved in two, three, or four concurrent cases.

(iii) Medical direction can occur for a single case furnished on or after January 1, 1998 if the physician performs the activities described in § 415.110 of this chapter and medically directs a single CRNA or AA.

(2) The rules for medical direction differ for certain time periods depending on the nature of the qualified individual who is directed by the physician.

(i) If more than two procedures are directed on or after January 1, 1994, the qualified individuals could be AAs, CRNAs, interns, or residents. The medical direction rules apply to student nurse anesthetists only if the physician directs two concurrent cases, each of which involves a student nurse anesthetist or the physician directs one case involving a student nurse anesthetist and the other involving a CRNA, AA, intern, or resident.

(ii) For services furnished on or after January 1, 2010, the medical direction rules do not apply to a single anesthesia resident case that is concurrent to another case which is paid under the medical direction payment rules as specified in paragraph (e) of this section.

(3) Payment for medical direction is based on a specific percentage of the payment allowance recognized for the anesthesia service personally performed by a physician alone. The following percentages apply for the years specified:

(i) CY 1994—60 percent of the payment allowance for personally performed procedures.

(ii) CY 1995—57.5 percent of the payment allowance for personally performed services.

(iii) CY 1996—55 percent of the payment allowance for personally performed services.

(iv) CY 1997—52.5 percent of the payment allowance for personally performed services.

(v)   CY 1998 and thereafter—50 percent of the payment allowance for personally performed services.

(e) *Special payment rule for teaching anesthesiologist involved in a single resident case or two concurrent cases.* For physicians' services furnished on or after January 1, 2010, if the teaching anesthesiologist is involved in the training of physician residents in a single anesthesia case or two concurrent anesthesia cases, the fee schedule amount must be 100 percent of the fee schedule amount otherwise applicable if the anesthesia services were personally performed by the teaching anesthesiologist and the teaching anesthesiologist fulfilled the criteria in § 415.178 of this chapter. This special payment rule also applies if the teaching anesthesiologist is involved in one resident case that is concurrent to another case paid under the medical direction payment rules.

(f) *Physician medically supervises anesthesia services.* If the physician medically supervises more than four concurrent anesthesia services, CMS bases the fee schedule amount on an anesthesia-specific CF and three base units. This represents payment for the physician's involvement in the pre-surgical anesthesia services.

(g) *Payment for medical or surgical services furnished by a physician while furnishing anesthesia services.*

   (1)   CMS allows separate payment under the fee schedule for certain reasonable and medically necessary medical or surgical services furnished by a physician while furnishing anesthesia services to the patient. CMS makes payment for these services in accordance with the general physician fee schedule rules in § 414.20. These services are described in program operating instructions.

   (2)   CMS makes no separate payment for other medical or surgical services, such as the pre-anesthetic examination of the patient, pre- or post-operative visits, or usual monitoring functions, that are ordinarily included in the anesthesia service.

(h) *Physician involved in multiple anesthesia services.* If the physician is involved in multiple anesthesia services for the same patient during the same operative session, the carrier makes payment according to the base unit associated with the anesthesia service having the highest base unit value and anesthesia time that encompasses the multiple services. The carrier makes payment for add-on anesthesia codes according to program operating instructions.

## 42 C.F.R. § 415.110 Conditions for payment: Medically directed anesthesia services.

(a)     *General payment rule.* Medicare pays for the physician's medical direction of anesthesia services for one service or two through four concurrent anesthesia services furnished after December 31, 1998, only if each of the services meets the condition in § 415.102(a) and the following additional conditions:

    (1)     For each patient, the physician—

        (i)     Performs a pre-anesthetic examination and evaluation;

        (ii)     Prescribes the anesthesia plan;

        (iii)     Personally participates in the most demanding aspects of the anesthesia plan including, if applicable, induction and emergence;

        (iv)     Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual as defined in operating instructions;

        (v)     Monitors the course of anesthesia administration at frequent intervals;

        (vi)     Remains physically present and available for immediate diagnosis and treatment of emergencies; and

        (vii)     Provides indicated post-anesthesia care.

    (2)     The physician directs no more than four anesthesia services concurrently and does not perform any other services while he or she is directing the single or concurrent services so that one or more of the conditions in paragraph (a)(1) of this section are not violated.

    (3)     If the physician personally performs the anesthesia service, the payment rules in § 414.46(c) of this chapter apply (Physician personally performs the anesthesia procedure).

(b)     *Medical documentation.* The physician alone inclusively documents in the patient's medical record that the conditions set forth in paragraph (a)(1) of this section have been satisfied, specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable.

**42 C.F.R. § 482.52 Condition of participation: Anesthesia services.**
If the hospital furnishes anesthesia services, they must be provided in a well-organized manner under the direction of a qualified doctor of medicine or osteopathy. The service is responsible for all anesthesia administered in the hospital.

(a) *Standard: Organization and staffing.* The organization of anesthesia services must be appropriate to the scope of the services offered. Anesthesia must be administered only by—

   (1)   A qualified anesthesiologist;

   (2)   A doctor of medicine or osteopathy (other than an anesthesiologist);

   (3)   A dentist, oral surgeon, or podiatrist who is qualified to administer anesthesia under State law;

   (4)   A certified registered nurse anesthetist (CRNA), as defined in § 410.69(b) of this chapter, who, unless exempted in accordance with paragraph (c)of this section, is under the supervision of the operating practitioner or of an anesthesiologist who is immediately available if needed; or

   (5)   An anesthesiologist's assistant, as defined in § 410.69(b) of this chapter, who is under the supervision of an anesthesiologist who is immediately available if needed.

(b) *Standard: Delivery of services.* Anesthesia services must be consistent with needs and resources. Policies on anesthesia procedures must include the delineation of preanesthesia and post anesthesia responsibilities. The policies must ensure that the following are provided for each patient:

   (1)   A preanesthesia evaluation completed and documented by an individual qualified to administer anesthesia, as specified in paragraph (a) of this section, performed within 48 hours prior to surgery or a procedure requiring anesthesia services.

   (2)   An intraoperative anesthesia record.

   (3)   A postanesthesia evaluation completed and documented by an individual qualified to administer anesthesia, as specified in paragraph (a) of this section, no later than 48 hours after surgery or a procedure requiring anesthesia services. The postanesthesia evaluation for anesthesia recovery must be completed in accordance with State law and with hospital policies and procedures that have been approved by the medical staff and that reflect current standards of anesthesia care.

(c)     *Standard: State exemption.*

    (1)    A hospital may be exempted from the requirement for physician supervision of CRNAs as described in paragraph (a)(4) of this section, if the State in which the hospital is located submits a letter to CMS signed by the Governor, following consultation with the State's Boards of Medicine and Nursing, requesting exemption from physician supervision of CRNAs. The letter from the Governor must attest that he or she has consulted with State Boards of Medicine and Nursing about issues related to access to and the quality of anesthesia services in the State and has concluded that it is in the best interests of the State's citizens to opt-out of the current physician supervision requirement, and that the opt-out is consistent with State law.

    (2)    The request for exemption and recognition of State laws, and the withdrawal of the request may be submitted at any time, and are effective upon submission.

**42 C.F.R. § 414.40 Coding and ancillary policies.**

(a)   *General rule.* CMS establishes uniform national definitions of services, codes to represent services, and payment modifiers to the codes.

(b)   *Specific types of policies.* CMS establishes uniform national ancillary policies necessary to implement the fee schedule for physician services. These include, but are not limited to, the following policies:

(1)   Global surgery policy (for example, post- and pre-operative periods and services, and intra-operative services).

(2)   Professional and technical components (for example, payment for services, such as an EEG, which typically comprise a technical component (the taking of the test) and a professional component (the interpretation)).

(3)   Payment modifiers (for example, assistant-at-surgery, multiple surgery, bilateral surgery, split surgical global services, team surgery, and unusual services).

**42 C.F.R. § 414.60 Payment for the services of CRNAs.**

(a)   *Basis for payment.* The allowance for the anesthesia service furnished by a CRNA, medically directed or not medically directed, is based on allowable base and time units as defined in § 414.46(a). Beginning with CY 1994—

   (1)   The allowance for an anesthesia service furnished by a medically directed CRNA is based on a fixed percentage of the allowance recognized for the anesthesia service personally performed by the physician alone, as specified in § 414.46(d)(3); and

   (2)   The CF for an anesthesia service furnished by a CRNA not directed by a physician may not exceed the CF for a service personally performed by a physician.

(b)   *To whom payment may be made.* Payment for an anesthesia service furnished by a CRNA may be made to the CRNA or to any individual or entity (such as a hospital, critical access hospital, physician, group practice, or ambulatory surgical center) with which the CRNA has an employment or contract relationship that provides for payment to be made to the individual or entity.

(c)   *Condition for payment.* Payment for the services of a CRNA may be made only on an assignment related basis, and any assignment accepted by a CRNA is binding on any other person presenting a claim or request for payment for the service.

## Federal Rule of Civil Procedure 54. Judgment; Costs

(a)     DEFINITION; FORM. "Judgment" as used in these rules includes a decree and any order from which an appeal lies. A judgment should not include recitals of pleadings, a master's report, or a record of prior proceedings.

(b)     JUDGMENT ON MULTIPLE CLAIMS OR INVOLVING MULTIPLE PARTIES. When an
action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

(c)     DEMAND FOR JUDGMENT; RELIEF TO BE GRANTED. A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

(d)     COSTS; ATTORNEY'S FEES.

    (1)     *Costs Other Than Attorney's Fees.* Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party. But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law. The clerk may tax costs on 14 days' notice. On motion served within the next 7 days, the court may review the clerk's action.

    (2)     *Attorney's Fees.*

        (A)     *Claim to Be by Motion.* A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.

        (B)     *Timing and Contents of the Motion.* Unless a statute or a court order provides otherwise, the motion must:

            (i)     be filed no later than 14 days after the entry of judgment;

            (ii)     specify the judgment and the statute, rule, or other grounds entitling the movant to the award;

        (iii)    state the amount sought or provide a fair estimate of it; and

        (iv)    disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

(C)    *Proceedings.* Subject to Rule 23(h), the court must, on a party's request, give an opportunity for adversary submissions on the motion in accordance with Rule 43(c) or 78. The court may decide issues of liability for fees before receiving submissions on the value of services. The court must find the facts and state its conclusions of law as provided in Rule 52(a).

(D)    *Special Procedures by Local Rule; Reference to a Master or a Magistrate Judge.* By local rule, the court may establish special procedures to resolve fee-related issues without extensive evidentiary hearings. Also, the court may refer issues concerning the value of services to a special master under Rule 53 without regard to the limitations of Rule 53(a)(1), and may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.

(E)    *Exceptions.* Subparagraphs (A)–(D) do not apply to claims for fees and expenses as sanctions for violating these rules or as sanctions under 28 U.S.C. §1927.

**Federal Rule of Civil Procedure 59. New Trial; Altering or Amending a Judgment**

(a)     IN GENERAL.

     (1)    *Grounds for New Trial.* The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:

          (A)    after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

          (B)    after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

     (2)    *Further Action After a Nonjury Trial.* After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

(b)     TIME TO FILE A MOTION FOR A NEW TRIAL. A motion for a new trial must be filed no later than 28 days after the entry of judgment.

(c)     TIME TO SERVE AFFIDAVITS. When a motion for a new trial is based on affidavits, they must be filed with the motion. The opposing party has 14 days after being served to file opposing affidavits. The court may permit reply affidavits.

(d)     NEW TRIAL ON THE COURT'S INITIATIVE OR FOR REASONS NOT IN THE
MOTION. No later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. In either event, the court must specify the reasons in its order.

(e)     MOTION TO ALTER OR AMEND A JUDGMENT. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

# Federal Rule of Civil Procedure 60. Relief from a Judgment or Order

(a) CORRECTIONS BASED ON CLERICAL MISTAKES; OVERSIGHTS AND OMISSIONS. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

(b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

   (1) mistake, inadvertence, surprise, or excusable neglect;

   (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

   (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

   (4) the judgment is void;

   (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

   (6) any other reason that justifies relief.

(c) TIMING AND EFFECT OF THE MOTION.

   (1) *Timing.* A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

   (2) *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

(d) OTHER POWERS TO GRANT RELIEF. This rule does not limit a court's power to:

   (1) entertain an independent action to relieve a party from a judgment, order, or proceeding;

   (2) grant relief under 28 U.S.C. §1655 to a defendant who was not personally notified of the action; or

(3)     set aside a judgment for fraud on the court.

(e)     BILLS AND WRITS ABOLISHED. The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.

**Medicare Claims Processing Manual, Chapter 12 § 40.9 – Procedures Billed With Two or More Surgical Modifiers**
**(Rev. 1, 10-01-03)**
**B3-4829**

A/B MACs (B) may receive claims for surgical procedures with more than one surgical modifier. For example, since the global fee concept applies to all major surgeries, A/B MACs (B) may receive a claim for surgical care only (modifier "-54") for a bilateral surgery (modifier "-50"). They may also receive a claim for multiple surgeries requiring the use of an assistant surgeon.

Following is a list of possible combinations of surgical modifiers.

(**NOTE:** A/B MACs (B) must price all claims for surgical teams "by report.")

- Bilateral surgery ("-50") and multiple surgery ("-51").

- Bilateral surgery ("-50") and surgical care only ("-54").

- Bilateral surgery ("-50") and postoperative care only ("55").

- Bilateral surgery ("-50") and two surgeons ("-62").

- Bilateral surgery ("-50") and surgical team ("-66").

- Bilateral surgery ("-50") and assistant surgeon ("-80").

- Bilateral surgery ("-50"), two surgeons ("-62"), and surgical care only ("-54").

- Bilateral surgery ("-50"), team surgery ("-66"), and surgical care only ("-54").

**Medicare Claims Processing Manual,**
**Chapter 12 § 50 - Payment for Anesthesiology Services**
**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

### A. General Payment Rule

The fee schedule amount for physician anesthesia services furnished is, with the exceptions noted, based on allowable base and time units multiplied by an anesthesia conversion factor specific to that locality. The base unit for each anesthesia procedure is communicated to the A/B MACs by means of the HCPCS file released annually. CMS releases the conversion factor annually. The base units and conversion factor are available on the CMS website at: https://www.cms.gov/Center/Provider-Type/Anesthesiologists-Center.html.

### B. Payment at Personally Performed Rate

The A/B MAC must determine the fee schedule payment, recognizing the base unit for the anesthesia code and one time unit per 15 minutes of anesthesia time if:

- The physician personally performed the entire anesthesia service alone;

- The physician is involved with one anesthesia case with a resident, the physician is a teaching physician as defined in §100;

- The physician is involved in the training of physician residents in a single anesthesia case, two concurrent anesthesia cases involving residents or a single anesthesia case involving a resident that is concurrent to another case that meets the requirements for payment at the medically directed rate. The physician meets the teaching physician criteria in §100.1.4;

- The physician is continuously involved in a single case involving a student nurse anesthetist;

- If the physician is involved with a single case with a qualified nonphysician anesthetist (a certified registered nurse anesthetist (CRNA) or an anesthesiologist's assistant)), A/B MACs may pay the physician service and the qualified nonphysician anesthetist service in accordance with the requirements for payment at the medically directed rate;

   Or

- The physician and the CRNA (or anesthesiologist's assistant) are involved in one anesthesia case and the services of each are found to be medically necessary. Documentation must be submitted by both the CRNA and the physician to support payment of the full fee for each of the two providers. The physician reports the AA modifier and the CRNA reports the QZ modifier.

### C. Payment at the Medically Directed Rate

The A/B MAC determines payment at the medically directed rate for the physician on the basis of 50 percent of the allowance for the service performed by the physician alone. Payment will be made at the medically directed rate if the physician medically directs qualified individuals (all of whom could be CRNAs, anesthesiologists' assistants, interns, residents, or combinations of these individuals) in two, three, or four concurrent cases and the physician performs the following activities.

- Performs a pre-anesthetic examination and evaluation;

- Prescribes the anesthesia plan;

- Personally participates in the most demanding procedures in the anesthesia plan, including, if applicable, induction and emergence;

- Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual;

- Monitors the course of anesthesia administration at frequent intervals;

- Remains physically present and available for immediate diagnosis and treatment of emergencies; and

- Provides indicated post-anesthesia care.

The physician must document in the medical record that he or she performed the pre-anesthetic examination and evaluation. Physicians must also document that they provided indicated post-anesthesia care, were present during some portion of the anesthesia monitoring, and were present during the most demanding procedures in the anesthesia plan, including induction and emergence, where indicated.

NOTE: Concurrency refers to to the maximum number of procedures that the physician is medically directing within the context of a single procedure and whether these other procedures overlap each other. Concurrency is not dependent on each of the cases involving a Medicare patient. For example, if an anesthesiologist medically directs three concurrent procedures, two of which involve non-Medicare patients and the remaining a Medicare patient, this represents three concurrent cases.

The requirements for payment at the medically directed rate also apply to cases involving student nurse anesthetists if the physician medically directs two concurrent cases, with each of the two cases involving a student nurse anesthetist, or the physician directs one case involving a student nurse anesthetist and another involving a qualified individual (for example: CRNA, anesthesiologist's assistant, intern or resident).

The requirements for payment at the medically directed rate do not apply to a single resident case that is concurrent to another anesthesia case paid at the medically directed rate or to two concurrent anesthesia cases involving residents.

If anesthesiologists are in a group practice, one physician member may provide the pre-anesthesia examination and evaluation while another fulfills the other criteria. Similarly, one physician member of the group may provide post-anesthesia care while another member of the group furnishes the other component parts of the anesthesia service. However, the medical record must indicate that the services were furnished by physicians and identify the physicians who furnished them.

A physician who is concurrently furnishing services that meet the requirements for payment at the medically directed rate cannot ordinarily be involved in furnishing additional services to other patients. However, addressing an emergency of short duration in the immediate area,

administering an epidural or caudal anesthetic to ease labor pain, periodic (rather than continuous) monitoring of an obstetrical patient, receiving patients entering the operating suite for the next surgery, checking or discharging patients in the recovery room, or handling scheduling matters, do not substantially diminish the scope of control exercised by the physician and do not constitute a separate service for the purpose of determining whether the requirements for payment at the medically directed rate are met.

However, if the physician leaves the immediate area of the operating suite for other than short durations or devotes extensive time to an emergency case or is otherwise not available to respond to the immediate needs of the surgical patients, the physician's services to the surgical patients would not meet the requirements for payment at the medically directed rate. A/B MACs may not make payment under the feeschedule.

### D. Payment at Medically Supervised Rate

The A/B MAC may allow only three base units per procedure when the anesthesiologist is involved in furnishing more than four procedures concurrently or is performing other services while directing the concurrent procedures. An additional time unit may be recognized if the physician can document he or she was present atinduction.

### E. Billing and Payment for Multiple Anesthesia Procedures

Physicians bill for the anesthesia services associated with multiple bilateral surgeries by reporting the anesthesia procedure with the highest base unit value with the multiple procedure modifier -51. They report the total time for all procedures in the line item with the highest base unit value.

If the same anesthesia CPT code applies to two or more of the surgical procedures, billers enter the anesthesia code with the -51 modifier and the number of surgeries to which the modified CPT code applies.

Payment can be made under the fee schedule for anesthesia services associated with multiple surgical procedures or multiple bilateral procedures. Payment is determined based on the base unit of the anesthesia procedure with the highest base unit value and time units based on the actual anesthesia time of the multiple procedures. See §§40.6-40.7 for billing and claims processing instructions for multiple and bilateral surgeries.

### F. Payment for Medical and Surgical Services Furnished in Addition to Anesthesia Procedure

Payment may be made under the fee schedule for specific medical and surgical services furnished by the anesthesiologist as long as these services are reasonable and medically necessary or provided that other rebundling provisions (see §30 and Chapter 23) do not preclude separate payment. These services may be furnished in conjunction with the anesthesia procedure to the patient or may be furnished as single services, e.g., during the day of or the day before the anesthesia service. These services include the insertion of a Swan Ganz catheter, the insertion of central venous pressure lines, emergency intubation, and critical care visits.

### G. Anesthesia Time and Calculation of Anesthesia Time Units

Anesthesia time is defined as the period during which an anesthesia practitioner is present with the patient. It starts when the anesthesia practitioner begins to prepare the patient for anesthesia services in the operating room or an equivalent area and ends when the anesthesia practitioner is no longer furnishing anesthesia services to the patient, that is, when the patient may be placed safely under postoperative care. Anesthesia time is a continuous time period from the start of anesthesia to the end of an anesthesia service. In counting anesthesia time for services furnished, the anesthesia practitioner can add blocks of time around an interruption in anesthesia time as long as the anesthesia practitioner is furnishing continuous anesthesia care within the time periods around the interruption.

Actual anesthesia time in minutes is reported on the claim. For anesthesia services furnished, the A/B MAC computes time units by dividing reported anesthesia time by 15 minutes. Round the time unit to one decimal place. The A/B MAC does not recognize time units for CPT code 01996 (daily hospital management of epidural or subarachnoid continuous drug administration).

For purposes of this section, anesthesia practitioner means:
- a physician who performs the anesthesia service alone,
- a CRNA who is furnishing services that do not meet the requirements for payment at the medically directed rate,
- a qualified nonphysician anesthetist who is furnishing services that meet the requirements for payment at the medically directed rate.

The physician who medically directs the qualified nonphysician anesthetist would ordinarily report the same time as the qualified nonphysician anesthetist reports for the service.

### H. Monitored Anesthesia Care

Monitored anesthesia care involves the intra-operative monitoring by a physician or qualified individual under the medical direction of a physician or of the patient's vital physiological signs in anticipation of the need for administration of general anesthesia or of the development of adverse physiological patient reaction to the surgical procedure. It also includes the performance of a pre-anesthetic examination and evaluation, prescription of the anesthesia care required, administration of any necessary oral or parenteral medications (e.g., atropine, demerol, valium) and provision of indicated postoperative anesthesia care.

The A/B MAC pays for reasonable and medically necessary monitored anesthesia care services on the same basis as other anesthesia services. If the physician personally performs the monitored anesthesia care case, payment is made under the fee schedule using the payment rules for payment at the personally performed rate. If the physician medically directs four or fewer concurrent cases and monitored anesthesia care represents one or more of these concurrent cases, payment is made under the fee schedule using the payment rules for payment at the medically directed rate. Anesthesiologists use the QS modifier to report monitored anesthesia care cases, in addition to reporting the actual anesthesia time and one of the payment modifiers on the claim.

### I. Anesthesia Claims Modifiers

Physicians report the appropriate modifier to denote whether the service meets the requirements for payment at the personally performed rate, medically directed rate, or medically supervised rate.

**AA -** Anesthesia Services performed personally by the anesthesiologist

**AD -** Medical Supervision by a physician; more than 4 concurrent anesthesia procedures

**G8 -** Monitored anesthesia care (MAC) for deep complex, complicated, or markedly invasive surgical procedures

**G9 -** Monitored anesthesia care for patient who has a history of severe cardio- pulmonary condition

**QK -** Medical direction of two, three or four concurrent anesthesia procedures involving qualified individuals

**QS -** Monitored anesthesia care service

NOTE:  The QS modifier can be used by a physician or a qualified nonphysician anesthetist and is for informational purposes.  Providers must report actual anesthesia time and one of the payment modifiers on the claim.

**QY -** Medical direction of one qualified nonphysician anesthetist by an anesthesiologist

**GC -** These services have been performed by a resident under the direction of a teaching physician.

NOTE:  The GC modifier is reported by the teaching physician to indicate he/she rendered the service in compliance with the teaching physician requirements in §100 of this chapter.  One of the payment modifiers must be used in conjunction with the GC modifier.

The A/B MAC must determine payment for anesthesia in accordance with these instructions. They must be able to determine the uniform base unit that is assigned to the anesthesia code and apply the appropriate reduction where the anesthesia procedure meets the requirements for payment at the medically directed rate. They must also be able to determine the number of anesthesia time units from actual anesthesia time reported on the claim. The A/B MAC must multiply allowable units by the anesthesia-specific conversion factor used to determine fee schedule payment for the payment area.

### J. Moderate Sedation Services Furnished in Conjunction with and in Support of Procedural Services

Anesthesia services range in complexity. The continuum of anesthesia services, from least intense to most intense in complexity is as follows: local or topical anesthesia, moderate (conscious) sedation, regional anesthesia and general anesthesia. Moderate sedation is a drug induced depression of consciousness during which the patient responds purposefully to verbal commands, either alone or accompanied by light tactile stimulation. Moderate sedation does not include minimal sedation, deep sedation or monitored anesthesia care.

Practitioners will report the appropriate CPT and/or HCPCS code that describes the moderate sedation services furnished during a patient encounter, which are furnished in conjunction with and in support of a procedural service, consistent with CPT guidance.

Refer to §50 and §140 of this chapter for information regarding reporting of anesthesia services furnished in conjunction with and in support of procedural services.

**K. Anesthesia for Diagnostic or Therapeutic Nerve Blocks and Services Lower in Intensity than Moderate Sedation**

If the anesthesiologist or CRNA provides anesthesia for diagnostic or therapeutic nerve blocks or injections and a different provider performs the block or injection, then the anesthesiologist or CRNA may report the anesthesia service using the appropriate CPT code consistent with CPT guidance. The service must meet the criteria for monitored anesthesia care as described in this section. If the anesthesiologist or CRNA provides both the anesthesia service and the block or injection, then the anesthesiologist or CRNA may report the anesthesia service and the injection or block. However, the anesthesia service must meet the requirements for moderate sedation and if a lower level complexity anesthesia service is provided, then the moderate sedation code should not be reported.

If the physician performing the medical or surgical procedure also provides a level of anesthesia lower in intensity than moderate sedation, such as a local or topical anesthesia, then the moderate sedation code should not be reported and no separate payment should be allowed by the A/B MAC.

# Medicare Claims Processing Manual, Ch. 12, § 140 - Qualified Nonphysician Anesthetist Services
**(Rev. 3883; Issued: 10-13-17; Effective: 01-16-18; Implementation: 01-16-18)**

Section 9320 of OBRA 1986 authorized payment under a fee schedule to certified registered nurse anesthetists (CRNAs) and anesthesiologists' assistants. CRNAs and anesthesiologists' assistants may bill Medicare directly for their services or have payment made to any individual or entity (such as a hospital, critical access hospital, physician, group practice, or ambulatory surgical center) with which the CRNA or anesthesiologist's assistant has an employment or contractor relationship that provides for payment to be made to the individual or entity.

## 140.1- Qualified Nonphysician Anesthetists
**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

For payment purposes, the term "qualified nonphysician anesthetist" is used to refer to both certified registered nurse anesthetists (CRNAs) and anesthesiologists' assistants unless otherwise separately discussed.

An anesthesiologist's assistant means a person who:

- Works under the direction of an anesthesiologist;
- Is in compliance with all applicable requirements of State law, including any licensure requirements the state imposes on nonphysician anesthetists; and

- Is a graduate of a medical school based anesthesiologist assistant educational program that –

  o Is accredited by the Committee on Allied Health Education and Accreditation;

  And

  o Includes approximately two years of specialized basic science and clinical education in anesthesia at a level that builds on a premedical undergraduate science background.

A CRNA is a registered nurse who:

- is licensed as a registered professional nurse by the State in which the nurse practices;

- Meets any licensure requirements the State imposes with respect to nonphysician anesthetists;

- Has graduated from a nurse anesthesia educational program that meets the standards of the Council on Accreditation of Nurse Anesthesia Programs; and

- Meets the following criteria:
  o Has passed a certification examination of the Council on Certification of Nurse Anesthetists or the Council on Recertification of Nurse Anesthetists;

Or

- o Is a graduate of a nurse anesthesia educational program that meets the standards of the Council of Accreditation of Nurse Anesthesia Educational Programs, and within 24 months of graduation, has passed a certification examination of the Council on Certification of Nurse Anesthetists or the Council on Recertification of Nurse Anesthetists.

## 140.2 - Entity or Individual to Whom Fee Schedule is Payable for Qualified Nonphysician Anesthetists
**(Rev. 3883; Issued: 10-13-17; Effective: 01-16-18; Implementation: 01-16-18)**

Payment for the services of a qualified nonphysician anesthetist may be made directly to the qualified nonphysician anesthetist who furnished the anesthesia services or have payment made to any individual or entity (such as a hospital, critical access hospital, physician, group practice, or ambulatory surgical center) with which the CRNA or

anesthesiologist's assistant has an employment or contractor relationship that provides for payment to be made to the individual or entity.

## 140.3 - Anesthesia Fee Schedule Payment for Qualified Nonphysician Anesthetists
**(Rev. 3883; Issued: 10-13-17; Effective: 01-16-18; Implementation: 01-16-18)**

Payment for the services furnished by qualified nonphysician anesthetists are subject to the usual Part B coinsurance and deductible, and are made only on an assignment basis. The assignment agreed to by the qualified nonphysician anesthetist is binding upon any other person or entity presenting a claim or request for payment for the service. Except for deductible and coinsurance amounts, any person who knowingly and willfully presents or causes to be presented to a Medicare beneficiary a bill or request for payment for services of a qualified nonphysician anesthetist for which payment may be made on an assignment-related basis is subject to civil monetary penalties.

The fee schedule for anesthesia services furnished by qualified nonphysician anesthetists is the applicable locality-adjusted anesthesia conversion factor multiplied by the sum of allowable base and time units, as defined in §50 of this chapter.

The allowance for an anesthesia service furnished by a qualified nonphysician anesthetist that meets the requirements for payment at the medically directed rate is based on a fixed percentage of the allowance recognized for the anesthesia service personally performed by the physician alone, as specified in §50 of this chapter.

The anesthesia locality-adjusted conversion factor for anesthesia services furnished by a CRNA that does not meet the requirements for payment at the medically directed rate may not exceed the allowance for a service personally performed by a physician, as specified in §50 of this chapter.

### 140.3.1 - Conversion Factors Used for Qualified Nonphysician Anesthetists

**(Rev. 3883; Issued: 10-13-17; Effective: 01-16-18; Implementation: 01-16-18)**

The anesthesia locality-adjusted conversion factors are updated by the update factor used to update physicians' services under the physician fee schedule. They are generally published in November of the year preceding the year in which they apply.

### 140.3.2 - Anesthesia Time and Calculation of Anesthesia Time Units

**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

Anesthesia time means the time during which a qualified nonphysician anesthetist is present with the patient. It starts when the qualified nonphysician anesthetist begins to prepare the patient for anesthesia services in the operating room or an equivalent area

and ends when the qualified nonphysician anesthetist is no longer furnishing anesthesia services to the patient, that is, when the patient may be placed safely under postoperative care. Anesthesia time is a continuous time period from the start of anesthesia to the end of an anesthesia service. In counting anesthesia time, the qualified nonphysician anesthetist can add blocks of time around an interruption in anesthesia time as long as the qualified nonphysician anesthetist is furnishing continuous anesthesia care within the time periods around the interruption.

### 140.3.3 - Billing Modifiers

**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

The following modifiers are used by qualified nonphysician anesthetists when billing for anesthesia services:

- QX – Qualified nonphysician anesthetist service: With medical direction by a physician.
- QZ – CRNA service: Without medical direction by a physician.
- QS – Monitored anesthesia care services
- NOTE: The QS modifier can be used by a physician or a qualified nonphysician anesthetist and is for informational purposes. Providers must report actual anesthesia time and one of the payment modifiers on the claim.

### 140.3.4 - General Billing Instructions

**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

Claims for reimbursement for qualified nonphysician anesthetist services should be completed in accordance with existing billing instructions for anesthesiologists with the following additions.

- If an employer-physician furnishes concurrent medical direction for a procedure involving CRNAs and the medical direction service is unassigned, the physician should bill on an assigned basis on a separate claim for the qualified nonphysician anesthetist service. If the physician is participating or takes assignment, both services should be billed on one claim but as separate line items.

- All claims forms must have the provider billing number of the qualified nonphysician anesthetist and/or the employer of the qualified nonphysician anesthetist performing the service in either block 24.H of the Form CMS-1500 and/or block 31 as applicable. Verify that the billing number is valid before making payment.

Payments should be calculated in accordance with Medicare payment rules in §140.3. The A/B MAC must institute all necessary payment edits to assure that duplicate payments are not made to physicians for qualified nonphysician

anesthetist services or to a qualified nonphysician anesthetist directly for bills submitted on their behalf by qualified billers.

A CRNA is identified on the provider file by specialty code 43. An anesthesiologist's assistant is identified on the provider file by specialty code 32.

## 140.4 - Qualified Nonphysician Anesthetist Special Billing and Payment Situations
**(Rev. 2716, Issued: 05-30-13, Effective:01-01-13, Implementation: 02-12-13)**

## 140.4.1 – An Anesthesiologist and Qualified Nonphysician Anesthetist Work Together
**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

A/B MACs will distribute educational releases and use other established means to ensure that anesthesiologists understand the requirements for medical direction of qualified nonphysician anesthetists.

A/B MACs will perform reviews of payments for anesthesiology services to identify situations in which an excessive number of concurrent anesthesiology services may have been performed. They will use peer practice and their experience in developing review criteria. They will also periodically review a sample of claims for medical direction of four or fewer concurrent anesthesia procedures. During this process physicians may be requested to submit documentation of the names of procedures performed and the names of the anesthetists medically directed.

Physicians who cannot supply the necessary documentation for the sample claims must submit documentation with all subsequent claims before payment will be made.

## 140.4.2 - Qualified Nonphysician Anesthetist and an Anesthesiologist in a Single Anesthesia Procedure
**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

Where a single anesthesia procedure involves both a physician medical direction service and the service of the medically directed qualified nonphysician anesthetist, the payment amount for the service of each is 50 percent of the allowance otherwise recognized had the service been furnished by the anesthesiologist alone. For the single medically directed service, the physician will use the QY modifier and the qualified nonphysician anesthetist will use the QX modifier.

In unusual circumstances when it is medically necessary for both the CRNA and the anesthesiologist to be completely and fully involved during a procedure, full payment for the services of each provider is allowed. The physician would report using the AA modifier and the CRNA would report using the QZ modifier. Documentation must be submitted by each provider to support payment of the full fee.

## 140.4.3 - Payment for Medical or Surgical Services Furnished by CRNAs
**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

Payment shall be made for reasonable and necessary medical or surgical services furnished by CRNAs if they are legally authorized to perform these services in the State in which the services are furnished. Payment is determined under the physician fee schedule on the basis of the national physician fee schedule conversion factor, the geographic adjustment factor, and the resource-based relative value units for the medical or surgical service.

## 140.5 - Payment for Anesthesia Services Furnished by a Teaching CRNA
**(Rev. 3747; Issued: 04-14-17; Effective: 01-01-17; Implementation: 05-15-17)**

Payment can be made under Part B to a teaching CRNA who supervises a single case involving a student nurse anesthetist where the CRNA is continuously present. The CRNA reports the service using the QZ modifier. No payment is made under Part B for the service provided by a student nurse anesthetist.

The A/B MAC may allow payment, as follows, if a teaching CRNA is involved in cases with two student nurse anesthetists:

- Recognize the full base units (assigned to the anesthesia code) where the teaching CRNA is present with the student nurse anesthetist throughout pre and post anesthesia care; and

- Recognize the actual time the teaching CRNA is personally present with the student nurse anesthetist. Anesthesia time may be discontinuous. For example, a teaching CRNA is involved in two concurrent cases with student nurse anesthetists. Case 1 runs from 9:00 a.m. to 11:00 a.m. and case 2 runs from 9:45a.m. to 11:30 a.m. The teaching CRNA is present in case 1 from 9:00 a.m. to 9:30 a.m. and from 10:15 a.m. to 10:30 a.m. From 9:45 a.m. to 10:14 a.m. and from 10:31 a.m. to 11:30 a.m., the CRNA is present in case 2. The CRNA may report 45 minutes of anesthesia time for case 1 (i.e., 3 time units) and 88 minutes (i.e., 5.9 units) of anesthesia time for case 2.

The teaching CRNA must document his/her involvement in cases with student nurse anesthetists. The documentation must be sufficient to support the payment of the fee and available for review upon request.

The teaching CRNA (not under the medical direction of a physician), can be paid for his or her involvement in each of two concurrent cases with student nurse anesthetists; allow payment at the regular fee schedule rate. The teaching CRNA reports the anesthesia service using the QZmodifier.

To bill the anesthesia base units, the teaching CRNA must be present with the student nurse anesthetist during pre and post anesthesia care for each of the two cases.  To bill anesthesia time for each case, the teaching CRNA must continue to devote his or her time to the two concurrent cases and not be involved in other activities. The teaching CRNA can decide how to allocate his or her time to optimize patient care in the two cases based on the complexity of the anesthesia cases, the experience and skills of the student nurse anesthetists, and the patients' health status and other factors.  The teaching CRNA must
document his or her involvement in the cases with the student nurse anesthetists.