No. 23-15973

IN THE

# United States Court of Appeals
# for the Ninth Circuit

UNITED STATES OF AMERICA
EX REL. NICOLE O'NEILL,

Plaintiff-Appellant,

v.

PST SERVICES LLC,

Defendant-Appellee.

v.

SOMNIA, INC., ET AL.

Defendants.

On Appeal from the United States District Court
for the Eastern District of California
No. 1:15-cv-00433-ADA-EPG, District Judge Dale A. Drozd

## BRIEF FOR APPELLEE

STEPHANIE YONEKURA
HARMONY GBE
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Ste 1400
Los Angeles, CA 90067

JOHANNAH WALKER
HOGAN LOVELLS US LLP
4 Embarcadero Ctr., Ste 3500
San Francisco, CA 94111

July 22, 2024

JESSICA L. ELLSWORTH
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Appellee PST Services, LLC n/k/a*
*Change Healthcare Technology Enabled Services, LLC*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee PST Services, LLC n/k/a Change Healthcare Technology Enabled Services, LLC, states that its ultimate parent company is UnitedHealth Group Incorporated, a publicly-traded managed health care company based in Minnetonka, Minnesota, traded on the New York Stock Exchange as "UNH." Apart from UnitedHealth Group Incorporated, no publicly-traded companies own 10 percent or more of the membership interest of PST Services, LLC n/k/a Change Healthcare Technology Enabled Services, LLC.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ...................................................................................iv

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION.........................................................................4

ISSUES PRESENTED FOR REVIEW ...................................................................4

STATEMENT OF THE CASE.................................................................................5

      A.      Regulatory Background .................................................................5

      B.      Nicole O'Neill Alleges That Other Defendants Lied About Performing Medical Services.................................................8

      C.      Nicole O'Neill Alleges That PST Improperly Uses The QZ Modifier .............................................................................9

      D.      The District Court Twice Dismisses O'Neill's Claims .................11

      E.      In 2022, O'Neill Requests Reconsideration Of The Court's 2018 Decision...................................................................15

SUMMARY OF ARGUMENT ..............................................................................16

STANDARD OF REVIEW ...................................................................................19

ARGUMENT ........................................................................................................20

I.      THE DISTRICT COURT CORRECTLY DISMISSED O'NEILL'S CLAIMS...................................................................................................20

      A.      O'Neill Failed To Allege Falsity .................................................20

            i.      *Alleging falsity in the Medicare and Medicaid billing context requires identifying the specific statute, regulation, or contractual provision allegedly violated* ...............................................21

# TABLE OF CONTENTS—Continued

       ii.    *Relator failed to allege a specific regulation allegedly violated* ..................................................23

       iii.   *This Court should reject O'Neill's belated attempt to reinvent her case on appeal* ................................28

   B.    O'Neill Also Did Not Plausibly Allege Knowledge Or Materiality .....................................................................34

II.   THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION AND DENIED O'NEILL'S MOTION FOR RECONSIDERATION ......................38

   A.    O'Neill's Motion Was Untimely And Failed To Identify New Evidence.................................................39

   B.    O'Neill's Challenges To The District Court's Ruling Lack Merit ......................................................................47

CONCLUSION .........................................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Antonetti v. Neven*,
No. 2:07-CV-00162-MMD-VCF, 2013 WL 4786029 (D. Nev.
Sept. 5, 2013) ................................................................................42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................36

*Back v. Sebelius*,
684 F.3d 929 (9th Cir. 2012) .........................................................30

*Baldwin v. Trailer Inns, Inc.*,
266 F.3d 1104 (9th Cir. 2001) .......................................................29

*Baronius Press Ltd. v. Faithlife Corp.*,
No. 2:22-CV-01635-TL, 2024 WL 1909087 (W.D. Wash. May 1,
2024) .............................................................................................42

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................................................19, 48

*Bly-Magee v. California*,
236 F.3d 1014 (9th Cir. 2001) .......................................................21

*California Pac. Bank v. Fed. Deposit Ins. Corp.*,
885 F.3d 560 (9th Cir. 2018) .........................................................30

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988) ......................................................................39

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) .........................................................39

*Clark v. United States*,
No. CV-06-00544 MEA/RLP, 2011 WL 2837591 (D. Haw. July
14, 2011) .......................................................................................42

*Cole v. Meeks*,
No. 15-1292, 2019 WL 1002500 (C.D. Ill. Mar. 1, 2019) .................................42

*Commerzbank AG v. U.S. Bank, N.A.*,
100 F.4th 362 (2d Cir. 2024) .....................................................................41, 47

*Coulibaly v. J.P. Morgan Chase Bank, N.A.*,
No. CIV.A. DKC 10-3517, 2011 WL 6837656 (D. Md. Dec. 28,
2011) ............................................................................................................42

*Ebeid ex rel. United States v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010) ...........................................................12, 19, 21, 32

*Evans v. S. California Intergovernmental Training & Dev. Ctr.*,
No. 22-16715, 2024 WL 1988827 (9th Cir. May 6, 2024) ...............................35

*Gharibian ex rel. United States v. Valley Campus Pharmacy, Inc.*,
No. 21-56253, 2023 WL 195514 (9th Cir. Jan. 17, 2023) ................................38

*Godecke v. Kinetic Concepts, Inc.*,
937 F.3d 1201 (9th Cir. 2019) .....................................................................37, 38

*Hooper v. Lockheed Martin Corp.*,
688 F.3d 1037 (9th Cir. 2012) .........................................................................34

*Int'l Rehab. Scis. Inc. v. Sebelius*,
688 F.3d 994 (9th Cir. 2012) ...........................................................................30

*Liberty Mut. Ins. Co. v. Sumo-Nan LLC*,
No. CV 14-00520 DKW-KSC, 2015 WL 5209345 (D. Haw. Sept.
4, 2015) .....................................................................................................41, 42

*Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*,
237 F.3d 1101 (9th Cir. 2001) .........................................................................29

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ...........................................................................44

# TABLE OF AUTHORITIES—Continued

Page(s)

*Mkhitaryan v. U.S. Bank, N.A.*,
    No. 2:11-CV-01055-JCM, 2013 WL 3943552 (D. Nev. July 30,
    2013) ................................................................................................42, 43

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) .............................................................36

*N'Genuity Enters. Co. v. Pierre Foods, Inc.*,
    No. CV-09-385-PHX-GMS, 2010 WL 94248 (D. Ariz. Jan. 5,
    2010) ..................................................................................................42

*Nittany Outdoor Advert., LLC v. Coll. Twp.*,
    179 F. Supp. 3d 436 (M.D. Pa. 2016).................................................42

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers &*
    *Lybrand, LLP*,
    322 F.3d 147 (2d Cir. 2003) .........................................................39, 40

*Oliver v. Nat'l Beef Packing Co.*,
    No. 7:07-CV-110 (WLS), 2008 WL 11460723 (M.D. Ga. July 23,
    2008) ..................................................................................................42

*Parker v. Arizona*,
    No. CV-17-00887-PHX-DWL, 2019 WL 2579404 (D. Ariz. June
    24, 2019) ............................................................................................42

*Pyramid Lake Paiute Tribe of Indians v. Hodel*,
    882 F.2d 364 (9th Cir. 1989) .............................................................39

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
    635 F.3d 757 (5th Cir. 2011) .............................................................30

*Santoro v. OCWEN Loan Servicing, LLC*,
    No. 6:14-CV-00522-TC, 2017 WL 6501860 (D. Or. Dec. 18,
    2017) ..................................................................................................42

*Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ...............................................................39

*Smith v. Barrow Neurological Inst.*,
 No. CV 10-01632-PHX-FJM, 2013 WL 221507 (D. Ariz. Jan. 18,
 2013) ........................................................................................42, 50

*SPV-LS, LLC v. Transamerica Life Ins. Co.*,
 912 F.3d 1106 (8th Cir. 2019) ....................................................43, 44

*State v. Altus Fin., S.A.*,
 116 P.3d 1175 (Cal. 2005) ...............................................................21

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
 637 F.3d 1047 (9th Cir. 2011) ..........................................................20

*United States ex rel. Campie v. Gilead Scis., Inc.*,
 862 F.3d 890 (9th Cir. 2017) ......................................................13, 21

*United States ex rel Gage v. Davis S.R. Aviation, L.L.C.*,
 658 F. App'x 194 (5th Cir. 2016) .....................................................22

*United States ex rel. Hanna v. City of Chicago*,
 834 F.3d 775 (7th Cir. 2016) ............................................................22

*United States ex rel. Hendow v. Univ. of Phoenix*,
 461 F.3d 1166 (9th Cir. 2006) ....................................................21, 32

*United States ex rel. Schutte v. SuperValu Inc.*,
 598 U.S. 739 (2023).........................................................................35

*United States ex rel. Silingo v. WellPoint, Inc.*,
 904 F.3d 667 (9th Cir. 2018) ......................................................21, 34

*United States ex rel. Stenson v. Radiology Ltd., LLC*,
 No. 22-16571, 2024 WL 1826427 (9th Cir. Apr. 26, 2024)......................*passim*

*United States Tobacco Coop. Inc. v. Big S. Wholesale of Virginia,
 LLC*,
 899 F.3d 236 (4th Cir. 2018) ............................................................39

*United States v. Neifert-White Co.*,
 390 U.S. 228 (1968).........................................................................21

Page(s)

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016) .....................................................................*passim*

*Valentine v. Settles*,
  No. 3:17-CV-01029, 2018 WL 11670292 (M.D. Tenn. Feb. 15,
  2018) ...............................................................................................42

*Vitreo Retinal Consultants of the Palm Beaches, P.A. v. U.S. Dep't of
  Health & Hum. Servs.*,
  649 F. App'x 684 (11th Cir. 2016) ...................................................30

*Whitaker v. Tesla Motors, Inc.*,
  985 F.3d 1173 (9th Cir. 2021) .........................................................19

STATUTES:

31 U.S.C. § 3729(b)(1)(A) ...................................................................34

Cal. Gov't Code § 12651(a)(1)-(2) ......................................................34

REGULATIONS:

42 C.F.R. § 414.40 ...............................................................................31

42 C.F.R. § 414.40(a) .............................................................................7

42 C.F.R. § 414.46(b) .............................................................................6

42 C.F.R. § 414.46(c) ..............................................................................5

42 C.F.R. § 414.46(c)(1)(i) ...............................................................5, 27

42 C.F.R. § 414.46(d) ..............................................................................5

42 C.F.R. § 414.46(d)(1)(i) ...................................................................28

42 C.F.R. § 414.46(f) ...........................................................................5, 6

42 C.F.R. § 414.60(a) ..........................................................................5, 6

42 C.F.R. § 415.110 ..............................................................................28

Page(s)

42 C.F.R. § 415.110(a)................................................................5, 25

42 C.F.R. § 415.110(a)(1) ..................................................................6

**RULES:**

Fed. R. Civ. P. 9(b) .........................................................................19

Fed. R. Civ. P. 54(b) ...................................................................41, 47

Fed. R. Civ. P. 59(e)........................................................................41

Fed. R. Civ. P. 60(c)........................................................................41

E.D. Cal. L.R. 230(j)(4) ...................................................................43

**OTHER AUTHORITIES:**

*Anesthesia and Pain Management*, Noridian Healthcare Sols.,
https://med.noridianmedicare.com/web/jeb/specialties/anesthesia-pain-
management ...............................................................................45

Billing Guidelines vs Conditions of Participation, https://moana.org/wp-
content/uploads/2020/09/CMS-AAs-Reimbursement-Ratios-2014.pdf ............44

Medicare Claims Processing Manual, ch. 12,
§ 50(C) ..................................................................................25
§ 50(H) ...............................................................................45, 46
§ 50(I).....................................................................7, 25, 26, 45, 46
§ 140.1....................................................................................7
§ 140.3.3.............................................................................8, 25, 26
§ 140.4.2..................................................................................26

# INTRODUCTION

Four years after the District Court dismissed Appellant Nicole O'Neill's *qui tam* action against PST Services,[1] a contractor that helps with healthcare provider billing, she sought reconsideration of that ruling. The District Court correctly dismissed her claims against PST in 2018 and did not abuse its discretion in denying her untimely motion for reconsideration in 2022. This Court should affirm.

Nicole O'Neill is a Certified Registered Nurse Anesthetist (CRNA), who used to work at a hospital. In 2015, O'Neill brought this *qui tam* action against various hospital employees and contractors. The core of her complaint was that the defendants had turned a blind eye as physicians billed for anesthesia services when they were instead off playing golf. Those allegations survived the motion-to-dismiss stage, proceeded to discovery, and the parties settled in 2022.

O'Neill's core allegations have nothing to do with this appeal. The Appellee is PST Services, a contractor that helped with the hospital's billing and was swept into this action as an afterthought. In addition to the allegations focused on PST's co-defendants, O'Neill also alleged that PST had improperly coded certain Medicare, Medicaid, and Medi-Cal procedures. More specifically, O'Neill alleged

---

[1] Effective December 31, 2017, PST Services, LLC changed its name to Change Healthcare Technology Enabled Services, LLC. PST Services has defended this action under its former name.

that when a physician supervises a CRNA who provides anesthesia to a patient, the provider must bill that procedure using a specific "QX" modifier. By contrast, according to O'Neill, the provider may use a different "QZ" modifier only if a CRNA *alone* provides services to a patient—with zero physician supervision. O'Neill argues that, when PST submitted certain Medicare, Medicaid, and Medi-Cal claims for payment using the QZ modifier, but a physician in *any* way supervised the CRNA, those claims were "false" for purposes of the False Claims Act and its California analog.

But O'Neill's allegations suffered a fatal defect. She was unable to identify *any* pertinent statute, regulation, or agency guidance that defined the QZ modifier to mean that a CRNA *alone* provided care, and that a physician, in no way, provided any degree of input or supervision. And as this Court recently explained, when a relator claims a defendant used an improper Medicare/Medicaid billing code, the relator must identify a "controlling rule, regulation, or standard" that rendered the use of that "billing code[]" "misleading." *United States ex rel. Stenson v. Radiology Ltd., LLC*, No. 22-16571, 2024 WL 1826427, at *3 (9th Cir. Apr. 26, 2024). In any meritorious case alleging improper billing, that requirement should have been an easy hurdle to clear. But O'Neill could not fulfill that basic requirement, meaning her complaint failed to state a claim against PST.

Indeed, the relevant regulations and standards affirmatively undermine O'Neill's case. The Centers for Medicare and Medicaid Services (CMS) promulgates an authoritative Medicare Claims Processing Manual—which outlines the billing modifiers providers use (including the QZ and QX modifiers). O'Neill's complaint repeatedly cited the Manual when discussing the QZ and QX modifiers. As the District Court explained, reading the Manual debunked O'Neill's theory. Nowhere does the Manual state that providers cannot use the QZ modifier when CRNAs are supervised by a physician to any degree. And the Manual does not even permit the use of the QX modifier in the particular manner that O'Neill argued—and still argues—is required.

On appeal, O'Neill asks this Court to overlook her failure to point to a statute or regulation defining the QZ code. She likewise asks the Court to ignore CMS's own Manual, which she cited in her complaint and briefed extensively in the District Court, because the Manual is a guidance document and was not subject to notice and comment rulemaking. She also claims that the meaning of the QZ code is a *question of fact*, which can only be decided by a jury.

These arguments are nonsense. First, the authoritative Manual *she invoked* refuted her claim. The District Court correctly resolved the Manual's meaning as a matter of law, as this Court and others routinely do in FCA cases. Second, even if the meaning of the QZ modifier were somehow a *purely factual question* (it just

isn't), O'Neill's theory would *still* fail.  Any *factual* assertions about the meaning of the QZ modifier would be subject to the heightened pleading standards in Federal Rule of Civil Procedure 9.  Under Rule 9, O'Neill would need to allege, with particularity, facts demonstrating that the QZ modifier literally means a CRNA *alone* provided anesthesia services.  O'Neill's complaint did nothing of the sort.

When the District Court dismissed the claims against PST in 2018, the case continued against other defendants on O'Neill's very different allegations.  She should not now—years later—be permitted to reopen a long-closed chapter on the basis that discovery relating to entirely different claims has allegedly revealed new evidence to support her theory.  The District Court properly granted PST's motion to dismiss in 2018 and denied O'Neill's motion for reconsideration as meritless and untimely in 2022.  Both decisions were correct.  This Court should affirm.

## STATEMENT OF JURISDICTION

Appellee agrees with Appellant's statement of jurisdiction.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court correctly dismissed the complaint because O'Neill failed to identify any regulation or standard defining the QZ modifier to mean a CRNA alone provided care?

2.      Whether this Court can also affirm the judgment below on the basis that O'Neill failed to plead the scienter element of her FCA claims (*i.e.*, that PST knew

its use of the QZ modifier rendered anesthesia claims false), and because O'Neill failed to plead the materiality element of her FCA claims?

3. Whether the District Court properly exercised its discretion in denying O'Neill's motion to reconsider, filed four years after the District Court had dismissed all claims against PST?

## STATEMENT OF THE CASE

### A. Regulatory Background

This case involves how Medicare, Medicaid, and Medi-Cal pay for anesthesia services. In California, anesthesia can be provided by a physician or by a Certified Registered Nurse Anesthetist, known as a "CRNA." CRNAs may practice completely independently or under the oversight of a physician.

Regulations promulgated by CMS define three types of physician anesthesia services for which the government will pay: (1) *personally performed*, (2) *medical direction*, and (3) *medical supervision*. *See* 42 C.F.R. §§ 414.46(c), (d), (f), 414.60(a). Each of these terms has a technical meaning under CMS's regulations.

"Personal performance" means the physician "performs the entire anesthesia service alone." *Id*. § 414.46(c)(1)(i).

"Medical direction" means an anesthesiologist directs the anesthesia in up to four concurrent procedures and satisfies seven requirements imposed by a provision in the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). *Id*. § 415.110(a).

Those seven requirements are that the anesthesiologist must: (1) perform a pre-anesthetic examination and evaluation; (2) prescribe the anesthesia plan; (3) personally participate in the most demanding aspects of the anesthesia plan, including, if applicable, induction and emergence; (4) ensure that any procedures in the anesthesia plan that the physician does not perform are performed by a qualified individual; (5) monitor the course of anesthesia administration at frequent intervals; (6) remain physically available for immediate diagnosis and treatment of emergencies; and (7) provide indicated post-anesthesia care. *Id*. § 415.110(a)(1).

Finally, "medical supervision" has a different meaning from medical direction. *Id*. §§ 414.46(b), (f). The regulations do not provide a precise definition of medical supervision, but it at minimum includes anytime a physician supervises more than four concurrent cases, the limit permitted to qualify for medical direction. *Id*. § 414.46(f).

CMS's regulations separately permit reimbursement of anesthesia provided by CRNAs. Those regulations provide for payment in two separate circumstances: When the anesthesia services provided by the CRNA are (1) "medically directed," and when anesthesia services provided by the CRNA are (2) "not directed by a physician." *Id*. § 414.60(a).

CMS's regulations also require the agency to "establish[] uniform national definitions of services, codes to represent services, and payments modifiers to the

codes." *Id.* § 414.40(a). Pursuant to the mandate to "establish[] uniform national definitions," *id.*, CMS promulgates the Medicare Claims Processing Manual. Among other things, Chapter 12 of the Manual describes various modifiers for use when requesting reimbursement for physician services, including:

> "AA – Anesthesia Services performed personally by the anesthesiologist";

> "AD – Medical Supervision by a physician; more than 4 concurrent anesthesia procedures"; and

> "QK – Medical direction of two, three or four concurrent anesthesia procedures involving qualified individuals."

Medicare Claims Processing Manual, ch. 12, § 50(I).[2]

Chapter 12 also provides modifiers for the services of a "qualified nonphysician anesthetist." *Id.* § 140.1. In the Manual, the term "qualified nonphysician anesthetist" means both a CRNA and an anesthesiologist's assistant, a different category of nurse anesthetist. *Id.* The Manual provides two modifiers, one that applies to all qualified nonphysician anesthetists and one that applies only to CRNAs:

> "QX – Qualified nonphysician anesthetist service: With medical direction by a physician"; and

> "QZ – CRNA service: Without medical direction by a physician."

---

[2] Chapter 12 of the Manual is available at this link: https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c12.pdf.

*Id.* § 140.3.3.

The Manual provides a third modifier, "QS," used for "informational purposes" when performing a particular type of anesthesia procedure. *Id.*

In this appeal, the relator alleges that when a CRNA receives some degree of supervision from a physician, but that supervision falls short of the strict requirements for medical direction, the CRNA must nevertheless use the "QX" modifier for medical supervision and the physician must bill for his or her services using the AD modifier. According to relator, a CRNA may bill under the "QZ" only if the CRNA *alone* provides care, and receives no input from a physician.

## B. Nicole O'Neill Alleges That Other Defendants Lied About Performing Medical Services.

Relator Nicole O'Neill is a CRNA who used to provide anesthesia services at Kaweah Delta Medical, a hospital in Visalia, California. ER-134; ER-137. The hospital contracted with two entities to provide professional services for its anesthesia department: Primary Anesthesia Services and Somnia, Inc. ER-137. For simplicity, this brief refers to the two entities collectively as "Somnia."

O'Neill began working at Kaweah in March 2012. *Id.* Over the course of two years, she came to believe that the government was being overbilled for anesthesia services provided at Kaweah to patients whose care was paid by Medicare, Medicaid, and Medi-Cal. ER-149-157.

According to O'Neill, physicians at Kaweah billed for services they did not perform. For example, O'Neill alleged that one doctor left for the airport but billed as if he had medically directed an anesthesiology procedure. ER-153. In 2013, the same doctor was supposed to be medically directing a procedure, but left to golf with the hospital's chief operating officer. ER-154. According to O'Neill, another doctor "was listed as medically directing" her services, "but left the OR" and was also "playing golf" when O'Neill tried to contact him for assistance. ER-155 (emphasis omitted).

O'Neill allegedly raised her concerns within the hospital and with Somnia. ER-154-156. Then, in late March 2013, O'Neill resigned from her position as chief CRNA and assumed a position as staff CRNA. ER-155-156. And in June 2014, Somnia terminated O'Neill without cause. ER-165. O'Neill claimed that her termination was retaliation for complaints about fraudulent billing. ER-169-171.

### C. Nicole O'Neill Alleges That PST Improperly Uses The QZ Modifier.

In March 2014, three months before O'Neill's termination, Somnia engaged PST Services to improve billing. ER-157-158. Even by O'Neill's account, PST sought to remedy defects in the hospital's practices. Shortly after Somnia hired PST, the hospital introduced new coding software. *Id*. And on at least one occasion during her short overlap with PST, a PST employee affirmatively sought to "resolve[]" "errors" she had identified in billing. ER-160.

O'Neill does not assert that PST had any hand in her allegedly retaliatory termination. ER-169-171. As the case progressed, O'Neill also disclaimed any allegations that PST falsely documented physicians' attendance in procedures when the physicians were not present, for example because they were playing golf.[3]

Instead, O'Neill has alleged that PST improperly used a QZ modifier in seeking reimbursement for some anesthesia services. According to O'Neill's operative complaint, when a CRNA is "Medically Supervised" by a physician, the CRNA must bill under a QX modifier, and the physician must also bill for services and use the AD modifier. ER-141. By contrast, according to O'Neill, the QZ modifier reflects "an express representation to the government that a CRNA, alone and without any supervision by an anesthesiologist, performed the services in question." ER-148. The complaint did not cite any regulation or agency guidance that defined the QZ modifier to mean that a CRNA *alone* performed the procedure, without *any* degree of input or potential oversight from a physician.

O'Neill alleges that PST submitted bills for CRNAs with a QZ modifier and did not submit bills for the physician. According to O'Neill, billing procedures in

---

[3] O'Neill conceded that she was not asserting any claims against PST prior to March 3, 2014, and would have no good faith basis to do so. ER-129. After the court dismissed O'Neill's allegations based on use of the QZ modifier at issue in this appeal, *id.*, O'Neill acknowledged that the dismissal fully resolved her claims against PST, *see* SER-37.

this manner resulted in a higher rate of reimbursement than if the hospital had submitted a CRNA bill with a QX modifier and a separate bill for the physician with the AD modifier.  ER-144-145.

### D. The District Court Twice Dismisses O'Neill's Claims.

In 2015, O'Neill filed this *qui tam* action in the Eastern District of California, asserting counts under both the federal and state FCAs.  The United States and California both declined to intervene.  D. Ct. Dkt. Nos. 16, 17.  PST and the other defendants filed motions to dismiss.  Rather than oppose those motions on the merits, O'Neill amended her complaint.  ER-236; *see also* D. Ct. Dkt. No. 41.

In that First Amended Complaint, O'Neill alleged that claims submitted for reimbursement using the QZ modifier had impliedly and falsely certified compliance with *the hospital's bylaws*, which required a physician to oversee a CRNA.  *See* SER-92.  The District Court dismissed these allegations based on the FCA's materiality element: O'Neill had failed to allege that the alleged false certification of compliance with hospital bylaws would have been material to the government's decision to pay claims for anesthesia care.  SER-103-104.  O'Neill's complaint contained "no mention of materiality," and her brief offered no response "to defendants' argument with respect to materiality."  *Id.*  As the District Court explained, that "deficiency" was "fatal."  SER-104.

O'Neill then filed a second amendment complaint, which is the operative complaint in this appeal. ER-131-178. O'Neill recrafted her theory. This time, she argued that Defendants' use of the QZ modifier certified that a CRNA performed the services "alone and without any supervision by an anesthesiologist," and that the services complied with "the TEFRA regulations." ER-148.

In September 2018, the District Court dismissed O'Neill's claims regarding the QZ modifier for a second time. The court explained that the "archetypal False Claims action involves a private company overcharging under a government contract, such that the claim for payment is itself literally false or fraudulent." ER-122 (quotation marks omitted). Such allegations "are referred to as 'factually false' claims." *Id.* (citation omitted). But a relator may also allege a legal false certification theory, which is the path O'Neill sought to take in this case.

A legal false certification theory comes in two forms: (a) express false certification, and (b) implied false certification. ER-123. "Under an express false certification theory of liability, 'the entity seeking payment falsely certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted.' " *Id.* (brackets omitted) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

"By contrast, under an implied false certification theory, 'when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment.' "

*Id.* (quoting *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 901 (9th Cir. 2017)). If "the claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement the defendant has made a misrepresentation that renders the claim" false. *Id.* (same, ellipses omitted). In both cases, the false certification of compliance with a *statute*, *regulation*, or *governmental standard* renders the claim false.

The District Court explained that, in her Second Amended Complaint, O'Neill had sought to bring both express and implied false certification, but neither stated a claim.

*First*, O'Neill asserted "that when defendants used the QZ code, they falsely 'made an express representation to the government that a CRNA, alone and without any supervision by an anesthesiologist, performed the services in question.' " *Id.* (quoting ER-148). But O'Neill did not point to "any legal authority stating that the QZ code may *only* be used in the absence of supervision by an anesthesiologist." ER-125. This defect was fatal to O'Neill's express false certification theory.

Meanwhile, the Second Amended Complaint and O'Neill's briefing had extensively cited the CMS Manual. ER-124. The District Court read the Manual and concluded that it undercut her theory, as a matter of law. The "most natural reading of the Manual" permitted the use of the QZ modifier for a CRNA's provision of anesthesia care "unless the service was medically directed." ER-125. The court

explained that the "Manual states only that the QZ code is to be used where CRNAs provide anesthesia services 'without medical direction by a physician.' " ER-125-126. This does not mean that "CRNAs must operate independently in order to use the QZ code." ER-126. "[M]edical direction is a term of art appearing within the Manual, and there are precise requirements that providers must meet in order to code a service as medically directed." ER-125. If a CRNA is not medically directed, but is supervised by a physician in some other fashion, the use of the QZ code is not "prohibited by any rule or regulation." ER-126.

*Second*, O'Neill had alleged "that defendants 'submitted demands for payment that contained false implied certifications that they had complied' " with the TEFRA regulations. ER-124 (quoting ER-148). But, the District Court explained, this implied false certification theory also failed to state a claim. ER-124, ER-126-127. The TEFRA regulations apply only when medical direction occurs. ER-126-127. By contrast, everyone agrees the QZ modifier applies only if a CRNA acts *without* medical direction. As a result, the QZ modifier could not possibly imply compliance with the TEFRA regulations. *Id.*

Finally, the court agreed that O'Neill could not plausibly sustain a claim against PST for conduct that pre-dated its involvement with the hospital. ER-127-128. The District Court's order dismissed all of O'Neill's claims against PST, leaving only her claims against the other defendants. ER-129-130.

### E. In 2022, O'Neill Requests Reconsideration Of The Court's 2018 Decision.

O'Neill and the remaining defendants proceeded to discovery on O'Neill's core allegations—*i.e.*, that doctors played golf instead of performing procedures, and that Somnia fired her in retaliation for her complaints. In 2022, four years after the District Court had dismissed its claims, and shortly before signing a settlement agreement with those defendants, O'Neill requested that the District Court reconsider its decision to dismiss the claims against PST. ER-16-38. She acknowledged that motions for reconsideration "should be infrequently brought and even more infrequently granted." ER-8. But she alleged that "new and different facts emerged" during discovery that had shed light on the meaning of the QZ modifier. ER-30 (emphasis omitted and capitalization altered).

The District Court denied O'Neill's motion. The court explained that the allegedly new facts would not have changed the outcome because its analysis of her false certification claims had been "based on the *legal* issue of the meaning of governing regulations and provisions relating to the QZ and other codes." ER-4 (emphasis added).

In addition, even "if some of the discovery might have had a bearing on the court's analysis," the motion was untimely. *Id*. The District Court noted that motions for reconsideration prior to the entry of judgment are permitted by Federal Rule of Civil Procedure 54(b). ER-3. While Rule 54(b) does not establish a fixed

deadline for filing such motions, courts may consider the timeliness of the motion, and "generally interpret the standards for Rule 54 to be coextensive with Rules 59 and 60." ER-4. Under those latter rules, "motions for reconsideration must be made within a reasonable time, and generally within one year." *Id*. The court concluded that O'Neill had failed to explain why "four years [had] passed before she sought reconsideration," and that the "time for reconsideration" had "long passed." ER-5.

This appeal follows.

## SUMMARY OF ARGUMENT

**I.** The District Court properly dismissed O'Neill's complaint for failure to state a claim. This Court should affirm.

**I.A.** O'Neill's complaint failed to point to a controlling rule, regulation or standard that would support her false certification theory of FCA liability. Her complaint alleged that, by using the QZ billing modifier on its claims, PST falsely certified that a CRNA *alone* provided anesthesia services. As this Court recently explained, however, when a realtor brings a false certification case based on CMS billing codes, the relator must identify the "controlling rule, regulation, or standard" that rendered the defendant's use of the "billing codes" "misleading." *Stenson*, 2024 WL 1826427, at *3. O'Neill did not do that. Indeed, CMS's Manual—which is the source of the QZ modifier on which O'Neill's complaint relied—affirmatively debunks the notion that the modifier applies only if a CRNA alone provides services.

On appeal, O'Neill argues that her complaint alleged factual falsity, and that the meaning of the QZ modifier is a factual question to be decided at trial. But before the District Court, O'Neill repeatedly framed her claims as a false certification theory, and she cannot run away from that characterization by raising a new argument now. Nor can she prevail simply by relabeling her complaint. If the meaning of the QZ modifier is a purely factual question (it is not), then O'Neill had an obligation under Rule 9's heightened pleading standard to identify facts with particularity that supported her assertions. She did not come close to doing that.

In short, that O'Neill could not point to *anything* that limited use of the QZ billing modifier to situations where there is zero physician involvement in anesthesia services is fatal to her claim, whether she labels it a "false certification" theory or a "factual falsity" theory.

**I.B.** O'Neill's claim against PST had other shortcomings as well: scienter and materiality. O'Neill did not plausibly allege that PST *knew* using the QZ modifier would make claims false when no physician supervision was involved. O'Neill likewise failed to allege that PST's use of the QZ modifier was *material* to the government's payment decision. Either of these alternative grounds is another basis for affirmance.

**II.** Four years after the District Court dismissed all claims against PST, O'Neill requested that the court reconsider its order. The court acted well within its

broad discretion and denied that extremely tardy request.  This Court should affirm, for at least three reasons.

*First*, O'Neill sought to present additional factual arguments (allegedly uncovered in discovery against the other defendants) regarding the meaning of the QZ modifier.  But as the District Court correctly explained, to support her false certification theory, O'Neill had a legal obligation to point to a government regulation or standard, and the plain text of the Manual refutes her claim.

*Second*, the District Court properly denied O'Neill's request to revisit a four-year old order as untimely.  Had O'Neill filed her motion after the entry of a final judgment, it would have unquestionably been untimely.  Federal Rule of Civil Procedure 59 would have imposed a 28-day limit on her motion, and Rule 60 would have barred it after 1-year.  Because O'Neill filed her motion before the entry of a judgment, the Federal Rules do not mandate a firm deadline.  But courts may nevertheless consider whether the movant has unreasonably delayed in bringing a motion and may look to the limits in Rules 59 and 60 as a guide.  In this case, the District Court acted well within its discretion when it concluded that a motion challenging a four-year old order was untimely.

*Third*, O'Neill's motion separately failed because the facts O'Neill sought to present to the court had been available to O'Neill when she opposed the motion to dismiss in 2018.  For example, O'Neill cited an article published in 2014, yet never

explained why she could not have cited the article in 2018. What is more, the facts O'Neill identified refuted (once again) her theory of the QZ modifier.

## STANDARD OF REVIEW

This Court reviews "de novo a district court's order granting a motion to dismiss for failure to state a claim." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1175 (9th Cir. 2021). In evaluating whether a plaintiff has stated a claim, the Court assumes the truth of the complaint's allegations, but does "not accept as true legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*. at 1176 (quotation marks and brackets omitted). In addition, because O'Neill alleges fraud, her complaint is subject to Rule 9's heightened pleading standard, and she must "state with particularity the circumstances constituting fraud." *Ebeid*, 616 F.3d at 998 (quoting Fed. R. Civ. P. 9(b)).

This Court reviews "the denial of a motion for reconsideration for abuse of discretion." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Reconsideration "is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Id*. at 858-859 (quotation marks omitted). "Reconsideration motions may not be used to raise new arguments or introduce new evidence if, with reasonable diligence, the arguments and evidence could have been presented during consideration of the original ruling." *Id*. at 859.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DISMISSED O'NEILL'S CLAIMS.

### A. O'Neill Failed To Allege Falsity.

The existence of a false claim is indispensable to proving FCA liability under federal and state law. *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("[A]n actual false claim is the sine qua non of a[n FCA] violation." (quotation marks omitted)). In this case, O'Neill advanced a false-certification theory, *i.e.*, that claims submitted by PST to Medicare falsely certified compliance with a law or regulation that was a material condition of payment. To survive a motion to dismiss, O'Neill needed to identify the law or regulation that PST allegedly violated by submitting claims for CRNA services with a QZ modifier. But as the District Court thoroughly explained, and despite that O'Neill was on the *third* version of her complaint, O'Neill completely failed to point to specific a law or regulation that barred the alleged conduct. Indeed, the opposite is true. The relevant sections of CMS's Medicare Claims Processing Manual—a document O'Neill's complaint repeatedly invoked—*confirm* that the use of the QZ modifier was appropriate. ER-124-127. O'Neill unequivocally failed to state a claim, and she cannot prevail simply by relabeling her allegations ones of "factual falsity." This Court should affirm.

i. *Alleging falsity in the Medicare and Medicaid billing context requires identifying the specific statute, regulation, or contractual provision allegedly violated.*

The federal and state FCAs "protect[] the funds and property of the Government" of the United States, and California, "from fraudulent claims." *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)); *see State v. Altus Fin., S.A.*, 116 P.3d 1175, 1182 (Cal. 2005).

To state a claim under either statute, a relator must allege "a false statement or fraudulent course of conduct." *Campie*, 862 F.3d at 899 (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)); *see also Altus Fin.*, 116 P.3d at 1184 ("Federal authority construing the FFCA supports our construction of the CFCA."). A claim may be *factually false* where it is "literally false or fraudulent," for instance where a defendant had requested payment "for goods or services never provided." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 675 (9th Cir. 2018) (quotation marks omitted).

A claim may also be *legally false*, under a so-called "false certification theory." There are two flavors of false certification. Under an *express* false certification theory, "the entity seeking payment" falsely "certifies compliance with a *law, rule or regulation* as part of the process through which the claim for payment is submitted." *Ebeid*, 616 F.3d at 998 (emphasis added). Under an *implied* false

21

certification theory, the defendant's submission of a claim to Medicare for payment—in-and-of-itself—"certifies compliance with all conditions of payment." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180 (2016). The implied certification that accompanies the claim is false if the claim "fails to disclose the defendant's violation of a *material statutory, regulatory, or contractual requirement*." *Id.* at 180-181 (emphasis added).

For both express and implied false certification, what matters is that a defendant's certification of compliance with a specific "statutory, regulatory, or contractual requirement[]" renders the claim false. *Id.* at 186-187; *see also Stenson*, 2024 WL 1826427, at *2 (explaining claims "are not false under the FCA unless they are furnished in violation of some controlling rule, regulation or standard" (quotation marks omitted)). If the complaint cannot identify a specific appropriate statute, regulation, or contractual requirement, the complaint fails to plead the central ingredient of a false certification theory. *See United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) (Wood, J.) (plaintiff must identify "the specific provisions of law whose violation made the certification of compliance false"); *United States ex rel Gage v. Davis S.R. Aviation, L.L.C.*, 658 F. App'x 194, 197 (5th Cir. 2016) (per curiam) (failure to identify "*any* statute or contract provision violated by the defendants" means complaint fails to state claim (quotation marks and ellipses omitted)). As this Court recently explained, where a complaint alleges

that a defendant "used misleading billing codes," but fails "to identify any controlling rule, regulation, or standard that [the defendant] violates by submitting 'misleading' billing codes," the complaint "fails to plead falsity." *Stenson*, 2024 WL 1826427, at *3. "In the absence of controlling authority, there can be no violation." *Id.*

### ii. *Relator failed to allege a specific regulation allegedly violated.*

In this case, O'Neill pursued express and implied false certification theories. The meat of the appeal involves what she styled an express certification theory. She alleged that use of the QZ billing modifier was an "express representation . . . that a CRNA, alone and without any supervision by an anesthesiologist, performed the services in question."[4] ER-148. But O'Neill *never* identified a statute, regulation, agency guidance, or contractual provision that defined the QZ billing modifier in this manner.

At the hearing on defendants' motion to dismiss, the District Court pressed O'Neill's counsel on this point: "[W]ith respect to the QZ modifier, what regulation are you alleging has been violated?" SER-57. O'Neill's counsel could not answer:

---

[4] Because O'Neill and the District Court labeled this theory an *express* false certification, we do too. That said, it may be more accurate to refer to it as an *implied* false certification claim given that O'Neill does not allege any actual certification. Regardless, the claim fails for the same reason: "In the absence of controlling authority, there can be no violation." *Stenson*, 2024 WL 1826427, at *3.

We're alleging that the regulation that called for – our answer is basically predicated in paragraph 36 of our second amended complaint. . . . We set forth the [billing] codes. . . . When you bill QZ, when it's not appropriate, you get more money back than if you don't bill medically supervised as I've described. . . . So that's where the – that's where the misrepresentation – so it's an express misrepresentation.

*Id.*

O'Neill cannot identify a regulation, guidance, or standard defining the QZ billing modifier in accordance with her narrow view because there is none to support her theory of this case. Contrary to O'Neill's arguments on appeal, *see* O'Neill Br. 44, 46, the absence of any regulation, guidance, or standard prohibiting PST's use of the QZ modifier *is* dispositive to her claims. *See Escobar*, 579 U.S. at 180 (implied certification is false if it "fails to disclose . . . violation of a *material statutory, regulatory, or contractual requirement*" (emphasis added)); *Stenson*, 2024 WL 1826427, at *2 (false certification claim requires certification of compliance with specific "controlling rule, regulation, or standard" (quotation marks omitted)).

What is more, CMS's Medicare Claims Processing Manual—which is promulgated according to CMS's mandate to establish uniform national standards, is the source of the QZ modifier, and which O'Neill cited extensively in her complaint—*permits* the use of the QZ modifier when a physician is involved in a procedure, but that involvement falls short of "medical direction." *See* ER-140, 143-145 (complaint repeatedly relying on the Manual).

The Manual lists three modifiers that CRNAs may use to code anesthesia services: "QX," "QZ," and "QS." Medicare Claims Processing Manual, ch. 12, § 140.3.3. According to the Manual, the "QS" modifier is for "informational purposes," not billing. *Id.* The remaining two modifiers distinguish between services provided "[w]ith medical direction by a physician" ("QX") and services provided "[w]ithout medical direction by a physician" ("QZ"). *Id.*

As the District Court explained, "medical direction is a term of art." ER-125. There "are precise requirements that providers must meet in order to code a service as medically directed." *Id.* According to CMS regulations and the Manual, to provide medical direction, a physician must oversee no more than "four concurrent anesthesia services," and must perform specific tasks, such as "a pre-anesthetic examination and evaluation" and "post-anesthesia care." 42 C.F.R. § 415.110(a); *see* Medicare Claims Processing Manual, ch. 12, § 50(C), (I).

If a physician does not meet the requirements of medical direction, the physician does not medically direct the CRNA, even if the physician supervises the CRNA to some degree. In such circumstances, because the CRNA provides services "[w]ithout medical direction," the Manual permits the CRNA to use the "QZ" modifier. Medicare Claims Processing Manual, ch. 12, § 140.3.3. The CMS Manual does not identify any other billing modifier that could cover this scenario.

Other portions of the Manual direct billers to use the "QZ" modifier in circumstances in which a CRNA and a physician are involved in the same procedure. This directly refutes O'Neill's theory that the "QZ" modifier is appropriate only if a CRNA *alone* provides care. For example, Section 140.4.2 of the Manual provides instructions regarding coding a procedure "when it is medically necessary for both the CRNA and the anesthesiologist to be completely and fully involved." Medicare Claims Processing Manual, ch. 12, § 140.4.2. In that case, the "physician would report using the AA modifier and the CRNA would report using the QZ modifier." *Id.* This debunks the motion that "QZ" means a CRNA *alone* provided care.[5]

The Manual likewise does not support O'Neill's theory that CRNAs should use a "QX" billing code if a CRNA performs anesthesiology services under "medical supervision." O'Neill Br. 35-36. The Manual explains that the "QX" code is reserved for services provided "[w]ith *medical direction* by a physician." Medicare Claims Processing Manual, ch. 12, § 140.3.3 (emphasis added). As O'Neill acknowledges, a physician may provide a degree of medical supervision *without* meeting the strict criteria for medical direction. ER-79. When a physician supplies *supervision* but not *medical direction*, the Manual does not permit the use of the

---

[5] The physician uses an "AA" modifier to signal the physician's personal performance of a procedure. *See* Medicare Claims Processing Manual, ch. 12, § 50(I). The CRNA uses a "QZ" modifier because the physician involved did not meet the requirements for medical direction. *See id.* § 140.3.3.

"QX" modifier. Meanwhile, the Manual provides just one code for the CRNA to use: "QZ."

Finally, if that were not enough (and it was), the District Court also explained that "other regulations promulgated by CMS" bolstered its straightforward reading of the Manual. ER-126. CMS's regulations provide a specific definition for when an anesthesiologist personally performs "the entire anesthesia service alone." *Id*. (quoting 42 C.F.R. § 414.46(c)(1)(i)). By contrast, CMS's regulations do *not* include "a corresponding provision in the regulations governing CRNA billing, although it could have done so, for instance by stating that the QZ code may be used when the CRNA 'performs the entire anesthesia service alone.' " *Id*. That "such language is absent from the regulations governing use of the QZ code" reinforces the conclusion "that CRNAs are not required to operate independently in order for the QZ code to be employed." *Id*.

O'Neill's implied false certification claim fared no better. To plead an implied false certification claim, a plaintiff must allege (1) that the defendant made "specific representations about the goods or services provided," and (2) the defendant's "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 579 U.S. at 190.

In the District Court, O'Neill had argued that, whenever PST employed the "QZ" modifier, PST impliedly certified compliance with regulations implementing the TEFRA. ER-148-149; *see also* SER-86 ("Relator has alleged that when Defendants submitted demands for payment, those demands included an implied certification that Defendants had complied with TEFRA").

But, as O'Neill later conceded and as the District Court explained in dismissing the claims against PST, those TEFRA regulations apply only to an anesthesiology procedure that meets the requirements for *medical direction*. ER-127; SER-45; *see also* 42 C.F.R. §§ 414.46(d)(1)(i), 415.110. By contrast, everyone agrees the "QZ" billing code *cannot apply* when CRNAs perform services *under medical direction*. Thus, the "QZ" code could not possibly imply compliance with TEFRA regulations that apply to medically directed procedures. *See* ER-127.

> iii.   *This Court should reject O'Neill's belated attempt to reinvent her case on appeal.*

On appeal, now six years after the District Court dismissed all claims against PST, O'Neill attempts to retool her case. O'Neill argues that her express false certification theory was a factual falsity argument, and that her implied false certification claim did not involve TEFRA regulations, but instead concerned a different regulation. These arguments were forfeited below. They are also meritless.

Start with O'Neill's attempt to reframe her argument about the QZ code as one of factual falsity. Below, O'Neill deliberately eschewed a factual falsity

argument, and thus conclusively forfeited it. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1112 (9th Cir. 2001) ("When a claim is not raised below, it is not considered on appeal."); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1111 n.2 (9th Cir. 2001) (declining to consider claim asserted on appeal that was not alleged in complaint or passed on by district court).

In deciding whether to dismiss the First Amended Complaint, the District Court explained that O'Neill's theory regarding the QZ code was a false certification theory. SER-97 n.6. O'Neill's Second Amended Complaint leaned into the District Court's characterization, and actually labeled her arguments as involving express and implied false certifications. ER-147 ("Each of the types of false claims described above constitute express false certifications . . . ."); ER-148-149 ("Similarly, as described above, Defendants submitted demands for payments that contained false implied certifications that they had complied with the TEFRA regulations . . . ."). When opposing the motion to dismiss, O'Neill defended her complaint by arguing that it plausibly alleged false certification. SER-80-88; *see also* D. Ct. Dkt. 80, at 10 (Opp'n to Somnia Mot. to Dismiss). In short, O'Neill *never* characterized her arguments as rooted in a theory of factual falsity below. She cannot sing a different tune on appeal.[6]

---

[6] To the extent O'Neill belatedly characterized her argument as involving factual falsity in her motion for reconsideration, four years after the District Court dismissed

Even if O'Neill had preserved a factual falsity argument, it would fail for at least two reasons.

*First*, the "QZ" modifier is the product of CMS's Manual. That is why O'Neill's complaint repeatedly cited the Manual. The Manual's meaning, like the meaning of a statute, regulation, or contract, is a legal question that a court can resolve at the outset of a case.

Indeed, this Court and others regularly interpret the Manual and similar agency guidance without reference to factual evidence or allegations. *See, e.g.*, *Int'l Rehab. Scis. Inc. v. Sebelius*, 688 F.3d 994 (9th Cir. 2012) (interpreting chapters 15 and 30 of the Medicare Claims Processing Manual); *Back v. Sebelius*, 684 F.3d 929, 932 n.3 (9th Cir. 2012) (rejecting party's interpretation of the Medicare Claims Processing Manual as a matter of law); *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 767 n.4 (5th Cir. 2011) (similar); *Vitreo Retinal Consultants of the Palm Beaches, P.A. v. U.S. Dep't of Health & Hum. Servs.*, 649 F. App'x 684 (11th Cir. 2016) (per curiam) (similar).

This makes sense. Agency-issued instruction manuals reflect an agency's interpretations and implementations of statutes and regulations. *See California Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 571 (9th Cir. 2018) ("[A]n agency-

---

her claims against PST, her arguments came far too late, and should have been raised in response to the motion to dismiss. *See infra* pp. 40-43.

issued instruction manual, even if lacking the force of law itself, can clarify what conduct is expected of a person subject to a particular regulation . . . .").  Interpreting an agency's *legal* analysis is thus an inherently legal endeavor.

O'Neill suggests that, because the Manual was not promulgated under notice-and-comment rulemaking, the Court cannot rely on its authoritative guidance to understand CMS's billing codes.  O'Neill Br. 15, 46.  This is a distraction.  Notice-and-comment rulemaking triggers procedural rights under the Administrative Procedures Act, such as the ability to file comments and challenge the agency's rule after promulgation.  The absence of notice-and-comment rulemaking, however, does not mean the Manual's meaning is any less of a legal question.  CMS's regulations require the agency to establish "uniform national definitions" and "uniform national ancillary policies," which CMS does through the Manual.  42 C.F.R. § 414.40.  The QZ billing modifier is a creature of CMS's Manual, O'Neill repeatedly invoked in the complaint, and was properly evaluated by the District Court.

*Second*, a realtor should not be able to relabel a meritless false certification case as a factual falsity argument.  O'Neill's complaint is best understood as a false certification theory—*i.e.* by using the QZ code PST certified compliance with the requirements accompanying that code.  *See Escobar*, 579 U.S. at 184 (characterizing argument that provider used "codes corresponding to different services that its staff provided" as a false certification theory).  To bring a false certification case, a relator

must point to point to a rule, regulation, or standard.  *See supra* pp. 21-23.  If the relator cannot, she does not state a claim.  *See, e.g.*, *Stenson*, 2024 WL 1826427, at *2.  To the extent O'Neill argues that her inability to do so is not "dispositive," she is simply wrong.  O'Neill Br. 44.

Yet even if O'Neill's theory is one of factual falsity (it is not), it still fails because it would be subject to Rule 9's heightened pleading standard.  Under Rule 9, O'Neill must demonstrate, with particularity, how the QZ modifier "literally" meant that a CRNA practiced independently.  *Hendow*, 461 F.3d at 1170.  To be sure, O'Neill's complaint made conclusory allegations that the QZ modifier was only appropriate when a CRNA acted independently.  Rule 9, however, requires her to establish factual circumstances demonstrating falsity with particularity.  *See Ebeid*, 616 F.3d at 998. O'Neill has not identified anything in the operative complaint to support her theory of the QZ modifier, and this Court should reject it out of hand.[7]

Finally, O'Neill suggests that the District Court's interpretation of the Manual renders the AD code for a physician's supervision meaningless because providers will always bill the QZ code for the CRNA and not bill for the physician at all to maximize the total payment to the provider.  O'Neill Br. 39.  Not so.

---

[7] O'Neill conflates the allegations in the operative Second Amended Complaint, with the allegations in her proposed *Third* Amended Complaint.  *See* O'Neill Br. 36-38 (citing, e.g., ER-79-80, ER-80, ER-80-81).  Those allegations came too late, and do not support her claim in any event.  *See infra* pp. 43-46.

Anesthesiologists and CRNAs do not always work for the same practice. An anesthesiologist who supervises more than four CRNAs at a different practice may need to use the AD code to bill for his or her services separately, even if it potentially produces lower overall combined reimbursement. Otherwise, only the CRNA's practice would receive reimbursement for the service provided.

This Court should similarly reject O'Neill's newest implied false certification theory. O'Neill now argues that PST's claims for payment were false because they impliedly certified compliance with a requirement that PST "document[] all providers involved in the service" provided. O'Neill Br. 43 (quoting ER-145). O'Neill argues that PST's certification was false because the QZ modifier "deceptive[ly]" communicates that no anesthesiologist had any degree of involvement. *Id.* But, again, O'Neill forfeited this argument and cannot raise it now.

O'Neill's theory is also wrong: The Manual directs providers to use the QZ code in circumstances in which a physician and a CRNA both provide care. *See supra* pp. 24-27. Meanwhile, O'Neill fails to identify a law, rule, or regulation that requires a billing service to list every provider involved in a procedure. *Contra Escobar*, 579 U.S. at 186-187; *Stenson*, 2024 WL 1826427, at *2.

O'Neill attempts to satisfy this requirement by invoking paragraph 50 of her Second Amended Complaint and the General Billing Instructions of the CMS Manual. O'Neill Br. 43. But neither helps. Paragraph 50 of the complaint cites

"482.52 et seq." and "MCM chapter 12 section 50 et seq." to suggest that federal law contains a provider-documentation requirement. ER-145. But 42 C.F.R § 482.52 says nothing about whether a claim for payment must list all providers involved in the billed-for service. Nor does chapter 12 or the "General Billing Instructions" for the CMS Manual.

\* \* \*

In short, O'Neill's complaint failed to state a claim because she did not point to a regulation or standard that definitively limited the QZ modifier to circumstances in which a CRNA *alone* provides care. That is also just not what the Manual says, and the District Court correctly dismissed the case against PST.

### B. O'Neill Also Did Not Plausibly Allege Knowledge Or Materiality.

This Court may affirm dismissal "on any ground supported by the record." *Silingo*, 904 F.3d at 678. O'Neill's complaint against PST separately failed because she did not plausibly allege either that PST *knowingly* submitted false claims for payment, or that the allegedly misleading use of the QZ code was *material* to the government's payment decision.

*Knowledge*. To be subject to FCA and CFCA liability, a defendant must submit a false or fraudulent claim "with knowledge that the claim was false or fraudulent." *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012); *see* 31 U.S.C. § 3729(b)(1)(A); Cal. Gov't Code § 12651(a)(1)-(2). This

requires a relator to allege that the defendant *actually* knew that its statement was false or that the defendant was deliberately or recklessly ignorant of the statement's falsity. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749-750 (2023).

The Second Amended Complaint contains no facts alleging that PST knew that use of the QZ modifier was limited to billing for CRNA services independent of any degree of physician supervision. To the contrary, the only available federal guidance on the QZ modifier indicated that PST's billing was proper. *Supra* pp. 24-27.

Pleading knowing misconduct is harder when the only available guidance suggests that a defendant's billing practices were proper. The FCA does not penalize a defendant's honest, albeit incorrect, reading of an ambiguous regulation. *See Schutte*, 598 U.S. at 751-752. So even if CMS's Manual were truly "inconclusive," O'Neill Br. 2, O'Neill was required to allege facts supporting that PST *knew* or had reason to know its interpretation was false. *Schutte*, 598 U.S. at 753-754; *see also Evans v. S. California Intergovernmental Training & Dev. Ctr.*, No. 22-16715, 2024 WL 1988827 (9th Cir. May 6, 2024) (relator did not plead knowledge absent allegations about what defendant "*subjectively* thought and believed"). The Second Amended Complaint says nothing of the sort.

In reply, O'Neill may argue that she satisfied the scienter requirement by alleging that PST "submitted claims that they knew failed to comply with *medical* direction, as non-medically directed service (QZ) with 100% reimbursement." ER-147 (emphasis in original). But "[t]hreadbare recitals of the elements of a cause of action" are famously insufficient to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, O'Neill was required to set forth "non-conclusory factual content," *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted), showing that PST knew or should have known that its use of the QZ modifier was false. O'Neill fell far short of this bar.[8]

Nor can O'Neill rely on her allegations about a phone call she had with PST representatives following her termination. *See* ER-166-167. These allegations show only that PST knew it was using the QZ modifier to bill for all non-medically directed CRNA services. *Id.* It does not at all tend to show that PST knew that this practice violated, or might violate as O'Neill alleges, federal law. And the fact that PST's representative allegedly thought the government might investigate the use of

---

[8] Contrary to what O'Neill suggests, the Second Amended Complaint makes no reference to PST's Compliance Officer, Courtney Reasoner, who allegedly knew that the QZ modifier referred only to CRNA-independent conduct. O'Neill Br. 39. These allegations, raised for the first time in O'Neill's May 2022 proposed Third Amended Complaint, have no bearing on whether O'Neill plausibly alleged knowledge in her *Second* Amended Complaint. Nor would that stray comment from Reasoner—shorn of any context—plausibly allege PST's knowledge.

the QZ modifier in the future is not the same as a belief that the practice was improper.

*Materiality.* O'Neill's complaint also independently failed to state a claim because she did not plausibly allege, with the requisite particularity, that PST's alleged false certification would have been "material to the Government's payment decision." *Escobar*, 579 U.S. at 181.

The FCA's materiality element "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (quotation marks and brackets omitted). The standard is "rigorous" and "demanding," *id.* at 192, 194; a plaintiff must plead materiality with "particularity"; and courts may resolve materiality "on a motion to dismiss," *id.* at 195 n.6 (rejecting argument that materiality "is too fact intensive" for "a motion to dismiss"). *Escobar* articulated a non-exhaustive list of factors for courts to consider in assessing materiality: whether the government expressly designated the requirement that was allegedly violated as a "condition of payment"; whether the alleged violation goes to the essence of the bargain; how the government has treated similar violations; and whether the government has made continued payments despite "actual knowledge" of the violation. *Id.* at 194-195.

O'Neill's complaint addresses none of these factors and offers no facts as to any of them. *Contra Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1213 (9th

Cir. 2019) (finding relator sufficiently pled materiality by alleging that Medicare local coverage determinations "explicitly provide that payment would not be made if a [particular medical device] was delivered before the written order was received" and detailing the "extensive negotiations" leading to that determination that were designed to "prevent fraud and abuse"). She offers only an entirely conclusory allegation that "[h]ad Medicare known the truth, it would not have reimbursed Defendants at the rates they requested." ER-148. That is not enough to survive the rigorous materiality inquiry required to plead materiality at the motion-to-dismiss stage. *Escobar*, 579 U.S. at 195 (rejecting government's view that an alleged violation is material "so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation"); *Gharibian ex rel. United States v. Valley Campus Pharmacy, Inc.*, No. 21-56253, 2023 WL 195514, at *2-3 (9th Cir. Jan. 17, 2023) (affirming dismissal of complaint for failure to plead materiality).

## II. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION AND DENIED O'NEILL'S MOTION FOR RECONSIDERATION.

Four years after the District Court had dismissed all claims against PST, and shortly before the remaining defendants settled, O'Neill filed a motion for reconsideration. ER-16-43. O'Neill asserted that information allegedly uncovered in discovery—which in fact had been available to her when PST filed its motion to

dismiss in 2018—supported her claims against PST. The District Court acted well-within its broad discretion and denied the motion. ER 3-5. This Court should affirm.

### A. O'Neill's Motion Was Untimely And Failed To Identify New Evidence.

Federal courts possess "inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 889 (9th Cir. 2001) (quotation marks omitted). But "as a rule courts should be loathe to do so in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Reconsideration is proper only "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (applied in Rule 59 motion for reconsideration); *see Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989) (same, in Rule 54(b) motion); *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 257 (4th Cir. 2018) (same); *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (same).

The reluctance to reopen a previously decided issue protects litigants' and the courts' interests in finality. Where "litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to

battle for it again." *Coopers & Lybrand*, 322 F.3d at 167 (quotation marks omitted).
Nor should courts be forced to entertain repeated requests to revisit a settled matter.
In O'Neill's own words, "motions for reconsideration should be infrequently
brought and even more infrequently granted." ER-8. For at least three independent
reasons, O'Neill failed to meet the exacting criteria to reopen the District Court's
four-year old order dismissing the claims against PST.

*First*, as the District Court explained, O'Neill's motion for reconsideration
raised purely factual arguments irrelevant to the resolution of her express and
implied false certification claims. In a false certification case, the "meaning of
governing regulations and provisions relating to the QZ and other codes" is a "legal
issue" that turns on the plain meaning of the Manual. ER-4. O'Neill's late-breaking
factual arguments had no bearing on the District Court's prior "legal determination,"
ER-4, which is correct, *see supra* pp. 30-31.

*Second*, even "if some of the discovery might have had a bearing on the
court's analysis," the District Court properly denied O'Neill's motion as untimely.
ER-4. O'Neill could not explain why "she waited almost four years to challenge the
court's ruling on the motion to dismiss" via a motion for reconsideration, just as the
case settled with respect to the remaining defendants. *Id*. O'Neill's delay was
inexcusable.

Had the District Court entered judgment when it granted PST's motion to dismiss, which O'Neill had actually requested, the federal rules would have conclusively barred the motion as untimely. *Cf.* Fed. R. Civ. P. 54(b) (allowing entry of final judgment as to one party). A motion to amend a judgment must be brought within 28 days. *See* Fed. R. Civ. P. 59(e). Motions for relief from judgment must be filed "within a reasonable time," and when based on newly discovered evidence never "more than a year after the entry of the judgment." Fed. R. Civ. P. 60(c). Under either standard, O'Neill's motion for reconsideration would have come multiple years too late.

Only because the District Court did not enter partial judgment with respect to PST in 2018 could O'Neill even potentially file a motion for reconsideration in 2022. Under Federal Rule of Civil Procedure 54(b), non-final orders "*may* be revised at any time before the entry of a judgment." Fed. R. Civ. P. 54(b) (emphasis added). "But Rule 54(b) does not *require* district courts to revisit decisions upon request . . . ." *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 378 (2d Cir. 2024). To prevent gamesmanship and promote judicial economy, courts may impose reasonable "time limit[s] on motions for reconsideration" filed pre-judgment. *Id.*; *see Liberty Mut. Ins. Co. v. Sumo-Nan LLC*, No. CV 14-00520 DKW-KSC, 2015 WL 5209345, at *1 (D. Haw. Sept. 4, 2015) ("Federal Rule 54(b) does

not dictate when that review must occur, nor does it purport to restrict district court discretion to manage reconsideration requests . . . .").

Across this Circuit[9] and around the nation,[10] district courts enforce local rules imposing extremely short time deadlines (*e.g.*, 14 days) on motions for reconsideration.  In district courts without "such a rule," the courts consider the movant's "timeliness, or lack thereof" holistically, when evaluating whether to grant a motion to reconsider.  *Santoro v. OCWEN Loan Servicing, LLC*, No. 6:14-CV-00522-TC, 2017 WL 6501860, at *4 n.2 (D. Or. Dec. 18, 2017); *see, e.g.*, *Cole v. Meeks*, No. 15-1292, 2019 WL 1002500, at *3 (C.D. Ill. Mar. 1, 2019); *Antonetti v. Neven*, No. 2:07-CV-00162-MMD-VCF, 2013 WL 4786029, at *2 (D. Nev. Sept. 5, 2013); *Mkhitaryan v. U.S. Bank, N.A.*, No. 2:11-CV-01055-JCM, 2013 WL

---

[9] *See, e.g.*, *Baronius Press Ltd. v. Faithlife Corp.*, No. 2:22-CV-01635-TL, 2024 WL 1909087, at *3 (W.D. Wash. May 1, 2024); *Parker v. Arizona*, No. CV-17-00887-PHX-DWL, 2019 WL 2579404, at *2 (D. Ariz. June 24, 2019); *Sumo-Nan LLC*, 2015 WL 5209345, at *1; *Smith v. Barrow Neurological Inst.*, No. CV 10-01632-PHX-FJM, 2013 WL 221507, at *1 (D. Ariz. Jan. 18, 2013); *Clark v. United States*, No. CV-06-00544 MEA/RLP, 2011 WL 2837591, at *1 (D. Haw. July 14, 2011); *N'Genuity Enters. Co. v. Pierre Foods, Inc.*, No. CV-09-385-PHX-GMS, 2010 WL 94248, at *1 (D. Ariz. Jan. 5, 2010).

[10] *See, e.g.*, *Valentine v. Settles*, No. 3:17-CV-01029, 2018 WL 11670292, at *1 (M.D. Tenn. Feb. 15, 2018); *Nittany Outdoor Advert., LLC v. Coll. Twp.*, 179 F. Supp. 3d 436, 438 (M.D. Pa. 2016); *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. CIV.A. DKC 10-3517, 2011 WL 6837656, at *2 (D. Md. Dec. 28, 2011); *Oliver v. Nat'l Beef Packing Co.*, No. 7:07-CV-110 (WLS), 2008 WL 11460723, at *1 (M.D. Ga. July 23, 2008).

3943552, at *1 (D. Nev. July 30, 2013).  As part of that holistic analysis, a court may of course look to Rule 59's 28-day deadline and Rule 60's 1-year deadline as reasonable benchmarks.  *See Mkhitaryan*, 2013 WL 3943552, at *1 ("Although the undersigned's Report and Recommendation # 177 is not a final judgment, the Court looks to Rule 59 to provide the framework for a motion for reconsideration.").

Here, the District Court explained that courts "generally interpret" Rule 54 in light of "Rules 59 and 60," and that the latter rules require "motions for reconsideration" to "be made within a reasonable time, and generally within one year."  ER-4.  The Court next stated that "the Relator does not explain why *four years* elapsed before [allegedly new information] was brought to the court's attention."  *Id*. (emphasis added).  Considering that lengthy delay—far longer than would have been permissible under Rules 59 and 60—the District Court denied the motion.  ER-4-5.  The court acted well within its discretion.

*Third*, O'Neill's motion independently failed because the facts on which she relied were not new and did not support her argument in any event.

"A motion for reconsideration is not a vehicle to identify facts or legal arguments that could have been, but were not, raised at the time the relevant motion was pending."  *SPV-LS, LLC v. Transamerica Life Ins. Co.*, 912 F.3d 1106, 1111 (8th Cir. 2019) (quotation marks omitted); *see* E.D. Cal. L.R. 230(j)(4) (movant must show "why the facts or circumstances were not shown at the time of the prior

motion"). A district court properly exercises "its discretion in denying a motion for reconsideration used for such an impermissible purpose." *Transamerica Life*, 912 F.3d at 1111 (quotation marks omitted); *see Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009).

For example, O'Neill's motion relied on an article published by PST's former compliance director *in 2014*, four years before O'Neill even filed this lawsuit. *See* ER-9 (citing Billing Guidelines vs Conditions of Participation, https://moana.org/wp-content/uploads/2020/09/CMS-AAs-Reimbursement-Ratios-2014.pdf). O'Neill offered no justification for failing to identify this source, which was publicly available as early as 2014, when opposing PST's motion to dismiss in 2018.

In any event, the article directly refutes her theory. The article explains that "some payers will allow a service to be billed as non-medically directed by the CRNA (QZ modifier) if a physician fails to meet all of the medical direction requirement while directing 4 concurrent procedures or fewer." Billing Guidelines vs Conditions of Participation, *supra*, at 3.[11]

---

[11] O'Neill also asserted that PST's former compliance director stated, in 2014, that "we would be able to bill for the CRNAs services with a QZ modifier, as long as, it was documented that the CRNA was not medically directed or supervised." ER-85 (quotation marks omitted). Notably, O'Neill did not attach evidence of the statement (*i.e.*, a letter or email) to her motion for reconsideration. An out-of-context snippet cannot establish falsity under Rule 9's heightened pleading standard. Meanwhile,

O'Neill similarly pointed to online guidance from California's Medicare administrative contractor. *See* ER-32. Yet O'Neill again never explained why she did not identify that guidance prior to 2018. And, once again, that document does not support O'Neill's position. It states that "QZ is not used by a CRNA when he/she is the non-physician anesthetist *with medical direction by a physician*." *Anesthesia and Pain Management*, Noridian Healthcare Sols., https://med.noridianmedicare.com/web/jeb/specialties/anesthesia-pain-management (emphasis added). Nowhere does the guidance state that the QZ modifier may not be used when a physician supervises but does not direct care.

Moreover, additional guidance before the court at the motion to dismiss actually addressed the question: "Are there any instances where a Certified Registered Nurse Anesthetist (CRNA) would not append the QZ modifier?" SER-114, SER-94-95. According to that guidance, the CRNA should not use the QZ modifier when receiving *medical direction* and also when engaged in monitored anesthesiology care services, a special kind of anesthesia service not at issue in this appeal that is billed differently. *See* Medicare Claims Processing Manual, ch. 12

---

the contemporaneous article the compliance officer wrote directly refutes O'Neill's assertion that the QZ code was inapplicable if a physician provided any amount of supervision to a CRNA.

§ 50(H)-(I). The bottom line: The Medicare administrative contractor's guidance refutes O'Neill's claim.

In her motion for reconsideration, O'Neill also submitted deposition testimony demonstrating that CRNAs had practiced with physician oversight, and that certain bylaws had required supervision in her hospital. *See* ER-55-56, ER-60-61, ER-65. Those facts were not new either. The Second Amended Complaint had alleged that the bylaws "prohibited independent CRNA practice and mandated the stricter requirement that CRNAs be supervised." ER-144. Those facts just did not matter. Under CMS's guidance and regulations, the QZ code can be used when a CRNA is supervised by a physician and the criteria for medical direction are not met. *See supra* pp. 24-26. Meanwhile, nothing in O'Neill's complaint suggested otherwise.

Finally, O'Neill claimed her expert testified "that use of the QZ modifier is improper in cases where Medical Supervision actually occurred." ER-42. But a retained expert's opinion cannot displace the Manual's plain meaning. Regardless, O'Neill could have hired her expert prior to filing her complaint and incorporated that (legally incorrect) opinion into her complaint. She cannot use a motion for reconsideration to belatedly backfill a complaint with allegations she could have stated at the outset.

In short, O'Neill's motion (1) raised irrelevant facts, (2) was untimely, and (3) did not raise new information. This Court should affirm the denial of the motion to reconsider.

### B. O'Neill's Challenges To The District Court's Ruling Lack Merit.

O'Neill offers a handful of counterarguments. All miss the mark.

*First*, O'Neill observes that "Rule 54(b) permits a district court to revise a non-final order 'any time before the entry' of final judgment." O'Neill Br. 48. O'Neill implies that district courts may never consider the timeliness (or lack thereof) of a motion to reconsider an interlocutory order. *See id.*

This is wrong. That Rule 54(b) *permits* reconsideration does not mean that Rule 54(b) *requires* reconsideration. Under Rule 54(b), a court "*may*" revisit an interlocutory order at any time "before the entry of a judgment." Fed. R. Civ. P. 54(b) (emphasis added). The Rule does not state that courts *must* do so. The Second Circuit recently rejected O'Neill's interpretation of Rule 54(b). *See Commerzbank AG*, 100 F.4th at 378. This Court should as well.

Indeed, adopting O'Neill's legal argument that Rule 54(b) mandates a court reconsider prior orders at any point before final judgment—no matter how untimely the request—would threaten to invalidate countless local rules imposing strict requirements on motions to reconsider. *See supra* pp. 42-43. O'Neill's position would also facilitate gamesmanship. For example, under O'Neill's theory, a litigant

could hold a newly found fact in reserve, wait to see if she prevailed on a different theory, and if she lost critical interlocutory orders, request a do-over based on the allegedly new fact. This Court should not hamstring a district court's ability to manage its docket and police against such gamesmanship.[12]

*Second*, O'Neill incorrectly suggests that "there are no" "finality concerns" prior to final judgment. O'Neill Br. 50. This Court has held the opposite, and recently explained that reconsideration of an interlocutory order should be "used sparingly in the interests *of finality and conservation of judicial resources*." *Berman*, 30 F.4th at 858-859 (emphasis added and quotation marks omitted). A litigant's and the court's interests in finality may grow greater post-judgment. That fact, however, does not negate finality interests prior to judgment.

In this case, PST's interests in finality were particularly meaningful. The District Court had dismissed all claims against PST, as result PST had not participated in discovery as a party, did not attend hearings, and the case had been closed from PST's perspective for four years. PST would have suffered significant prejudice if O'Neill were permitted to belatedly reopen the litigation four years later, after the other defendants had settled the case.

---

[12] There are hints of gamesmanship in this case. O'Neill waited to request reconsideration until after crafting a settlement with the other defendants and shortly before entry of that agreement.

*Third*, O'Neill agrees that courts hearing a motion to reconsider an interlocutory order apply the "*substantive* standard[s]" governing a motion under Rule 59 or Rule 60. O'Neill Br. 49. O'Neill then asserts that the District Court erred in using those same rules as a guidepost when assessing timeliness. Not so. Just as courts may look to Rule 59 and Rule 60's substantive standards, courts may use Rule 59 and Rule 60's time limits as a benchmark when evaluating timeliness. *See supra* pp. 42-43. Nothing in Rule 54(b) says otherwise. Regardless, it bears emphasis: O'Neill's years-late motion for reconsideration was untimely by any metric.

*Fourth*, O'Neill suggests that her motion for reconsideration was both timely and presented new evidence because discovery revealed a small amount of data showing that, in a sample of 110 patients, "Somnia/PAS billed AD for Medical Supervision at least once." ER-42; *see also* O'Neill Br. 50-51. According to O'Neill, she could not have raised this information to the court's attention prior to May 2022 because "discovery did not close until December 2021." O'Neill Br. 52.[13]

This argument fails multiple times over. O'Neill misleads the reader into thinking she *received* the Somnia/PAS billing data in December 2021. But she never stated so below, and such an assertion would be implausible. Fact discovery closed

---

[13] O'Neill made no attempt, in this Court or the District Court, to justify her failure in 2018 to identify evidence that was publicly available at the time, such as the 2014 article and online guidance from Noridian. She has thus forfeited any argument for why, had she exercised "due diligence," she could not have presented these facts to the court in 2018. O'Neill Br. 52 (quotation marks omitted).

*on June 11, 2021*, and she likely received the evidence earlier. ER-41; *see* SER-32-34 (informal discovery letter stating that Somnia had produced discovery beginning in January 2021); SER-14-16 (patient encounters produced by May 2021).[14]

Even if O'Neill had received the data in December 2021, O'Neill never explained why she would have waited until late May 2022 to file a motion for reconsideration. *See, e.g.*, *Barrow Neurological*, 2013 WL 221507, at *1 (three-month delay rendered motion untimely). Regardless, the fact that Somnia once used an AD code for a physician is immaterial. ER-42. That fact does not establish, as O'Neill suggests, *id.*, that a hospital may *never* use the QZ modifier to bill for CRNA care if the CRNA received supervision from a physician that falls short of medical direction.

---

[14] To the extent O'Neill acquiesced to a lengthy delay in the production of documents, she also bears responsibility for that delay. Nor can O'Neill rely on the fact that expert discovery closed in December 2021 to explain why she failed to bring her *own expert's* opinion to the Court's attention earlier. The timing of her expert's analysis lay within her control.

# CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's judgment.

Respectfully submitted,

/s/ Jessica L. Ellsworth
JESSICA L. ELLSWORTH
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

STEPHANIE YONEKURA
HARMONY GBE
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Ste 1400
Los Angeles, CA 90067

JOHANNAH WALKER
HOGAN LOVELLS US LLP
4 Embarcadero Ctr, Suite 3500
San Francisco, CA 94111

*Counsel for Appellee PST Services, LLC n/k/a Change Healthcare Technology Enabled Services, LLC*

July 22, 2024

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Ninth Circuit Rule 32-1(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,653 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

July 22, 2024                                    /s/ Jessica L. Ellsworth
                                                 Jessica L. Ellsworth

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 22, 2024.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

July 22, 2024                                    /s/ Jessica L. Ellsworth
                                                       Jessica L. Ellsworth