No. 23-15973

———————————————————

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————————————

UNITED STATES OF AMERICA, et al.

*Plaintiff-Appellant,*

v.

PST SERVICES LLC,

*Defendant-Appellee,*

*v.*

SOMNIA, INC., et al.

*Defendants.*

———————————————————

Appeal from the United States District Court for the Eastern District of California
Case No. 1:15-cv-00433-ADA-EPG, Honorable. Dale A. Drozd

———————————————————

**APPELLANT'S REPLY BRIEF**

———————————————————

GLENN E. CHAPPELL
ANDREA R. GOLD
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, District of Columbia 20006
(202) 973-0900
*gchappell@tzlegal.com*
*agold@tzlegal.com*

WILMER HARRIS
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
715 Fremont Ave., Suite A
South Pasadena, CA. 91030
(626) 441-4129
*wharris@sshhzlaw.com*

MICHAEL D. SEPLOW
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
9415 Culver Blvd., #115
Culver City, CA 90232
(310) 396-0731
*mseplow@sshhzlaw.com*

# TABLE OF CONTENTS

INTRODUCTION................................................................................................ 1

ARGUMENT ...................................................................................................... 4

I.    The SAC sufficiently established both factual and legal falsity, and Ms. O'Neill has maintained this position throughout the litigation.......... 4

    A.    A defendant can use an improper billing code to make a factually false statement or a legally false statement, and when a statement is factually false, the FCA does not require a relator to show violation of a condition of payment............................................................................................ 4

    B.    Ms. O'Neill has maintained the same theory of falsity through this litigation. ....................................................... 8

    C.    PST's arguments on the QZ modifier are incorrect, but more importantly, they speak to issues of fact not suitable for resolution on the pleadings. ..................................................... 12

II.    The SAC easily establishes knowledge and materiality............................ 18

    A.    The SAC sufficiently pled knowledge because it alleged that PST directly admitted its use of the QZ modifier was improper............................................................................................ 18

    B.    The Government directly ties the reimbursement rate directly to the type of anesthesia care provided; thus, PST's representation that it provided the more lucrative type of care is *a fortiori* material. ................................................... 20

III.    The District Court's refusal to reconsider its prior ruling was premised on application of the wrong timeliness standard and misinterpretation of the SAC's theory of liability...................................... 22

CONCLUSION ................................................................................................. 26

CERTIFICATE OF COMPLIANCE ............................................................. 27

CERTIFICATE OF SERVICE ......................................................................... 28

# TABLE OF AUTHORITIES

<small>CASES</small>

*Back v. Sebelius,*
    684 F.3d 929 (9th Cir. 2012) ................................................................. 14

*Clarian Health W., LLC v. Hargan,*
    878 F.3d 346 (D.C. Cir. 2017) ............................................................... 13

*Cobell v. Norton,*
    224 F.R.D. 266 (D.D.C. 2004) ............................................................... 23

*Detrich v. Ryan,*
    740 F.3d 1237 (9th Cir. 2013) ............................................................... 18

*In re Mercury Interactive Corp. Sec. Litig.,*
    618 F.3d 988 (9th Cir. 2010) ................................................................. 12

*Int'l Rehab. Scis. Inc. v. Sebelius,*
    688 F.3d 994 (9th Cir. 2012) ................................................................. 13

*Okoli v. City of Baltimore,*
    648 F.3d 216 (4th Cir. 2011) ................................................................. 12

*Randall D. Wolcott, M.D., P.A. v. Sebelius,*
    635 F.3d 757 (5th Cir. 2011) ................................................................. 14

*Segal v. Fifth Third Bank, N.A.,*
    581 F.3d 305 (6th Cir. 2009) ................................................................. 12

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ............................................................... 24

*U.S. ex rel. Guardiola v. Renown Health,*
    No. 3:12-CV-00295-LRH, 2014 WL 4162201 (D. Nev. Aug. 20, 2014) ................. 6

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.,*
    245 F.3d 1048 (9th Cir. 2001) ............................................................... 11

*United States ex rel Gage v. Davis S.R. Aviation, L.L.C.,*
    658 F. App'x 194 (5th Cir. 2016) ............................................................. 5

*United States ex rel. Campie v. Gilead Scis., Inc.,*
    862 F.3d 890 (9th Cir. 2017) ................................................................. 11

*United States ex rel. Druding v. Druding,*
    952 F.3d 89 (3d Cir. 2020) ..................................................................... 5

*United States ex rel. Garrett v. Kootenai Hosp. Dist.,*
    No. 2:17-CV-00314-CWD, 2020 WL 3268277 (D. Idaho June 17, 2020) ......... 6, 21

*United States ex rel. Hanna v. City of Chicago,*
    834 F.3d 775 (7th Cir. 2016) .................................................. 5

*United States ex rel. Polukoff v. St. Mark's Hosp.,*
    895 F.3d 730 (10th Cir. 2018) ............................................... 5

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC,*
    836 F.3d 770 (7th Cir. 2016) .................................................. 6

*United States ex rel. Rose v. Stephens Inst.,*
    909 F.3d 1012 (9th Cir. 2018) .............................................. 21

*United States ex rel. Schutte v. SuperValu Inc.,*
    598 U.S. 739 (2023) ............................................................ 19

*United States ex rel. Silingo v. WellPoint, Inc.,*
    904 F.3d 667 (9th Cir. 2018) .................................................. 5

*United States ex rel. Stenson v. Radiology Ltd., LLC,*
    No. 22-16571, 2024 WL 1826427 (9th Cir. Apr. 26, 2024) ................ 5, 8

*United States ex rel. Swoben v. United Healthcare Ins. Co.,*
    848 F.3d 1161 (9th Cir. 2016) .............................................. 17

*United States ex rel. Vatan v. QTC Med. Servs., Inc.,*
    721 F. App'x 662 (9th Cir. 2018) .......................................... 11

*United States v. Carolina Liquid Chemistries, Corp.,*
    No. 13-CV-01497-JST, 2019 WL 3207851 (N.D. Cal. July 16, 2019) ............ 6

*United States v. Eisenhower Med. Ctr.,*
    No. 5:18-CV-02667-RGK-KK, 2020 WL 6153103 (C.D. Cal. May 12, 2020) ............................................................................ 6, 21

*United States v. Gaudin,*
    515 U.S. 506 (1995) ............................................................ 20

*United States v. Kindred Healthcare, Inc.,*
    469 F. Supp. 3d 431 (E.D. Pa. 2020) .................................... 6, 21

*United States v. Rite Aid Corp.,*
    No. 212CV01699KJMEFB, 2018 WL 4214887 (E.D. Cal. Sept. 5, 2018) ............ 7

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
    579 U.S. 176 (2016) ............................................................ 20

*Vitreo Retinal Consultants of the Palm Beaches, P.A. v. U.S. Dep't of Health & Hum. Servs.,*
    649 F. App'x 684 (11th Cir. 2016) ........................................ 14

**STATUTES**

31 U.S.C. § 3729(b) ................................................................ 18, 20

**OTHER AUTHORITIES**

CMS, Publication No. 100-04, Medicare Claims Processing Manual, Ch.12, §
140.4.2 ........................................................................................................ 16

CMS, Publication No. 100-04, Medicare Claims Processing Manual, Ch.12, § 40 ........ 7

CMS, Publication No. 100-04, Medicare Claims Processing Manual, Ch.12, §
50.D ............................................................................................................ 15

**RULES**

FED .R. CIV. P. 9(b) ................................................................................... 17, 18

FED. R. CIV. P. 54(b) .................................................................................... 3, 23

**INTRODUCTION**

At its heart, this case is not overly complicated. Relator Nicole O'Neill's Second Amended Complaint ("SAC") alleged that Defendant PST Services LLC ("PST") provided one type of anesthesia care (Medical Supervision) but sought reimbursement for another, more lucrative type (CRNA-independent care). This practice—which PST carried out by using the QZ billing code in its reimbursement requests—concealed the involvement of a supervising physician, telling the Government the care was provided with a CRNA practicing independently in a one-to-one setting, when in fact the CRNA was working on behalf of an anesthesiologist overseeing a series of concurrent procedures. This is fundamentally a misrepresentation of the *type and value* of care patients at Kaweah Hospital received.

Yet, nearly every argument in PST's Answering Brief (cited herein as "ARB") is built around a central misunderstanding of this theory. Apparently because Ms. O'Neill at times characterized her theory of liability as one of "false certification," PST assumes and then runs with the idea that these words can *only* mean false certification *of compliance* with some Government condition of payment.

This is a bridge too far. A defendant can violate the False Claims Act ("FCA") by falsely certifying *facts* about the services provided just as much as it can by falsely certifying *compliance* with various Government requirements. This Court and others have repeatedly recognized this distinction. And PST's misunderstanding is consequential because its waiver arguments make no sense when the SAC's *actual* theory of liability is

considered. Likewise, its arguments on the sufficiency of the SAC's falsity allegations largely skate past the core misrepresentations conveyed through PST's use of the QZ code.

Once PST's misguided reasoning on this point is set aside, few arguments remain on the falsity element (the lone element upon which the District Court's order was premised). PST contests some of the SAC's falsity allegations, but these thin assertions largely go to the weight of the evidence as to what the Government would have understood when PST used the QZ modifier. Those are (unpersuasive) arguments for the trier of fact that cannot be resolved at the pleading stage.

Again, Ms. O'Neill does not allege that PST's use of the QZ modifier communicated *only* factual falsehoods. For example, it falsely communicated compliance with the requirement that a provider document everyone involved in a patient's care (billing with the QZ modifier signifies a CRNA practiced alone without any physician involvement and thereby conceals the overseeing physician's participation in the care).

But we homed in on factual falsity in the Opening Brief (cited herein as "AOB") to highlight the District Court's fundamental error in dismissing the SAC: Concluding that the SAC's falsity allegations turned *solely* on showing violation of a condition of payment and consequently treating interpretation of the Medicare Claims Processing Manual ("Claims Manual") as the dispositive, purely legal question. Because (1) this case

involves both factual and legal falsity and (2) the Claims Manual is guidance that does not have the force of law, its interpretation is not dispositive of the whole case.

PST also asks this Court to rule on knowledge and/or materiality in the first instance. Although the District Court did not address these elements, the SAC plainly establishes both. As to knowledge, PST's own representative admitted that it uses the billing code that allows for 100% reimbursement from Medicare—no matter what, that "[b]ylaws don't mean anything to billers," *and* that he believed the Government was "tapped up to start investigating" its billing practices. Especially when the inferences are drawn in Ms. O'Neill's favor, this allegation and others in the SAC easily establish knowledge under the FCA's broad scienter standard.

As to materiality, this is a classic upcoding case. The Government's establishment of different reimbursement rates for different types of anesthesia care shows without a doubt that PST's improper use of the QZ modifier materially influenced the Government's payment decision. When the Government pays one price for service $x$ and another, higher price for service $y$, falsely representing that you provided service $y$ when you provided $x$ cuts right to the heart of the Medicare bargain.

Lastly, PST's arguments on whether the District Court properly denied Ms. O'Neill's motion for reconsideration mostly depend on recasting her position as something it is not. Ms. O'Neill sought reconsideration pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Her position is that the timeliness standard for reconsidering an interlocutory order under Rule 54(b) is more permissive than the

standard applicable when reconsideration of a final order is sought, and that she made the requisite showing that justice required reconsideration here. The District Court applied the wrong standard taken from the wrong rules. Thus, PST's slippery-slope arguments concerning "gamesmanship" and as-of-right, anytime review are beside the point. More importantly, the SAC's allegations are enough even without the additional evidence submitted on reconsideration and in the proposed amended pleading.

The Court should reverse.

## ARGUMENT

**I.** **The SAC sufficiently established both factual and legal falsity, and Ms. O'Neill has maintained this position throughout the litigation.**

**A.** **A defendant can use an improper billing code to make a factually false statement or a legally false statement, and when a statement is factually false, the FCA does not require a relator to show violation of a condition of payment.**

Because PST leads off with its flawed assumption, we begin by debunking it. PST's singular focus on identifying a "specific a law or regulation that barred the alleged conduct," ARB20, is misguided because that is not a requirement when a relator alleges factual falsity.

It is overreach to claim, as PST does, that "[a]lleging falsity in the Medicare and Medicaid billing context requires identifying the specific statute, regulation, or contractual provision allegedly violated." ARB21. That is true when—as in other contexts—the relator's theory of liability in this context rests *solely* on fraudulent certification of *compliance*, but it is not true when the relator's theory of liability rests on

false certification that one type of good or service was provided when another type was actually provided. Again, a claim for payment can be false under the FCA where it untruthfully certifies legal or contractual compliance, *see United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 741 (10th Cir. 2018), and it can also be false under the FCA where it offers "an incorrect description of goods or services provided," where it presents "a request for reimbursement for goods or services never provided," or where "the facts contained within the claim are untrue," *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 675 (9th Cir. 2018) (first and second quotations) (internal quotation marks omitted); *United States ex rel. Druding v. Druding*, 952 F.3d 89, 96 (3d Cir. 2020) (third quotation).

This FCA principle extends to the Medicare and Medicaid billing context. Use of a Medicare billing code can be misleading because it expressly or impliedly communicates that the claimant complied with Government-imposed conditions of payment when those conditions were not in fact satisfied (for example, the Medical Direction modifier signifies compliance with certain regulatory conditions, *see* AOB42). That was the situation in every case PST cites.[1] But it can *also* be misleading because it

---

[1] *See United States ex rel. Stenson v. Radiology Ltd., LLC*, No. 22-16571, 2024 WL 1826427, at *2 (9th Cir. Apr. 26, 2024) (per curiam) (relator alleged defendant falsely certified services were medically necessary and complied with CMS policy concerning FDA approval of medical devices); *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778 (7th Cir. 2016) (relator alleged city "falsely certified compliance with its civil rights obligations"); *United States ex rel Gage v. Davis S.R. Aviation, L.L.C.*, 658 F. App'x 194, 197 (5th Cir. 2016) (per curiam) (explaining the pleading requirements "*when a plaintiff*

falsely communicates to the Government that the claimant performed one type of medical service, when it in fact performed another type.

Scores of courts across the country recognize that a relator can state a claim under the FCA by alleging a defendant used an improper Medicare or Medicaid billing code to make a factually false statement about the nature of the healthcare services delivered to a patient—and thereby obtain an overpayment.[2]

---

*is pursuing a theory of an implied false certification*" and why the relator's claim failed to satisfy Rule 9(b) under that theory of liability) (emphasis added).

[2] *See, e.g.*, *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 778-79 (7th Cir. 2016) (relator alleged defendant submitted claims using billing codes corresponding to specific psychiatric services but in fact had performed only nonpsychiatric evaluations); *United States ex rel. Garrett v. Kootenai Hosp. Dist.*, No. 2:17-CV-00314-CWD, 2020 WL 3268277, at *5 (D. Idaho June 17, 2020) (relator stated FCA claim premised in part on factual falsity where it alleged defendant used billing codes to "fraudulently bill and obtain higher reimbursement from Medicare for services rendered by non-physicians as if the services were rendered by physicians"); *United States v. Eisenhower Med. Ctr.*, No. 5:18-CV-02667-RGK-KK, 2020 WL 6153103, at *7 (C.D. Cal. May 12, 2020) (relator stated FCA claim premised jointly on factual and legal falsity where it alleged defendants "routinely upcoded procedures, using complex code designations for simple procedures"); *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 446 (E.D. Pa. 2020) (relator stated FCA claim premised in part on factual falsity where it alleged defendant used Medicare billing codes to falsely signify a higher, more lucrative level of support provided to nursing home residents); *United States v. Carolina Liquid Chemistries, Corp.*, No. 13-CV-01497-JST, 2019 WL 3207851, at *4 (N.D. Cal. July 16, 2019) ("Relators' theory is that Defendants violated the FCA by knowingly causing Carolina Liquid customers to submit Medicare and Medicaid reimbursement claims that were factually false. In other words, because customers improperly coded tests, their reimbursement claims were based on an incorrect description of goods or services provided or goods or services never provided.") (cleaned up); *U.S. ex rel. Guardiola v. Renown Health*, No. 3:12-CV-00295-LRH, 2014 WL 4162201, at *9 (D. Nev. Aug. 20, 2014) (relator stated FCA claim premised in part on factual falsity where it alleged defendant used Medicare billing code that falsely signified provision of inpatient services rather than outpatient services); *United States v. Rite Aid Corp.*, No.

PST's use of the QZ modifier was, in significant part, the second type of deceit: PST told the Government that one type of anesthesia care (CRNA-independent) was provided, when another, less lucrative care type (Medical Supervision) was in fact provided. This is not merely certification of compliance with a law or regulation; it is certification of the type of care a patient received and the providers involved in that care. To be clear, use of the QZ code also certified compliance with regulatory requirements, such as the requirement to document all the providers involved in a patient's care, *see* AOB43-44,[3] but like many cases involving the use of improper billing codes, the legal falsity was not the only fraud at issue, *see supra* note 2.

For that reason, the unpublished decision by a panel of this Court in *Stenson* is not persuasive here. *Stenson* addressed only a *legally* false-certification theory (the relator alleged billing codes falsely communicated that the medical devices it used had "a particular degree of approval"); thus, its statement that "there can be no violation" if there is no "controlling authority" was limited to the facts before it. *Stenson*, 2024 WL

212CV01699KJMEFB, 2018 WL 4214887, at *3 (E.D. Cal. Sept. 5, 2018) (allegation that defendant submitted "claims with override codes, representing Code 1 requirements were met when Code 1 review was not performed," "sufficiently allege[d] factually false claims") (cleaned up).

[3] PST is also incorrect when it argues that Ms. O'Neill "forfeited" this theory of false certification of compliance. ARB 33. The SAC alleged this, *see* SAC ¶ 50, and in responding to PST's second motion to dismiss, Ms. O'Neill argued that PST's use of the QZ modifier was fraudulent because of this false certification as well, *see* Dist. Ct. ECF No. 80 at 15-16 (citing Claims Manual Ch. 12 § 140.3.4 ("If the physician is participating or takes assignment, both services should be billed on one claim but as separate line items.")). These allegations sufficiently state both the factual and legal bases of her claim.

1826427, at *2, *3. The case did not also involve a theory of factual falsity, such as the one here involving falsely billing for a more lucrative *type* of care than the one provided.

## B. Ms. O'Neill has maintained the same theory of falsity through this litigation.

Throughout this case, Ms. O'Neill has maintained that Defendants' (including PST's) use of the QZ modifier was false in part because it told the Government that the care was provided with a CRNA practicing independently in a one-to-one setting when in fact the CRNA was working on behalf of an anesthesiologist overseeing a series of concurrent anesthesia cases. PST does not get to declare that the SAC is "best understood" as stating a false certification claim, ARB 31, when Ms. O'Neill repeatedly explained how to understand it.

We begin with the operative pleading. Starting with the first paragraph, the SAC repeatedly alleged that Defendants improperly coded the care provided as one type when it should have been coded as another type. *See, e.g.*, ER-133 ¶ 1; ER-145 ¶ 51; ER-147 ¶ 62. More specifically, Paragraph 68 explains the SAC's dual-nature theory of factual and legal falsity as to the QZ modifier (the factually false aspects are italicized but the full context is included):

> The express false certifications of services provided went to the very essence of the bargain between Defendants and the Medicare system: the government sets forth clear conditions for payment for certain services and *Defendants fraudulently characterized the services they provided* in order to obtain higher, and unwarranted, reimbursement from the government. *In so doing, defendants falsely described the services for which they sought reimbursement* and actively concealed their failure to comply with the conditions of payment the government set forth in the regulations described above.

ER-148 ¶ 68 (emphasis added). The disjunctive use of "and" in the last sentence is particularly telling.

Further, although the motion to dismiss briefing did not focus on the distinction between factual and legal falsity, Ms. O'Neill continued to make clear that her theory of liability as to the QZ modifier rested on falsely communicating the type of anesthesia care it provided. In response to the Somnia Defendants' assertion in their first motion to dismiss that her claims related to the QZ modifier rested on violation of Kaweah Hospital's contract or bylaws, Ms. O'Neill explained that her allegations "do not stem from" such contractual violations; "[r]ather, the bills submitted by defendants to the Government for Independent CRNA anesthesia services were false and fraudulent *because the CRNAs were not, in fact, providing proper independent CRNA services.*" Dist. Ct. ECF No. 54 at 11 (emphasis added).

Similarly, she explained in opposition to PST's second motion to dismiss that, "by using the QZ modifier as a default when the requirements for Medical Direction were not met, Defendants knowingly concealed from the Government that some procedures billed using the more lucrative QZ modifier *were not in fact CRNA Independent practice*, but rather should have been billed as less lucrative Medical Supervision procedures." Dist. Ct. ECF No. 81 at 3 (emphasis added); *see also id.* at 13 (explaining that Defendants' improper use of QZ and other codes "made express false representations to the Government *about the value of the services rendered*") (emphasis added).

Indeed, Ms. O'Neill elaborated further by explaining that if her arguments on legal certification were rejected, the SAC still stated a claim based on factual falsity. She argued that, "even accepting PST's flawed and incorrect definition of the QZ modifier" in the Claims Manual, Defendants' use of QZ to bill for Medically Supervised services "still resulted in express misrepresentations" because "the QZ modifier to a reimbursement claim does not reflect any physician involvement, much less physician supervision." *See id.* at 15-16. Again, this is a false statement in part about the nature of the care provided, not whether the care complies with legal/contractual conditions.[4]

In arguing that Ms. O'Neill "forfeited" her theory of factual falsity, PST conflates the term "false certification [end of phrase]" with false certification *of compliance*. In the District Court, Ms. O'Neill sometimes characterized Defendants' use of the QZ modifier as making "false certifications," but she explained these were "false certifications of services" and that "when Defendants billed with code QZ, they made an express representation that the services were performed by a CRNA working alone, without any supervision." *See* Dist. Ct. ECF No. 81 at 12. PST ignores all this context and appears to argue that any reference to the term "certification" can only refer to legal falsity.

---

[4] *See also* Dist. Ct. ECF No. 80 at 11, 13-14 (making same arguments in another brief); Dist. Ct. ECF No. 88 at 7:20-8:1 (explaining Defendants "pretend that the doctor had nothing to do with the procedure and then said the nurse did it independently"); *id.* at 15:9-14 ("'[T]hey change the reality of what's going on in the operating room in order to get a higher reimbursement. . . . They leave the anesthesiologist out of the picture in order to get a higher reimbursement for QZ.'").

That is incorrect: This Court has repeatedly recognized the theory of "factually false certification," which occurs when a defendant "misrepresents what goods or services that it provided to the Government." *See United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 900, 902 (9th Cir. 2017) (internal quotation marks omitted); *United States ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 664 (9th Cir. 2018). In *Campie*, the Court recognized factually false certification in the context of "misbranded goods," giving the example of a defendant providing substitute regulators that "functioned equally to those contracted for" but "misbrand[ing] substitutes to make them appear to be the genuine article." 862 F.3d at 900, 902 (alterations in original accepted). And in *Vatan* (an unpublished decision), the Court recognized factually false certification in the provision of services—specifically, falsely representing to the Veteran's Administration that the defendant reviewed a claims folder in its entirety when in fact it performed only cursory review. 721 F. App'x at 664, 665.

Imprecision of language can be confusing in this space, but this is an opportunity for the Court to clean up the verbiage in a crucial area of FCA enforcement. Many courts use the term "false certification" as shorthand to refer to theories of FCA liability premised on false certification *of compliance* with a condition of payment. *See, e.g., U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001) (based on district court's characterization, referring to claims premised on false compliance with "certain testing regulations" as "false certification claims"). But as *Campie* and *Vatan*

demonstrate, a contractor can violate the FCA by falsely certifying *facts* concerning the goods or services provided.

Ms. O'Neill should not be penalized for using the term "false certification" when she has alleged from the start that Defendants misrepresented the nature and value of the anesthesia services provided. Courts repeatedly reject that a complaint must use "magic words" to assert a theory. *See, e.g.*, *Okoli v. City of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011) ("Several sister circuits have noted that sexual harassment complaints need not include 'magic words' such as "sex" or 'sexual.'"); *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir. 2009) (courts "must look to" the "substance of a complaint's allegations," not engage in a "formalistic search" for "magic words"). And this Court holds that an issue is preserved for appeal so long as it was "raised sufficiently for the trial court to rule on it." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (internal quotation marks omitted). The District Court had an opportunity to do so here but did not.

### C. PST's arguments on the QZ modifier are incorrect, but more importantly, they speak to issues of fact not suitable for resolution on the pleadings.

On pages 24-28 and again on pages 30-34 of its brief, PST raises a series of arguments concerning interpretation of the Claims Manual. These arguments are wrong on the merits, but that's PST's *smallest* problem on this point. A bigger problem dooms PST's position.

Let's begin with that bigger problem: PST's view rests on the incorrect assumption that PST wins if Ms. O'Neill fails to show "violation" of the Claims Manual. As we just discussed, Ms. O'Neill's theory of falsity as to PST's use of the QZ modifier is a theory of *factual* falsity in important respects. Thus, there is no need to show violation of any statute, regulation, or contractual condition. Rather, what's important is whether PST misrepresented the anesthesia services it provided.

The Claims Manual is not a statute or regulation. It is nonbinding *guidance* that does not have the force of law. AOB15-16, 46. PST does not appear to contest this. Yet PST still argues that the Claims Manual's meaning is "a legal question" because, in its view, the QZ modifier derives from the Claims Manual. *See* ARB 30-31. But interpretation of an instruction from an agency cannot be a "legal" inquiry when the instruction is only a "general statement of policy" that "do[es] not establish binding norms." *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 349 (D.C. Cir. 2017) (discussing Claims Manual).

To be sure, courts read and discuss agency guidance when it is relevant to a question of law. That is what the cases cited by PST demonstrate. For example, in two of those decisions, courts reviewed administrative action taken by the Department of Health and Human Services and simply found that the agency's determination was not arbitrary and capricious—in part because the determination was made in accordance with its prior guidance. *See Int'l Rehab. Scis. Inc. v. Sebelius*, 688 F.3d 994, 1003-04 (9th Cir. 2012); *Vitreo Retinal Consultants of the Palm Beaches, P.A. v. U.S. Dep't of Health &*

*Hum. Servs.*, 649 F. App'x 684, 693 (11ᵗʰ Cir. 2016). This Court's discussion in *Back v. Sebelius*, also cited by PST, is similar. *See* 684 F.3d 929, 932 n.3 (9th Cir. 2012) (noting that the Claims Manual's language "appear[ed] to be consistent with the Secretary's regulation"); *see also Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 767 n.4 (5th Cir. 2011) (cited by PST; noting in dicta that a MAC's challenged conduct accorded with agency guidance). A ruling that those agency decisions were consistent with prior guidance is not a ruling that the Claims Manual is a binding legal command that conclusively resolves all questions concerning a matter within its purview as a matter of law.

Thus, interpretation of the Claims Manual can serve as *factual* evidence of what the Government and Defendants would have understood the QZ modifier to signify as to the services being billed. At most, that evidence squares off with the evidence and arguments Ms. O'Neill presented in the District Court and thus creates ambiguity in what the Government or PST understood the QZ modifier to mean. AOB45-47. Accordingly, arguments over the Claim Manual's provisions on the QZ modifier are non-dispositive—especially at the pleading stage. Ms. O'Neill has alleged facts making it plausible that PST's use of the QZ modifier was deceptive, and that is enough to withstand a motion to dismiss.

In any event, PST's factual arguments lack merit, and they fall far short of showing PST's entitlement to prevail on falsity as a matter of law.

*First*, PST suggests that the Claims Manual "does not identify any other billing modifier that could cover" a scenario where Medical Direction fails but a physician supervises fewer than four concurrent procedures at once. ARB 25. That is true insofar as it does not *expressly* identify the appropriate code, but that silence does not lead to the conclusion that the QZ modifier fills that gap. Rather, use of the Medical Supervision modifier (AD) is much more logical and appropriate.

The Claims Manual already explains that the Medical Supervision category applies in at least some of the cases of failed Medical Direction described in the SAC. *See* AOB38-39 (discussing Claims Manual, Ch. 12, § 50.D). And in cases where the physician supervises fewer than four concurrent cases and Medical Direction nevertheless fails, reading the Claims Manual to permit the provider to choose between the more lucrative QZ modifier and the less lucrative Medical Supervision modifier makes little sense.

PST's interpretation would render the Medically Supervised rates in the Claims Manual meaningless by giving the provider the choice to accept a lower payment or a higher one depending on which modifier they use (obviously, they would choose the higher paying one). That misaligns with the Claims Manual's structure, which sets forth three separate models of anesthesia care. AOB38-39.

*Second*, PST observes that in limited circumstances, the Claims Manual allows use of QZ when a physician is "involved" in a patient's care. ARB 24-25. But being involved in a procedure is distinct from *overseeing* the procedure during concurrent care of

multiple patients. The latter is an entirely different model of care, which is done by an independent CRNA practitioner, not a CRNA assisting an overseeing anesthesiologist.

The Claims Manual authorizes use of both the AA (Personally Performed anesthesiologist practice) modifier and the QZ modifier (CRNA-independent practice) "[i]n unusual circumstances when it is medically necessary for both the CRNA and the anesthesiologist to be completely and fully involved during a procedure." Claims Manual, Ch. 12, § 140.4.2. But in these rare circumstances, the Claims Manual makes clear that "[d]ocumentation must be submitted by each provider to support payment of the full fee," and it is appropriate only where both are fully dedicated to that one procedure. *See id.* That is not a scenario where a physician is concurrently directing multiple procedures and thus could not possibly be "completely and fully involved" with a single patient. Rather than "debunk" Ms. O'Neill's argument, ARB 26, this underscores the deception and impropriety of PST's use of the QZ modifier, in which it *concealed* a physician's involvement instead of documenting it.

*Third*, PST's argument concerning the QX code, *see* ARB26-27, is a red herring because Ms. O'Neill briefly mentioned it in the Opening Brief only to show that the rate associated with the QZ modifier code is more lucrative than the rate associated with either the AA code or the QX code. AOB25, 35-36. Even if it might not have been appropriate to use the QX modifier, PST should have used the Medical Supervision modifier (AD).

*Fourth*, PST's reliance on CMS's "other regulations" to inform interpretation of the Claims Manual, ARB 27, is misplaced. As we explained in the Opening Brief, the regulations were enacted long before the CRNA-independent care model was recognized or even legal in the country. AOB14. Rather than revise the regulations, CMS deferred to the Claims Manual and to the MACs, with the MAC for California making clear that the QZ modifier is to be used only when a CRNA works independently. AOB29, 37, 38. The regulations' silence is not probative when they predated subsequent evolutions in CRNA care models.

*Fifth*, PST's cursory argument that the SAC fails to satisfy Rule 9(b)'s particularity standard is even further afield. *See* ARB32. "Rule 9(b) serves two principal purposes": (1) provide defendants with "notice of the particular misconduct" so they can prepare a defense and (2) protect them from "false or unsubstantiated charges" "[b]y requiring some factual basis for the claims" of fraud. *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (internal quotation marks omitted). A complaint satisfies Rule 9(b) if it pleads enough information to satisfy these dual purposes. *Id.* at 1183 n.11. Here, the SAC gives PST ample information to know exactly what fraud is alleged against it and how to defend the claim—as evidenced by PST's detailed defense of its use of the QZ modifier in its brief and in the District Court. Nothing more is required.

*Sixth*, PST misses Ms. O'Neill's point when it contends that its understanding of the QZ code does not render the AD code *entirely* superfluous, because it can be used

when the anesthesiologist and CRNA are employed by different practices. ARB 32-33. True. But, if PST's understanding is correct, *every time* a CRNA is Medically Supervised, the biller may simply elect to bill at the more lucrative CRNA Service rate if they so choose—a reading that does not accord with the Claims Manual's structure. *See* AOB 38-40.

To conclude: The SAC sufficiently pled theories of both factual and legal falsity, and PST has not shown otherwise in its briefing.

## II. The SAC easily establishes knowledge and materiality.

PST also urges the Court to address knowledge and materiality in the first instance. ARB34-38. Although the District Court did not rule on these elements, this Court can still do so because "there is little doubt about the correct answer." *Detrich v. Ryan*, 740 F.3d 1237, 1248-49 (9th Cir. 2013) (en banc). That answer is the opposite of what PST argues: the SAC plainly establishes both elements.

### A. The SAC sufficiently pled knowledge because it alleged that PST directly admitted its use of the QZ modifier was improper.

The FCA defines "knowingly" to mean that a person, with respect to information: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require "proof of specific intent to defraud." *Id.* And knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

The Supreme Court recently confirmed that the FCA's scienter element looks to the defendant's "knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). This is important where, as here, an at-issue term or requirement (here, the meaning and propriety of the QZ modifier) is open to more than one interpretation. Even if such a term is "less than perfectly clear," a defendant has the requisite scienter if they "believed that their claims were not accurate." *Id.* at 757. And just "because *other* people might make an honest mistake," the defendant's subjective beliefs do not "bec[o]me irrelevant to their scienter." *Id.* at 753 (emphasis in original).[5]

Here, a paradigm of such subjective belief can be found in the SAC's allegation that, when pressed on use of the QZ modifier at Kaweah Hospital, a representative of PST's predecessor company (McKesson) responded that "[b]ylaws don't mean anything to billers" and that "[t]oo much money is lost" to accurately bill the services as Medical Supervision. ER-166-67 ¶ 134. He proclaimed, "[W]e bill everything at 100%," even though he believed "the OIG is tapped up to start investigating it." *Id.* This is an express acknowledgement that PST knowingly used whatever billing code was needed to obtain

---

[5] For that same reason, PST's assertion that "[p]leading knowing misconduct is harder when the only available guidance suggests that a defendant's billing practices were proper," ARB35, is baseless. PST's basic assumption is false: Noridian's binding "guidance" (more accurately characterized as an instruction) told billers not to use QZ in such circumstances. AOB29, 37, 38. But in any event, because scienter is a subjective element, the pleading standard is unaffected by the existence of "guidance."

100% reimbursement, regardless of any other requirement. And this is just one example of several in the SAC in which PST representatives exhibited at minimum reckless disregard for the accuracy of its coding and compliance with Medicare's requirements to use particular codes. *See* ER-157-63 ¶¶ 96-118.

PST's argument on this allegation misconstrues the SAC as alleging only legal falsity, which, again, is incorrect. Further, its representative's admission that a government investigation of its use of the QZ modifier was impending plainly tends to show "a belief that the practice was improper," ARB36-37, especially when it is coupled with his acknowledgment that "billers" ignored "bylaws" to ensure they "bill everything at 100%." PST ignores this context.

**B.** **The Government directly ties the reimbursement rate directly to the type of anesthesia care provided; thus, PST's representation that it provided the more lucrative type of care is *a fortiori* material.**

Likewise, the SAC sufficiently pled materiality. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Under this definition, materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016) (quotation marks omitted). Materiality is likely to be a determination for a jury. *See, e.g.*, *United States v. Gaudin*, 515 U.S. 506, 512 (1995). Indeed, this Court holds that materiality typically should not be resolved as a matter of law when factors

point in different directions. *See United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1020 n.5 (9th Cir. 2018).

Here, the SAC alleged facts making it more than plausible that PST's upcoding was material to the Government's payment decision. It alleged that PST's misrepresentations "went to the very essence of the bargain between Defendants and the Medicare system" because the services they billed for but did not provide are tied directly to a higher reimbursement rate. ER-148 ¶ 68. And it alleged that "[h]ad Medicare known the truth, it would not have reimbursed Defendants at the rates they requested." *Id.* That is more than enough to establish materiality.

In the Medicare and Medicaid context, the use of a fraudulent billing code automatically influences the Government's payment decision, because the choice of billing code establishes the reimbursement rate. Thus, multiple courts have found allegations like Ms. O'Neill's sufficient to establish materiality at the pleading stage.[6] Use of an incorrect billing code enables an overpayment by the Government, so it is *a fortiori* material to the payment decision.

---

[6] *See Garrett*, 2020 WL 3268277, at *8 (relator sufficiently pled materiality "by asserting Medicare's payments of claims were influenced or caused by [defendant]'s fraudulent acts, not merely because of any regulatory violations or conditions of payment"); *Eisenhower Med. Ctr.*, 2020 WL 6153103, at *7 (relator sufficiently pleaded materiality by alleging defendant "routinely provided inaccurate billing codes" while "knowing that this could influence the amount of Medicare and Medicaid's reimbursement"); *Kindred Healthcare, Inc.*, 469 F. Supp. 3d at 446 ("As the alleged misrepresentations in this case directly affected the amount of reimbursement, the Court concludes that relator has sufficiently alleged their materiality.").

PST's threadbare argument that the SAC "offers no facts" as to materiality, ARB37-38, is meritless. For one thing, PST cites factors the Supreme Court set forth in *Escobar* for examining whether a false certification *of compliance* is material. The inquiry is more straightforward here because a key allegation is that PST sought reimbursement for different and more lucrative anesthesia services than those actually provided. Further, PST ignores the SAC's allegation that Defendants' (including PST's) upcoding struck at the heart of the bargain by misstating the value of the services provided. ER-148 ¶ 68. The theory of legal falsity at issue in *Escobar* was different. *See* AOB41.

## III. The District Court's refusal to reconsider its prior ruling was premised on application of the wrong timeliness standard and misinterpretation of the SAC's theory of liability.

Because the SAC sufficiently pled violations of the FCA, the Court does not need to address the District Court's erroneous denial of Ms. O'Neill's motion for reconsideration and request to file a Third Amended Complaint ("TAC"). Nevertheless, if the Court reaches the issue, it should reverse because the District Court applied the wrong timeliness standard and erroneously treated the additional facts learned in discovery as irrelevant to the determination of falsity. *See* AOB47-52. PST's various arguments in response are unavailing.

*First*, PST rehashes its argument that those additional facts are irrelevant to interpretation of the Claims Manual. ARB40. But for all the reasons explained above, whether PST's use of the QZ modifier was deceptive is in significant part a question of fact because it speaks to factual falsity, not purely legal falsity. Thus, even if the Court

agrees with PST and the District Court that PST made no false certification *of compliance*, that alone cannot support affirming in favor of PST.

*Second*, Ms. O'Neill does not argue for a standard that would allow courts to reconsider interlocutory orders "upon request," ARB41 (internal quotation marks omitted), nor does she argue a district court "may never consider the timeliness (or lack thereof) of a motion to reconsider an interlocutory order," ARB47. Instead, she more narrowly argues that courts are allowed to review interlocutory orders "as justice requires," *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004) (internal citation and quotation marks omitted), and that Rule 54(b)'s timeliness standard is more permissive than those applicable to final orders or judgments, AOB48-52.

Under this standard, if a litigant seeks reconsideration without a showing of just cause, changed circumstances, or permissible delay, justice would not require it. This standard thus accounts for the "gamesmanship" arguments PST marches out as part of its strawman argument against a standard Ms. O'Neill does not propose. *See* ARB47-48. And here, Ms. O'Neill showed in detail why the subsequent facts she learned in discovery constituted good cause for revisiting the District Court's prior order. AOB50-52.

*Third*, Ms. O'Neill acknowledges that some finality concerns may nevertheless be present when a court reconsiders an interlocutory order. *See* ARB48. Indeed, she agreed in the District Court that "motions for reconsideration should be infrequently brought and even more infrequently granted," and that courts disfavor them "[w]ith good

reason." ER-8. But she also explained and showed that "the circumstances of the instant case are truly exceptional." *Id.* Indeed, PST admits that finality concerns "may grow greater post-judgment." ARB48. Here, the weaker finality concerns associated with an interlocutory order did not outweigh Ms. O'Neill's strong showing that the interests of justice favor allowing reconsideration—especially since PST knew the issues in its motion to dismiss were deeply intertwined with those in the ongoing case. *See* ER-14.

*Fourth*, while PST argues over the probative value of individual pieces of additional information put forth in the TAC, *see* ARB44-45, those arguments are factual contentions concerning use of the QZ modifier that cannot be resolved on the pleadings, *see Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").[7]

---

[7] Regardless, PST's factual arguments are unpersuasive. For example, the Reasoner article stated that "*some payers* will allow a service to be billed as non-medically directed by the CRNA (QZ modifier) if a physician fails to meet all of the medical direction requirements while directing 4 concurrent procedures or fewer." ARB44 (emphasis added) (internal quotation marks omitted) (citing at-issue article). But the "payer" here did not—Noridian forbade it. AOB29, 37, 38. As to the Noridian guidance, PST argues that it does not "state that the QZ modifier may not be used when a physician supervises but does not direct care," ARB45, but Ms. O'Neill identified the portion of the guidance affirmatively and explicitly stating that "Medical supervision occurs"—not CRNA-independent care—in such circumstances, ER-32. Further, the additional Noridian guidance obtained by Ms. O'Neill's expert expressly confirmed that "medical supervision should be reported" when Medical Direction fails. ER-80 ¶ 50.

*Fifth*, PST is also wrong when it claims that Ms. O'Neill did not justify the timing of her presentation of the new evidence. For one thing, PST only addresses two of many documents obtained in discovery, so even if it is correct, it does not defeat Ms. O'Neill's showing of timeliness as to the other information. ER-30-35 (reviewing new evidence). PST's arguments concerning those two documents are incorrect as well. As to the article written by its compliance director, PST argues that Ms. O'Neill should have identified it earlier because it was published in 2014, ARB44, but PST fails to explain how Ms. O'Neill would or could have even known Ms. Reasoner was a witness or person of interest in the litigation until learning that in discovery. Likewise, the Noridian guidance is not a statute or regulation—it is guidance by a private claims-processing entity, and Ms. O'Neill did not have a full picture of the complex web of private entities and the full universe of documents and guidance in play when PST submitted claims using the QZ modifier, especially before she had the opportunity to consult her expert (indeed, her expert identified this guidance). ER-42 ¶¶ 7-8.

*Sixth*, Ms. O'Neill never claimed or suggested she *received* this new information in December 2021, *see* ARB49-50; she simply observed that December 2021 is when discovery closed, AOB52. It was reasonable for her to wait until discovery was complete and take a modest amount of time thereafter so that she could synthesize all the materials obtained and present the motion for reconsideration and the proposed TAC with all the evidence, including evidence from her expert. *See* ER-24, 31, 32, 34-35 (explaining importance of expert's testimony and involvement). Requiring her to file

her motion in the midst of discovery and upon receipt of any new document supporting her position, when she may well have needed to supplement it or file another one when other evidence later came to light, would serve no purpose.

## CONCLUSION

The Court should reverse the District Court's order dismissing the claims against PST with prejudice and without leave to amend.

Dated: September 11, 2024

Respectfully submitted,

*/s/ Glenn E. Chappell*
GLENN E. CHAPPELL
ANDREA R. GOLD
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, District of Columbia 20006
(202) 973-0900
gchappell@tzlegal.com
agold@tzlegal.com

WILMER HARRIS
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
715 Fremont Ave., Suite A
South Pasadena, CA. 91030
(626) 441-4129
*wharris@sshhzlaw.com*

MICHAEL D. SEPLOW
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
9415 Culver Blvd., #115
Culver City, CA 90232
(310) 396-0731
*mseplow@sshhzlaw.com*

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and 9th Circuit Rule 32-1(a), because it contains 6,988 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typefacing using Microsoft Office Word in Garamond 14-point font.

Dated: September 11, 2024                      /s/ *Glenn E. Chappell*
                                                Glenn E. Chappell

## CERTIFICATE OF SERVICE

I certify that on September 11, 2024, I caused to be served a true and correct copy of the foregoing document on all counsel of record via electronically filing it via the CM/ECF System. All counsel of record are registered CM/ECF users, and will be served via the platform.

/s/ *Glenn E. Chappell*
Glenn E. Chappell